## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LLOYD FREED, Individually and on Behalf of all Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNIVERSAL HEALTH SERVICES, INC., ALAN B. MILLER AND STEVE G. FILTON,<br><br>                    Defendants. | CIVIL ACTION FILE NO.<br><br>COMPLAINT - CLASS ACTION FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff and plaintiff's counsel, based upon the investigation undertaken by plaintiff's counsel (which investigation included analysis of publicly-available news articles and reports, public filings, securities analysts reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company) and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class (the "Class") consisting of all persons other than defendants who purchased the securities of Universal Health Services, Inc. ("UHS") between July 21, 2003 and February 27, 2004 seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      On March 1, 2004, before the markets opened, defendants shocked investors by withdrawing their guidance for 2004 and announcing that earnings per diluted share for the three-month period ending March 31, 2004 could be as much as 25% lower than the $0.84 per diluted share recorded in the same period in the prior year.  Defendants attributed the decline in substantial part to UHSs inability to compete effectively in two key markets in Nevada and Texas, erosion of UHS's market share, poor case management resulting in an increase in the length of patient stays beyond the period reimbursable by Medicaid or Medicare, and a pronounced increase in bad debt from uninsured patients.  The Company which had already increased its provision for doubtful accounts in the fourth quarter of 2003 to $74.3 million, or 7.8% of revenues, as compared to $58 million, or 6.9% of revenues, during the prior year's fourth quarter, said that bad debt in 2004 was likely to exceed the Company's previously reported expectation of 9.5% of revenues.

3.      The Company's share price had increased by 40% during the preceding 12 months, during which time the Company reported a bad debt allowance that was well below the industry average and otherwise failed to disclose the deterioration of its business.  During this period, insiders sold their personally held UHS shares for proceeds of $7.9 million.  On news that the Company's bad debt allowance would be increased to "catch up" for the under-reporting of bad debt in previous quarters, that the increase in bad debt allowance going forward would seriously erode future operating income, and that patient admissions were decreasing as costs and expenses increased, the Company's share price fell $9.05, or 17%, to $44.88.

2

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

5.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

6.      Venue is properly laid in this District pursuant to Section 27 of the Exchange Act (15 U.S.C §§ 78j(b) and 78t(a) and rule 10b-5 promulgated thereunder (17 C.F.R. § 240. 10b-5).  The acts and conduct complained of herein, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District, and UHS maintains its principal place of business in this District.  In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE").

## PARTIES

7.      Plaintiff purchased UHS securities, as set forth in the certification attached hereto and incorporated herein by reference.

8.      Defendant UHS is a Delaware corporation and maintains its principal executive offices at 367 South Gulph Road, King of Prussia, Pennsylvania.  UHS owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers.

9.      Defendant Alan B. Miller ("Miller") was at all relevant times UHS's President, Chief Executive Officer and Chairman of the Board.

10.      Steve G. Filton ("Filton") was at all relevant times UHS's Chief Financial Officer.

11.      Miller and Fitch are referred to collectively herein as the "Individual Defendants".

12.      By reason of their management positions, and/or membership on UHS's Board of Directors, and their ability to make public statements in the name of UHS, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) UHS to engage in the unlawful conduct complained of herein.

## MOTIVE, OPPORTUNITY AND KNOWLEDGE

13.      Because of their Board memberships and/or executive and managerial positions with UHS, each of the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of UHS particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

14.      Defendants had a duty to disseminate accurate and truthful information with respect to UHS's operations and financial condition promptly or to cause and direct that such information be disseminated and to correct promptly any previously disseminated

4

information that was misleading to the market.  As a result of their failure to do so, the price of

UHS securities was artificially inflated during the Class Period, damaging plaintiff and the Class.

15.     The Individual Defendants, because of their positions with UHS,

controlled the contents of the quarterly and annual reports, press releases and presentations to

securities analysts.  Each Individual Defendant was provided with copies of the reports and press

releases alleged herein to be misleading prior to or shortly after their issuance and had the ability

and opportunity to prevent their issuance or cause them to be corrected.  Because of their

positions and access to material non-public information available to them but not the public, each

of these defendants knew that the adverse facts specified herein had not been disclosed to and

were being concealed from the public and that the positive representations which were being

made were then false and misleading.  As a result, each of the Individual Defendants is

responsible for the accuracy of UHS's corporate releases detailed herein as "group-published"

information and is therefore responsible and liable for the representations contained therein.

16.     Each of the defendants is liable as a primary violator in making false and

misleading statements, and/or for participating in a fraudulent scheme and course of business that

operated as a fraud or deceit on purchasers of UHS securities during the Class Period.  All of the

defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, i.e.,

inflating the profits of UHS and the trading price of UHS securities by making false and

misleading statements and concealing material adverse information.  The fraudulent scheme and

course of business was designed to and did:  (i) deceive the investing public, including plaintiff

and other Class members; (ii) enable UHS insiders to sell thousands of shares of UHS stock at

artificially inflated prices for proceeds of more than $7.9 million; (iii) cause plaintiff and other

members of the Class to purchase UHS stock at inflated prices; and (iv) conceal and cover up the true financial condition of UHS.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) (3) on behalf of himself and all purchasers of UHS securities from July 21, 2003 through February 27, 2004.  Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

18.    The members of the Class are so numerous that joinder of all members is impracticable.  UHS had more than 56 million shares outstanding as of October 31, 2003.  The precise number of Class members is unknown to plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of UHS or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

19.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

20.     Plaintiff's claims are typical of the claims of the other members of the Class because plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

21.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      Whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      Whether defendants' public statements during the Class Period omitted and/or misrepresented material facts about UHS and its business; and

c.      The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATONS

### Background

23.     UHS receives payments for services rendered from private-sector insurers, the federal government under the Medicare Program, from state governments under their respective Medicaid programs and directly from uninsured patients.  The payments are for services provided by UHS hospitals and their staffs such as radiology, operating rooms, pharmacy, physiotherapy and laboratory procedures, and for the hospital room and related services such as general nursing care, meals, maintenance and housekeeping.

24.     During the two-year period preceding the Class Period, health insurance premiums, co-pay charges and deductibles steadily increased, which meant that increasing numbers of individuals were responsible for an increasing percentage of healthcare expenditures. On December 10, 2003, Susquehanna Financial Group LLP published an accounting research report in which it commented on the extent to which the burden of health care expenses had been shifted from employers, private-sector insurers and the state and federal governments to individuals, and on the implications of this shift for hospitals and employers such as those owned and operated by UHS and UHS competitors.  In this regard, the report stated, in relevant part, as follows:

> As a result of the unrelenting rise in healthcare costs, members of employee-based health plans are assuming a greater responsibility for their healthcare needs.  According to a recent Towers Perrin study completed in October 2003, employers were facing healthcare cost increases of 12% in 2004, which marks the fifth consecutive year of double-digit increases.  On a cumulative basis, employer healthcare costs have doubled since 1999.  Growth in healthcare expenses has led to employees paying more out-of-pocket expenses for healthcare and this will continue into 2004.  [. . .]

25.     Uninsured "self pay" patients account for the lion's share of hospital bad debt and, as the cost of health care shifted from the federal and state government and private-sector insurers to individuals, many analysts predicted that the increasing self-pay mix would serve as a drag on 2004 earnings growth.  Many hospitals accounted for the shift toward increasing numbers of "self pay" patients by increasing their allowances for doubtful accounts.  According to the Susquehanna report, many hospitals increased their bad debt expense as a percentage of reported revenue by at least 150 basis points over the prior two years.  In contrast, as set forth in the chart below, UHS debt allowance as a percentage of reported revenue *decreased* by 340 basis points, from 11.9% of revenue to 8.5% of revenue, over the course of the preceding eight quarters:

| QUARTER | BAD DEBT AS A PERCENTAGE OF REVENUE |
|---------|-------------------------------------|
| Sept. 03 | 8.5% |
| March 03 | 8.3% |
| Dec. 03 | 8.9% |
| Sept. 02 | 8.5% |
| June 02 | 9.5% |
| March 02 | 7.9% |
| Dec. 01 | 8.8% |
| Sept. 01 | 9.0% |
| June 01 | 11.9% |

26.     The Company continued to report stable bad debt through the fourth quarter of 2003.  In this regard, the Susquehanna report, published in December 2003, stated as follows:

> Management indicates pure uninsured patients represent 8%-10% of net patient revenue, which when combined with co-pays and deductibles provide us with a 15% total self-pay estimate.  According to last quarter's call, management indicated that it reviews the company's bad debt policy by primarily looking at cash flow from operations as a trending indicator.  In addition, the company monitors days in AR, aging of accounts and bad debt as a percentage of revenue. ***Last quarter, the company indicated that bad debt as a percentage of revenue remains stable and management sees no change in payor mix or collectability of accounts.  Bad debt expense in the acute care division was 8.5%-9.0% during Q3.  The company's French and radiation oncology centers carry lower bad debt risk than the acute care hospitals.***  [Emphasis added.]

27.     It was not until mid-February that defendants indicated that the Company's 2003 fourth-quarter bad debt allowance was being increased to catch up for previous under-reporting of bad debt and, even then, the Company did not disclose the full negative effect of the necessary adjustments on earnings.

28.     As set forth herein, unbeknownst to investor, defendants knew or recklessly disregarded, as early as July 21, 2003, that UHS's bad debt rate was not decreasing or even stable but rather was increasing at an alarming rate as increasing numbers of UHS hospital patients were forced to directly pay for their health care and/or pay higher premiums and co-payments.  Defendants concealed this fact from the investing public until the end of the Class period on March 1, 2004, they stated that bad debt as a percentage of revenue remained stable, they failed increase the Company's provision for doubtful accounts, and they thereby artificially inflating the Company's reported profit margins and operating income.

**Defendants' False and Materially Misleading Statements**

29. The Class Period begins on July 21, 2003. On that date, UHS issued a news release over the *PR Newswire* in which it announced its financial results for the second quarter ended June 30, 2003. With respect to second quarter earnings, the Company stated as follows:

> Universal Health Services, Inc. (NYSE: UHS) announced today that its net income and earnings per share (diluted) were $51.0 million and $.82 for the three-month period ended June 30, 2003, and $103.7 million and $1.66 for the six-month period ended June 30, 2003, respectively. These results represent a 19% increase in earnings per share (diluted) both for the three-month and six-month periods ended June 30, 2003 over the comparable prior year periods. [. . .]
>
> Operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended June 30, 2003 and June 30, 2002, increased to 18.3% from 17.6%. Operating margins for the Company's behavioral health hospitals owned in both periods increased to 23.8% during the second quarter of 2003 from 21.2% during the prior year quarter. The Company's operating margin (as calculated on the attached schedules of Supplemental Consolidated Income Statement Information), increased to 16.7% in the three-month period ended June 30, 2003 as compared to 16.0% in the same period of the prior year.

30. On August 13, 2003, UHS filed its quarterly report on Form 10-Q for the three months ended June 30, 2003, signed and certified by defendants Miller and Filton, in which it explained the importance of operating income and operating margins as a measure of the Company's performance, and stated that operating income and operating margins had increased. In this regard, the Form 10Q stated as follows:

> ***Management of the Company believes that operating income, which is a non-GAAP financial measure, is helpful to investors as a measure of the Company's operating performance***. The Company defines operating income as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts. Since the source of financing for the purchase of property and equipment and other assets at each hospital varies, the Company believes that measuring operating performance before capital-related costs (such as depreciation and amortization, lease and rental and interest

11

expense) provides a useful comparison of relative operating performance among its facilities. ***Operating income and operating margin (which is also a non-GAAP financial measure and computed by dividing operating income by net revenues) are used by management as analytical indicators for purposes of assessing the relative operating performance of the Company's individual hospitals and operating segments, and the overall Company. In addition, the Company's use of operating income and operating margin enables investors to compare the performance of the Company with that of others in the industry.*** To obtain a complete understanding of the Company's financial performance, operating income and operating margin should be examined in connection with net income, determined in accordance with generally accepted accounting principles, as presented in the financial statements elsewhere in this Quarterly Report on Form 10-Q.

> ***Operating income (defined as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts) increased 16% to $151 million for the three month period ended June 30, 2003 from $129 million in the comparable prior year quarter. Overall operating margins (defined as operating income divided by net revenues) were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period.*** Overall operating margins were 16.7% and 16.2% during the six month periods ended June 30, 2003 and 2002, respectively. The increase in the overall operating margins during the three and six month periods of 2003, as compared to the comparable prior year periods, resulted primarily from a decrease in other operating expenses which decreased to 23.4% and 23.1% of net revenue during the three and six month periods ended June 30, 2003, respectively, as compared to 24.6% and 24.2% during the three and six month periods ended June 30, 2002, respectively. These decreases resulted primarily from decreased pharmacy costs resulting from a new outsourcing agreement, that commenced during the third quarter of 2002, covering the provision of pharmacy services for the Company's acute care facilities located in the U.S. and Puerto Rico. [Emphasis added.]

      31.    On October 20, 2003, UHS issued a news release over the *PR Newswire* in

which it announced its financial results for the third quarter ended September 30, 2003.  The

release stated, in relevant part, as follows:

> Universal Health Services, Inc. (NYSE: UHS) announced today that its net income and earnings per share (diluted) were $47.4 million and $.76 for the three-month period ended September 30, 2003, and $151.1 million and $2.42 for the nine-month period ended September 30, 2003, respectively, after recording after

tax, non-recurring gains on sales of $4.4 million or $.07 per share (diluted) and an after tax charge for the cumulative effect of a change in accounting principle of $1.7 million or $.03 per share (diluted). Excluding the non-recurring gains and the cumulative change in accounting principle, earnings per share (diluted) for the three-month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002. . . .

Operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended September 30, 2003 and September 30, 2002, increased to 17.0% from 16.7%. Operating margins for the Company's behavioral health hospitals owned in both periods increased to 22.3% during the third quarter of 2003 from 19.2% during the prior-year quarter.

32.     The following day, on October 21, 2003, Wachovia Securities published a report on UHS in which it commented on UHS's low bad debt levels relative to its peers. In this regard, the report stated, in pertinent part, as follows:

*Bad debt remains low relative to peers because of business mix. Despite increasing bad debt throughout the hospital sector with higher unemployment, increasing copayments, and the rising number of uninsured, UHS's Q3 2003 bad debt expense actually fell to 6.9% of revenue from 7.7% last year.* On a consolidated basis, this is the lowest in our universe due to the company's business mix, with the company's non-acute bad debt ratio reducing the company average. Acute-care bad debt is 8.5-9.0% of revenue. French operations had no bad debt, and the behavioral health business has roughly 2.5% bad debt. [Emphasis added.]

33.     On November 10, 2003, UHS filed its quarterly report on Form 10-Q for the three months ended September, 2003, signed by defendants Miller and Filton. With respect to the provision for doubtful accounts, the Form 10-Q stated, in relevant part, as follows:

Management of the Company believes that operating income, a non-GAAP financial measure as defined above, is helpful to investors as measures of the Company's operating performance. Since the source of financing for the purchase of property and equipment and other assets at each hospital varies, the Company believes that measuring operating performance before capital-related costs (such as depreciation and amortization, lease and rental and interest expense) provides a useful comparison of relative operating performance among its facilities. Operating income is used by management as an analytical indicator for purposes of assessing the relative operating performance of the Company's

13

individual hospitals and operating segments, and the overall Company. In addition, the Company's use of operating income enables investors to compare the performance of the Company with that of others in the industry. To obtain a complete understanding of the Company's financial performance, operating income should be examined in connection with net income, determined in accordance with generally accepted accounting principles, as presented in the financial statements elsewhere in this Quarterly Report on Form 10-Q.

Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively. ***The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter***, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expense. [Emphasis added.]

34.    On December 10, 2003, Susquehanna Financial Group LLP published a research report in which it contrasted the general trend toward higher bad debt in 2004 in the healthcare industry and UHS's contention that its bad debt level was stable.  In this regard, the report stated, in pertinent part, as follows:

According to last quarter's call, management indicated that it reviews the company's bad debt expense policy by primarily looking at cash flow from operations as a trending indicator.  In addition, the company monitors days in AR, aging of accounts and bad debt as a percentage of revenue. ***Last quarter, the company indicated bad debt as a percentage of revenue remains stable and management sees no changes in payor mix or collectability of accounts. Bad debt expense in the acute care division was 8.5-9.0% during Q3.  The Company's French and radiation oncology centers carry lower bad debt risk than the acute care hospitals.***  [Emphasis added.]

35.    On February 18, 2004, UHS issued a news release over the *PR Newswire* in which it announced its financial results for the fourth quarter and year ended December 31,

14

2003, and, for the first time during the Class Period, reported an increase in its bad debt level.

The release stated, in relevant part, as follows:

> Universal Health Services, Inc. (NYSE: UHS) announced today its results for the fourth quarter and full year ended December 31, 2003.  Reported net income was $46.5 million or $.75 per diluted share during the fourth quarter of 2003, as compared to $43.9 million or $.69 per diluted share during the fourth quarter of 2002. For the full year of 2003, reported net income was $199.3 million or $3.20 per diluted share as compared to $175.4 million or $2.74 per diluted share during 2002.  [. . .]

> The Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter. The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts.  We expect this trend to continue until there is a notable strengthening of the labor market.

36.     The Company stated that part of the increase in bad debt allowance was due to a "true up" of bad debt from previous quarters.  In this regard, Morgan Stanley stated with respect to the Company's bad debt at acute care facilities, in a research report, issued February 18, 2004, as follows:

> ***According to the Company, bad debt at the acute care hospitals increased to roughly 9.1% of revenue from about 8.5%.  Part of the increase was due to a "true-up" of bad debt from previous quarters. . . .***

> Consolidated bad debt expense was 7.8% of revenue in 4Q3 vs 6.9% in both 3Q03 and 4Q02.  According to the company, bad debt for the acute care hospitals ran approximately 9.1% of revenue in the quarter vs. 8.5% for the year. ***While UHS did not take a bad debt write-off in 4Q03, the company noted that the higher bad debt expense was used to effectively "true-up" bad debt expense from previous periods.  The company believes that the full-year bad debt expense result of 7.2% of revenue is the correct run for 2004.***  However, we are raising our 2004 estimate to 7.4% of revenue vs. 7.1% previously.  Our adjustment reflects this quarter's data point and what seems to be a general deterioration of bad debt throughout the industry.  [Emphasis added]

37.     The statements set forth above in ¶¶29-36, including those statements made by defendants to analysts, investors and the press, referenced above, were each materially

false and misleading when made, and were known by defendants to be false or were recklessly

disregarded as such thereby, for the following reasons, among others:

        a.      UHS has unable to compete effectively in key markets;

        b.      UHS hospitals were losing better-paying patients to their

competitors and the proportion of uninsured patients, who constitute a greater credit risk, was

increasing;

        c.      Due to poor case management, certain UHS hospitals were unable

to effectively manage their caseloads and, as a consequence, had experienced an increase in the

number of Medicare patients who remained hospitalized at UHS facilities beyond the period

reimbursable by Medicaid and Medicare and that, therefore, the hospitals were not receiving full

payments for the services provided;

        d.      Defendants failed to properly write-off uncollectible receivables,

and materially overstated UHS's financial results by maintaining known uncollectible accounts

as assets during the Class Period;

        e.      The Company's allowance for doubtful accounts was insufficient

and, as a result, the Company's reported operating income was artificially inflated; and

        f.      The Company's reported operating income was not a true measure

of the Company's operating performance because defendants failed to properly deduct from

operating income the appropriate allowance for doubtful accounts.

### THE TRUTH BEGINS TO EMERGE

        38.      On March 1, 2004, before the market opened, the Company issued a news

release over the *PR Newswire* in which it stated that its earnings per share for the three-month

16

period ending March 31, 2004 could be off by as much as 25%.  In this regard, the release stated, in relevant part:

> Universal Health Services, Inc. (NYSE: UHS - News) announced today that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year. On a same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay patients continues to unfavorably impact our bad debt expense. The Company is vigorously addressing each of these areas.

39.     During a conference call for analysts held on March 1, 2004, defendants further disclosed that they would increase UHS's bad debt allowance to more than 10% of acute care revenues, that the increase was in part to "catch up" from previous quarters and that defendants had known of certain of the problems "for some time."  In this regard, defendant Filton stated, in relevant part, as follows:

> The decline in expected earnings results from a number of factors.  As we have discussed before, we are generally finding that acute admissions remain soft. Quarter to date on the same facility basis, they are still several percentage points behind the same period last year.  We continue to attribute the majority of the admissions weakness to the general malaise in the economy, particularly the jobs market, but we've also identified trends indicating that the erosion of some businesses, surgeries, for example, in certain markets, are the result of increased hospital and patient competition.  In some cases, the business that has been lost represents some of our better-paying patients.

> Bad debt expense remains a pressure point in our hospital as the level of uninsured patients being treated continues to rise. Finally a number of our hospitals have experienced an increase in length of stay, primarily Medicare patients early in 2004, and this proves problematic as we receive a fixed level of reimbursement for the stations. ***So what are we doing about these adverse filings -- certain of the problems have been well known for sometime now*** and we have already been responding to (indiscernible) others are more recent and we are still analyzing and creating additional solutions at the same time. Among these steps we have already taken are, we realize some of our hospitals that (indiscernible) for an expected seasonal surge in business that in many cases did not materialize.

Consequently several hundred MGEs (ph) had been reduced throughout our hospitals and we will look for additional salary expense savings that do not impair patient care -- specifically we have frozen hiring for many general and administrative positions and are taking steps to reduce overhead expenses throughout the organization [. . .]

> *I think that for the most part the general admission softness and pressure on bad debt are dynamics that have been present now for several quarters and for the most part again we see across all of our facilities.* [Emphasis added.]

40.     Adam Feinstein, a Lehman Brothers analyst, asked Filton the following

question:  with respect to the magnitude of the earnings decrease:

[. . .] the magnitude of the decline in earnings really stands out.  I mean, you guys are saying earnings . . . down almost 24% and it sounds like pricing's holding up pretty strong [. . .] Just in terms of the bad debt, is there any sort of catch-up charge, though that you're anticipating here?  I guess just trying to think through the issue with the bad debt.  Is there some sort of boost in reserves levels?  Thank you.

41.     Filton answered, in relevant part, as follows:

There's no conscious change, Adam, in our reserving policy or anything like that.  Again, as we talked about it in the fourth quarter, *I think the fourth quarter probably contained some intra-quarter catch up in 2004.  Look, I'm sure if we went through the detail, we would find some element of catch-up in the first quarter of '04.  I don't think it's material.*  I think the greater issue is the just the increase in the level of uninsureds.  Which, again, as I listen to what our peers have to say, seems to be what everybody, or most of my peers are experiencing.  [Emphasis added.]

42.     On March 1, 2004, TheStreet.com published an article about the UHS

announcement in which it reported on UHS's admission that its problems were not all industry

wide.  In this regard, the article stated as follows:

Some of Universal's problems may not prove contagious, however.  The company acknowledged that it had overstaffed its hospitals for business that did not materialize in the first half of the quarter.  It blamed its soft admissions, in large part, on competition from nearby physician-owned facilities.  It also said it has been treating more Medicare patients --- for longer periods --- who bring in a limited amount of revenue.

43.     The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be they type of information which is expected to be and must be disclosed.

44.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of UHS stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, earnings momentum, and future business prospects, including:

    a.     UHS has unable to compete effectively in key markets;

    b.     UHS hospitals were losing better-paying patients to their competitors and the proportion of uninsured patients, who constitute a greater credit risk, was increasing;

    c.     Due to poor case management, certain UHS hospitals were unable to effectively manage their caseloads and, as a consequence, had experienced an increase in the number of Medicare patients who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare and that, therefore, the hospitals were not receiving full payments for the services provided;

      d.     Defendants failed to properly write-off uncollectible receivables, and materially overstated UHS's financial results by maintaining known uncollectible accounts as assets during the Class Period;

      e.     The Company's allowance for doubtful accounts was insufficient and, as a result, the Company's reported operating income was artificially inflated; and

      f.     The Company's reported operating income was not a true measure of the Company's operating performance because defendants failed to properly deduct from operating income the appropriate allowance for doubtful accounts.

### DEFENDANTS' FINANCIAL STATEMENTS DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

45.     At all relevant times during the Class Period, defendants represented that UHS's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.  However, in order to artificially inflate the price of UHS's stock, defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets, stockholders' equity and earnings during the Class Period.

46.     UHS's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding UHS's  actual operating results.  Specifically, defendants caused the Company to violate GAAP by improperly failing to timely expense uncollectible receivables.

47.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statement of

Financial Accounting Concepts ("Concepts Statement") No. 1 (November 1978), one of the

fundamental objectives of financial reporting is that it provide accurate and reliable information

concerning an entity's financial performance during the period being presented.  Concepts

Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's
> financial performance during a period.  Investors and creditors often use
> information about the past to help in assessing the prospects of an enterprise.
> Thus, although investment and credit decisions reflect investors' and creditors'
> expectations about future enterprise performance, those expectations are
> commonly based at least partly on evaluations of past enterprise performance.

48.     As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial

statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be

presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a) (1).  Management is

responsible for preparing financial statements that conform with GAAP.  As noted by the AICPA

professional standards:

> financial statements are management's responsibility . . . . [M]anagement
> is responsible for adopting sound accounting policies and for establishing and
> maintaining internal control that will, among other things, record, process,
> summarize, and report transactions (as well as events and conditions) consistent
> with management's assertions embodied in the financial statements.  The entity's
> transactions and the related assets, liabilities and equity are within the direct
> knowledge and control of management . . . .  Thus, the fair presentation of
> financial statements in conformity with Generally Accepted Accounting
> Principles is an implicit and integral part of management's responsibility.

49.     UHS's reported financial results during the Class Period were materially

false and misleading because the Company failed to timely expense uncollectible receivables,

despite the fact that the Company was experiencing a significant deterioration in the quality of its

receivables.

21

50.     UHS's 10-K for year ended December 31, 2003, represented that Defendants "estimate[d] . . . provisions for doubtful accounts based on general factors such as payor mix, the agings of the receivables and historical collection experience [and] routinely review[ed] accounts receivable balances in conjunction with these factors and other economic conditions which might ultimately affect the collectibility of the patient accounts and [made] adjustments to . . . allowances as warranted."

51.     GAAP provides that an estimated loss from a loss contingency, such as the collectibility of receivables, "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies 8 (March 1975).  SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.

52.     The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."  17 C.F.R. § 210.10-01.

22

53.     In addition, GAAP provides that the objective of providing for reserves against receivables is to assure that, "[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated as the amount of cash estimated as realizable."  Accounting Research Bulletin No. 43, Restatement and Revision of Accounting Research Bulletins Chapter 3, Section 9 (June 1953).

54.     The Company also violated GAAP by failing to take a provision for bad debt in its interim financial statements:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates.  To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

Accounting Principles Board Opinion No. 28, Interim Financial Reporting  17 (May 1973)

55.     In addition, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . ." FASB Concepts Statement No. 5 (December 1984).

56.     Moreover, GAAP considers "[t]he conditions under which receivables exist [to] usually involve some degree of uncertainty about their collectibility, in which case a contingency exists . . . . [Contingency is defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain or loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur...]  Losses from uncollectible receivables shall be accrued when both conditions in paragraph 8 are met.  Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.  SFAS No. 5  22.

57.     In order to falsely and materially inflate earnings during the Class Period, UHS violated GAAP and SEC rules by failing to record additional provisions for uncollectible receivables in its financial statements related to its accounts receivables.  The Company's failure to properly account for and disclose UHS's deteriorating accounts receivables was materially misleading to investors.

58.     As a result of the foregoing accounting improprieties, Defendants caused UHS's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a.     The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (Concepts Statement No. 1,  34);

b.     The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (Concepts Statement No. 2, 132);

c.     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

24

accountability to prospective investors and to the public in general.  (Concepts Statement No. 1, 50);

d.      The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, 42);

e.      The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (Concepts Statement No. 2, 58-59);

f.      The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (Concepts Statement No. 2, 80);

g.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (Concepts Statement No. 2, 95, 97); and

h.      The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies.  (FAS No. 5).

## SCIENTER ALLEGATIONS

59.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding UHS and its business practices, their control over and/or receipt of UHS's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UHS, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.  Moreover, during the class period, as set forth on the chart below, Company insiders sold 156,202 of shares of UHS stock at artificially inflated prices for proceeds of $7,951,999 and defendant Miller, alone, sold 102,587 UHS shares for proceeds of $5,181,245.

**STEVE G. FILTON**
**CHIEF FINANCIAL OFFICER**

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|------|------------------|-------|----------|
| 7/25/03 | 4,077 | $47.83 | $195,002 |

| | | | |
|---|---|---|---|
| **TOTAL** | **4,077** | **$47.83** | **$195,002** |

## JOHN H. HERRELL
## DIRECTOR

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 12/31/03 | 91 | $53.72 | $4,888 |
| **TOTAL** | **91** | **$53.72** | **$4,888** |

## ROBERT H. HOTZ
## DIRECTOR

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 12/5/03 | 10,000 | $53.75 | $537,500 |
| **TOTAL** | **10,000** | **$53.75** | **$537,500** |

## ALAN B. MILLER
## CEO AND CHAIRMAN

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 11/13/03 | 26,010 | $49.98 | $1,299,979 |
| 9/16/03 | 25,351 | $51.28 | $1,299,999 |
| 7/29/03 | 24,940 | $51.75 | 1,290,625 |
| 7/28/03 | 26,286 | $49.10 | $1,290,642 |
| **TOTAL** | **102,587** | **$49.10 - $53.72** | **$5,181,245** |

## DEBRA K. OSTEEN
## VICE PRESIDENT

27

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 12/11/03 | 2,793 | $52.60 | 146,911 |
| 11/25/03 | 7,472 | $48.04 -- $52.73 | $394,000 |
| 7/23/03 | 2,093 | $48.04 | $100,547 |
| **TOTAL** | **12,358** | **$49.10 - $51.75** | **$641,458** |

**ANTHONY PANTALEONI
DIRECTOR**

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 11/18/03 | 2,000 | $50.75 | $101,500 |
| **TOTAL** | **2,000** | **$50.75** | **$101,500** |

**RICHARD C. WRIGHT
VICE PRESIDENT**

| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 11/26/03 | 3,800 | $52.45 | $200,000[1] |
| 11/25/03 | 16,109 | $52.65 | $848,138 |
| 7/23/03 | 5,180 | $46.77 | $242,268 |
| **TOTAL** | **25,089** | **$46.77 - $56.65** | **$1,290,406** |

60.     The Individual Defendants engaged in such a scheme to inflate the price of

UHS securities in order to: (i) protect and enhance their executive positions and the substantial

---

[1] Estimated based on average of multiple prices reported

compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of UHS securities; and (iii) sell their personally-held UHS shares at artificially inflated prices for proceeds in excess $7.9 million.

## STATUTORY SAFE HARBOR

61.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."  Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of UHS who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

62.     At all relevant times, the market for UHS stock was an efficient market for the following reasons, among others:

(a)     UHS stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient market;

(b)     As a regulated issuer, UHS filed periodic public reports with the SEC and the NASD;

(c)      UHS stock was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)      UHS regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

63.      As a result, the market for UHS securities promptly digested current information with respect to UHS from all publicly-available sources and reflected such information in UHS's stock price.  Under these circumstances, all purchasers of UHS securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### For Violations Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated hereunder
### Against All Defendants

64.      Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

65.      During the Class Period, UHS, Miller and Filton carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of UHS securities; and (iii) cause plaintiff and other members of the Class to purchase UHS stock at artificially inflated prices.  In furtherance

of this unlawful scheme, plan and course of conduct, defendants UHS, Miller and Filton took the actions set forth herein.

66.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UHS securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein. Defendants Miller and Filton are also sued herein as controlling persons of UHS, as alleged below.

67.     In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. §229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

68.     UHS and these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, business practices, performance, operations and future prospects of UHS as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of UHS's value and performance and substantial growth.  This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about UHS and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of UHS securities during the Class Period.

        69.     Defendants UHS, Miller and Filton's primary liability, and controlling person liability, arises from the following facts: (i) each of the defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) these defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

70.     Defendants UHS, Miller and Filton had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing UHS's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

71.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UHS's securities was artificially inflated during the Class Period. Unaware of the fact that the market price of UHS's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, plaintiff and the other members of the Class acquired UHS securities during the Class Period at artificially high prices and were damaged thereby.

72.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were unaware of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of UHS, which were not disclosed by these defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their UHS securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

73.     By virtue of the foregoing, these defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The
### Exchange Act Against Defendants Miller and Filton

75.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

76.     Defendants Miller and Filton were and acted as controlling persons of UHS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Each of these Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In addition, each of the defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.     As set forth above, UHS and these defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, defendants Miller and Filton are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

a.     declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

    b.  awarding plaintiff and other members of the Class damages

together with interest thereon;

    c.  awarding plaintiff and other members of the Class their costs and

expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts'

fees and other costs and disbursements; and

    d.  awarding plaintiff and other members of the Class such other and

further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

 Plaintiff hereby demands a trial by jury.


Dated: March _____, 2004    Respectfully submitted,

        **BERGER & MONTAGUE, P.C.**


        By: _____
        Sherrie R. Savett
         Robert Kauffman
         1622 Locust Street
        Philadelphia, PA 19103
        Telephone: (800) 424-6690
        Facsimile:  (215) 875-4604

        **Local Counsel**

        **MILBERG WEISS BERSHAD HYNES &**
        **LERACH LLP**
        Steven G. Schulman
        Peter E. Seidman
        One Pennsylvania Plaza
        New York, NY 10119-0165
        Tel: (212) 594-5300
        Fax: (212) 868-1229

36

**FARUQI & FARUQI, LLP**
Lubna M. Faruqi
Nadeem Faruqi
320 East 39th Street
New York, NY 10016
(212) 983-9330
Fax: (212)983-9331

**Attorneys for Plaintiff**