UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LLOYD FREED, Individually and On Behalf of All Others Similarly Situated, ) ) ) | Civ. Action No. 2:04-CV-01233-JP |
| Plaintiff, ) ) | <u>CLASS ACTION</u> |
| vs. ) ) | |
| UNIVERSAL HEALTH SERVICES, INC., et al., ) ) ) | |
| Defendants. ) ) | |
| LISELOTTE KLEIN, Individually and On Behalf of All Others Similarly Situated, ) ) | Civ. Action No. 2:04-CV-01340-JP |
| Plaintiff, ) ) | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934** |
| vs. ) ) | |
| UNIVERSAL HEALTH SERVICES, INC., et al., ) ) ) | |
| Defendants. ) ) ) | <u>JURY TRIAL DEMANDED</u> |

## NATURE OF ACTION

1.     This is a federal securities class action on behalf of all purchasers of the publicly traded securities of Universal Health Services, Inc. ("UHS" or the "Company") between July 21, 2003 and February 27, 2004 (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant UHS owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers.  Throughout the Class Period, UHS materially understated its bad debt reserves thereby overstating its reported financial results.

3.     Prior to and during the Class Period, it was well known throughout the medical industry that health care costs were on a steady rise and that more and more individual patients were becoming responsible for a greater portion of their medical expenses as opposed to third-party payors.  This trend towards self-pay – where individuals were responsible to pay hospitals for medical services – was leading to increasing levels of bad debt as the level of uninsured patients was rising.  Uninsured patients are less likely to pay their debts and therefore expose the hospital to the increased risk of non-payment.

4.     While other companies in the hospital sector were increasing their bad debt reserves prior to and during the Class Period in recognition of this trend, UHS maintained its bad debt reserves significantly below that of its peers and consistently reported that its hospitals were not experiencing the same difficulties in collecting for services rendered that its competitors were. Furthermore, during the Class Period, UHS attributed its low bad debt levels, as compared to its peers, to its mix of business and superior management.

5.     In truth and fact, however, the amount of uncollectible receivables on UHS's books was steadily increasing.  Defendants knowingly or recklessly concealed UHS's rising levels of bad debt by artificially maintaining or lowering UHS's bad debt reserves thereby materially overstating

UHS's financial results during the Class Period.  Defendants' manipulation of the doubtful or bad debt accounts falsely inflated UHS's earnings, assets and stockholders' equity earnings during the Class Period and made it appear that UHS was performing better than it actually was.

6.       During the Class Period, the price of UHS stock rose from $45.95 per share on July 21, 2003 to $53.93 per share on February 27, 2004.  While the stock was trading at these inflated levels, defendants Miller and Filton sold or otherwise disposed of their personally held UHS shares for proceeds of $6.6 million.

7.       Then, on March 1, 2004, before the markets opened, UHS shocked investors by withdrawing their guidance for 2004 and announcing that earnings per diluted share for the three-month period ending March 31, 2004 could be as much as 25% lower than the $0.84 per diluted share recorded in the same period in the prior year.  Subsequently, defendants attributed the decline in substantial part to a pronounced increase in bad debt from uninsured patients, UHS's inability to compete effectively in two key markets in Nevada and Texas, erosion of UHS's market share, and poor case management resulting in an increase in the length of patient stays beyond the period reimbursable by Medicaid or Medicare.  The Company reported that bad debt in 2004 was likely to exceed the Company's previously reported expectation of 9.5% of revenues.  Finally, defendants admitted that the increase in the Company's bad debt reserve for the fourth quarter was to "catch up" or "true-up" for under-reserving for bad debts during the fiscal year 2003.

8.       In response to these announcements, the price of UHS common stock fell $9.05, or 17%, to $44.88 on heavy trading volume.

## JURISDICTION AND VENUE

9.       The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.l0b-5).

10.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule l0b-5 promulgated thereunder (17 C.F.R. §240. l0b-5).  The acts and conduct complained of herein, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District, and UHS maintains its principal place of business in this District.  In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE").

## PARTIES

12.     Lead Plaintiff National Asbestos Workers Pension Fund ("plaintiff") purchased UHS securities, as set forth in the certification attached hereto and incorporated herein by reference.

13.     Defendant UHS is a Delaware corporation and maintains its principal executive offices at 367 South Gulph Road, King of Prussia, Pennsylvania. UHS owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers.

14.     Defendant Alan B. Miller ("Miller") was at all relevant times UHS's President, Chief Executive Officer and Chairman of the Board.  During the Class Period, Miller sold or otherwise disposed of 102,587 shares of his UHS stock for proceeds of over $5 million.

15.     Defendant Steve G. Filton ("Filton") was at all relevant times UHS's Chief Financial Officer.  During the Class Period, Filton sold or otherwise disposed of 4,077 shares of his UHS stock for proceeds of $195,002.

16.     Defendants Miller and Filton are referred to collectively herein as the "Individual Defendants."

17.     By reason of their management positions, and/or membership on UHS's Board of Directors, and their ability to make public statements in the name of UHS, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) UHS to engage in the unlawful conduct complained of herein.

18.     Because of their Board memberships and/or executive and managerial positions with UHS, each of the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of UHS particularized herein via access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

19.     Defendants had a duty to disseminate accurate and truthful information with respect to UHS's operations and financial condition promptly, or to cause and direct that such information be disseminated, and to correct promptly any previously disseminated information that was misleading to the market.  As a result of their failure to do so, the price of UHS securities was artificially inflated during the Class Period, damaging plaintiff and the Class.

20.     The Individual Defendants, because of their positions with UHS, controlled the contents of the quarterly and annual reports, press releases and presentations to securities analysts. Each Individual Defendant was provided with copies of the reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of UHS's corporate releases

detailed herein as "group-published" information and is therefore responsible and liable for the representations contained therein.

21.     Each of the defendants is liable as a primary violator in making false and misleading statements, and/or for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of UHS securities during the Class Period.  All of the defendants had motives to pursue a fraudulent scheme in furtherance of their common goal, *i.e.*, inflating the profits of UHS and the trading price of UHS securities by making false and misleading statements and concealing material adverse information.

22.     The fraudulent scheme and course of business was designed to and did: (1) deceive the investing public, including plaintiff and other class members; (ii) enable defendants to sell or otherwise dispose of thousands of shares of UHS stock at artificially inflated prices for proceeds of more than $6.6 million; (iii) cause plaintiff and other members of the Class to purchase UHS stock at inflated prices; and (iv) conceal and cover up the true financial condition of UHS.

## SUBSTANTIVE ALLEGATIONS

### UHS and Its Business

23.     Defendant UHS receives payments for services rendered from private-sector insurers, the federal government under the Medicare program, from state governments under their respective Medicaid programs and directly from uninsured patients.  The payments are for services provided by UHS hospitals and their staffs and include general surgery, internal medicine, obstetrics, emergency room care, operating room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services, physiotherapy and laboratory procedures.  Payments are also received for the hospital room and related services such as general nursing care, meals, maintenance and housekeeping.

24.     In 2001 and 2002, the hospital market sector began to experience a significant change in the mix of patients and the way they were paid.  During this time, health insurance premiums, co-

pay charges and deductibles steadily increased, which meant that increasing numbers of individuals were responsible for an increasing percentage of healthcare expenditures.  In addition, the level of uninsured patients steadily increased according to a report by Susquehanna Financial Group, LLP published on December 10, 2003, entitled "Healthcare Services" (the "Susquehanna Report").  The burden of health care expenses was shifting from employers, private-sector insurers and the state and federal governments to individuals and there were serious implications of this shift for hospitals and employers such as those owned and operated by UHS and UHS's competitors.  In this regard, the report stated, in pertinent part, as follows:

> As a result of the unrelenting rise in healthcare costs, members of employee-based health plans are assuming a greater responsibility for their healthcare needs.  According to a recent Towers Perrin study completed in October 2003, employers are facing healthcare cost increases of 12% in 2004, which makes the fifth consecutive year of double-digit increases.  On a cumulative basis, employer healthcare costs have doubled since 1999.  Growth in healthcare expenses has led to employees paying more out-of-pocket expenses for healthcare and this will continue into 2004.

25.    Many hospitals accounted for the shift toward increasing numbers of "self pay" patients by increasing their allowances for doubtful accounts.  Uninsured "self pay" patients account for the lion's share of hospital bad debt and, as the cost of health care shifted from the federal and state governments and private-sector insurers to individuals, many analysts predicted that the increasing self-pay mix would serve as a drag on 2004 earnings growth.  According to the Susquehanna Report, many hospitals *increased* their bad debt expense in 2003 as a percentage of reported revenue by at least 150 basis points over the prior two years.

## UHS Materially Understated Its Bad Debt During The Class Period

26.    During the same period that its competitors were increasing their bad debt reserves, UHS was lowering its bad debt reserves.  Indeed, UHS's debt allowance as a percentage of reported revenue *decreased* by 340 basis points, from 11.9% of revenue in June 2001 to approximately 8.5%

of revenue in 2003.  During the Class Period, defendants repeatedly represented that UHS was not subject to the changing mix of payors and was not experiencing rising bad debt.

27.     Unbeknownst to investors, UHS was materially understating its bad debt and keeping its bad debt reserve artificially low, thereby overstating the Company's financial results.

28.     This decrease reported by UHS, while other hospitals were experiencing increased bad debt expenses, was attributable, in material part, to UHS's unique corporate policy during and before the Class Period of directing all its affiliated hospitals to never designate an account as bad debt if it was less than 180 days old.  According to former UHS personnel employed in the business office of Lancaster Community Hospital ("LCH"), this corporate procedure, unbeknownst to investors, dictated that no accounts less than 180 days old were to be considered bad debt even if an account was known or anticipated to be uncollectible from the date service was provided.  For instance, at LCH, when self-pay patients were admitted to a UHS hospital through the emergency room and could not or would not provide any address, phone number, personal physician contact information or any other information that would provide a means to pursue collection for the services rendered, and when a patient had no income, assets, Medicare coverage or another type of charity-care arrangement, such accounts were not automatically considered to be uncollectible, were not turned over to a collection agency, and an appropriate amount was not set aside in the bad debt reserves.  This practice caused UHS to delay recognizing material amounts of bad debt during the Class Period.

29.     Moreover, according to a former business office employee at LCH, UHS's practice was to bill Medicare and Medicaid for all services rendered and *recognize all revenue at the time of service even if it was known or anticipated that a large portion of those claims would be denied*.  The time period for Medicare to reject the claim and for UHS to appeal the rejection to a final decision took several months.  UHS routinely kept this revenue on its books the entire time, never

taking these amounts into consideration in its bad debt accounts unless and until all final appeals were lost.  This practice also concealed the true level of bad debt at the Company.

30.     Finally, Defendants were reckless in reducing UHS's bad debt reserves during the Class Period as many of the Company's hospitals were located in less economically stable markets which therefore exposed the Company to increased risk of non-payment.  For example, LCH, situated in Lancaster, California began serving essentially as the county hospital in the fall of 2002 when High Desert Hospital, previously the only county hospital in the entire area, closed its doors.  According to a former UHS employee from the business office of LCH, it immediately began experiencing an influx of indigent patients seeking treatment through the emergency room.  Likewise, Edinburg Regional Medical Center ("ERMC") in Edinburg, Texas served as the county hospital before being purchased by UHS.  A former ERMC director explained that ERMC inherited the large indigent patient population from the date of purchase.

**Materially False and Misleading Statements Issued During the Class Period**

31.     On July 21, 2003, UHS issued a news release over the *PR Newswire* in which it announced its financial results for the second quarter ended June 30, 2003.  The Company stated with respect to earnings and operating margins:

> Universal Health Services, Inc. (NYSE: UHS) announced today that its net income and earnings per share (diluted) were $51.0 million and $.82 for the three-month period ended June 30, 2003, and $103.7 million and $1.66 for the six-month period ended June 30, 2003, respectively.  These results represent a 19% increase in earnings per share (diluted) both for the three-month and six-month periods ended June 30, 2003 over the comparable prior year periods.

> *             *             *

> Operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended June 30, 2003 and June 30, 2002, increased to 18.3% from 17.6%.  Operating margins for the Company's behavioral health hospitals owned in both periods increased to 23.8% during the second quarter of 2003 from 21.2% during the prior year quarter.  The Company's operating margin (as calculated on the attached schedules of Supplemental Consolidated Income Statement Information), increased to 16.7% in the three-month

period ended June 30, 2003 as compared to 16.0% in the same period of the prior year.

32.     On July 22, 2003, Defendants Miller and Filton participated in a conference call with analysts and investors to discuss second quarter earnings results.  In response to a question regarding UHS's bad debt expenses, defendant Filton responded:

> We actually think that our self-pay utilization as a percentage of overall utilization is pretty much pancake flat between 2003 and 2002 and have not seen significant changes.

33.     On August 13, 2003, UHS filed its quarterly report on Form l0-Q for the three months ended June 30, 2003.  The 10-Q was signed and certified by defendants Miller and Filton.  Defendants represented in the 2Q03 10-Q that operating income and operating margins were important measures of the Company's performance, and that both had increased. In this regard, the Form l0-Q stated as follows:

> Management of the Company believes that operating income, which is a non-GAAP financial measure, is helpful to investors as a measure of the Company's operating performance. The Company defines operating income as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts.  Since the source of financing for the purchase of property and equipment and other assets at each hospital varies, the Company believes that measuring operating performance before capital-related costs (such as depreciation and amortization, lease and rental and interest expense) provides a useful comparison of relative operating performance among its facilities.  ***Operating income and operating margin (which is also a non-GAAP financial measure and computed by dividing operating income by net revenues) are used by management as analytical indicators for purposes of assessing the relative operating performance of the Company's individual hospitals and operating segments, and the overall Company. In addition, the Company's use of operating income and operating margin enables investors to compare the performance of the Company with that of others in the industry***....
>
> ***Operating income (defined as net revenues less salaries, wages & benefits, other operating expenses, supplies expense and provision for doubtful accounts) increased 16% to $151 million for the three month period ended June 30, 2003 from $129 million in the comparable prior year quarter.  Overall operating margins (defined as operating income divided by net revenues) were 16.7% and 16.0% during the three month periods ended June 30, 2003 and 2002, respectively. Operating income increased 15% to $300 million for the six month period ended June 30, 2003 from $261 million in the comparable prior year period.***

34.     The statements referenced above in ¶¶31-33 were each materially false and misleading because:

(a)     Defendants had failed to properly write off uncollectible receivables throughout the Class Period, and materially overstated UHS's financial results by maintaining known uncollectible accounts as assets on UHS's balance sheet.  In fact, UHS reported receivables from uninsured patients as assets even though these were essentially uncollectible on the day the patient left the hospital;

(b)     The Company's allowance for doubtful accounts was insufficient given its bad debt exposure and, as a result, the Company's reported operating income was artificially inflated;

(c)     The Company's reported operating income was not a true measure of the Company's operating performance because defendants failed to properly deduct from operating income the appropriate allowance for doubtful accounts;

(d)     UHS's financial statements were not prepared in accordance with GAAP and were therefore materially false and misleading as detailed in ¶¶61-85;

(e)     UHS hospitals were losing better-paying patients to their competitors and the proportion of uninsured patients, who constitute a greater credit risk, was increasing; and

(f)     Due to poor case management certain UHS hospitals were unable to effectively manage their caseloads and, as a consequence, had experienced an increase in the number of Medicare patients who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare and, therefore, the hospitals were not receiving full payments for the services provided.

35.     On October 20, 2003, UHS issued a news release over the *PR Newswire* in which it announced its financial results for the third quarter ended September 30, 2003. The release stated in relevant part:

Universal Health Services, Inc. (NYSE: UHS) announced today that its net income and earnings per share (diluted) were $47.4 million and $.76 for the three-month period ended September 30, 2003, and $151.1 million and $2.42 for the nine-month period ended September 30, 2003, respectively, after recording after tax, non-recurring gains on sales of $4.4 million or $.07 per share (diluted) and an after tax charge for the cumulative effect of a change in accounting principle of $1.7 million or $.03 per share (diluted).  Excluding the non-recurring gains and the cumulative change in accounting principle, earnings per share (diluted) for the three-month period ended September 30, 2003 were $.72, an 11% increase from the earnings recorded in the third quarter of 2002.

*        *        *

Operating margins for the Company's acute care hospitals located in the U.S. and Puerto Rico owned in both the three-month periods ended September 30, 2003 and September 30, 2002, increased to 17.0% from 16.7%.  Operating margins for the Company's behavioral health hospitals owned in both periods increased to 22.3% during the third quarter of 2003 from 19.2% during the prior-year quarter.

36.    The importance of the level of bad debt expenses to the financial health of UHS and its competitors was made clear by an October 13, 2003, J.P. Morgan Securities, Inc. report, which commented that "*[w]e believe the most salient metric to watch in 3Q03 will be the magnitude of increases in bad debt ratios* – particularly among companies operating in smaller/rural markets oversaturated with economically sensitive small employers and/or Medicaid beneficiaries, as they may find bad debt ratios increase in connection with: 1) a rising uninsured population and 2) lower collection rates from self-pay patients."

37.    A week after the J.P. Morgan report referenced above, on October 21, 2003, Wachovia Securities published a report on UHS in which it commented on UHS's low bad debt levels relative to its peers.  The report stated in pertinent part:

*Bad debt remains low relative to peers because of business mix*.  Despite increasing bad debt throughout the hospital sector with higher employment, increasing copayments, and the rising number of uninsured, UHS's Q3 2003 bad debt expense actually fell to 6.9% of revenue from 7.7% last year.  On a consolidated basis, this is the lowest in our universe due to the company's business mix, with the company's non-acute bad debt ratio reducing the company average.  Acute-care bad debt is 8.5-9.0% of revenue, French operations had no bad debt, and the behavioral health business has roughly 2.5% bad debt.

38.     During a conference call with analysts also held on October 21, 2003, Defendants suggested they had continued to maintain a lower bad debt percentage because they were not experiencing the same increase in providing service to uninsured patients as others in the industry. Filton specifically stated:

> We're not seeing as some of the other companies have mentioned, a real increase in uninsured or at least uninsured after insurance patients or a difficulty in collecting from those patients.

39.     In reality, UHS hospitals had begun to experience increased numbers of self-pay patients as much as six months earlier.  For example, the ERMC in Edinburg, Texas (a small, rural market which the October 13, 2003 J.P. Morgan report warned would experience increased bad debt ratios) internally recorded that bad debt was a concern in April 2003.

40.     On November 10, 2003, UHS filed its quarterly report on Form 10-Q for the three months ended September 30, 2003, signed by defendants Miller and Filton.  With respect to the provision for doubtful accounts, defendants stated:

> Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter. Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively.  The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expense.

41.     Subsequent to the filing of UHS's 3Q03 10-Q, the stock began to rise, and was trading at $49.98 on November 13, 2003 when CEO Miller sold or otherwise disposed of over 26,000 shares (over ¼ of his shares sold during the Class Period).

42.     The statements referenced above in ¶¶35-40 were each materially false and misleading because:

(a)      Defendants had failed to properly write off uncollectible receivables throughout the Class Period, and materially overstated UHS's financial results by maintaining known uncollectible accounts as assets on UHS's balance sheet.  In fact, UHS reported receivables from uninsured patients as assets even though these were essentially uncollectible on the day the patient left the hospital;

(b)      The Company's allowance for doubtful accounts was insufficient given its bad debt exposure and, as a result, the Company's reported operating income was artificially inflated;

(c)      The Company's reported operating income was not a true measure of the Company's operating performance because defendants failed to properly deduct from operating income the appropriate allowance for doubtful accounts;

(d)      UHS's financial statements were not prepared in accordance with GAAP and were therefore materially false and misleading as detailed in ¶¶61-85;

(e)      UHS hospitals were losing better-paying patients to their competitors and the proportion of uninsured patients, who constitute a greater credit risk, was increasing; and

(f)      Due to poor case management certain UHS hospitals were unable to effectively manage their caseloads and, as a consequence, had experienced an increase in the number of Medicare patients who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare and, therefore, the hospitals were not receiving full payments for the services provided.

43.      On December 10, 2003, Susquehanna Financial Group, LLP published to Susquehanna Report, a research report, in which it contrasted the general trend toward higher bad debt in 2004 in the healthcare industry to UHS's contention that its bad debt level was stable. In this regard, the Susquehanna Report stated, in pertinent part, as follows:

> According to last quarter's call, management indicated that it reviews the company's bad debt expense policy by primarily looking at cash flow from operations as a

trending indicator.  In addition, the company monitors days in AR, aging of accounts and bad debt as a percentage of revenue.  ***Last quarter, the company indicated bad debt as a percentage of revenue remains stable and management sees no changes in payor mix or collectability of accounts.  Bad debt expense in the acute care division was 8.5-9.0% during Q3.  The Company's French and radiation oncology centers carry lower bad debt risk than the acute care hospitals***.

44.     A December 31, 2003 Deutsche Bank report, based on findings published by the Center on Budget and Policy Priorities, stated that bad debt would remain an issue for hospitals in 2004, as Medicaid cuts would cause further uncompensated care for many hospitals.  Deutsche Bank's report further stated the cuts were expected to be significant in the five key "high risk" states of Texas, California, Tennessee, Florida and Missouri, leaving UHS with significant exposure due to the number of its facilities in those locations.

45.     During the 22nd Annual J.P. Morgan Healthcare Conference held in mid-January 2004, CEO Alan Miller stated that UHS's bad debt ratio had not been increasing at the same rate as its peers because UHS had not experienced a material adverse change in self-pay revenues in its markets or in the collection rates and expected the ratio to remain stable in the near term.  Miller failed to disclose that UHS's bad debt ratios were superior to other hospitals' due to improper accounting practices.

46.     The statements referenced above in ¶¶43-45 were each materially false and misleading for the reasons set forth in ¶42 above.

## UHS Admits Its Understated Bad Debt During the Class Period

47.     Just over 30 days after CEO Alan Miller had reassured investors at the 22nd Annual J.P. Morgan Healthcare Conference that, unlike its peers, UHS's bad debt ratio had not been increasing, UHS issued a news release over the *PR Newswire* on February 18, 2004.  The news release announced UHS's financial results for the fourth quarter and year ended December 31, 2003.  For the first time during the Class Period UHS reported an increase in its bad debt level.  The release stated in relevant part:

Universal Health Services, Inc. (NYSE: UHS) announced today its results for the fourth quarter and full year ended December 31, 2003.  Reported net income was $46.5 million or $.75 per diluted share during the fourth quarter of 2003, as compared to $43.9 million or $.69 per diluted share during the fourth quarter of 2002.  For the full year of 2003, reported net income was $199.3 million or $3.20 per diluted share as compared to $175.4 million or $2.74 per diluted share during 2002.

*        *        *

**The Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter.**  The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts.  We expect this trend to continue until there is a notable strengthening of the labor market.

48.     The Company announced an increase in its bad debt level for the first time in mid-

February 2004 and attributed part of the increase to a "true up" of bad debt from previous quarters.

In this regard, Morgan Stanley stated in a February 18, 2004 research report:

**According to the Company, bad debt at the acute care hospitals increased to roughly 9.1% of revenue from about 8.5%.  Part of the increase was due to a "true-up" of bad debt from previous quarters**.

*        *        *

Consolidated bad debt expense was 7.8% of revenue in 4Q03 vs. 6.9% in both 3Q03 and 4Q02.  According to the company, bad debt for the acute care hospitals ran approximately 9.1% of revenue in the quarter vs. 8.5% for the year.  **While UHS did not take a bad debt write-off in 4Q03, the company noted that the higher bad debt expense was used to effectively "true-up" bad debt expense from previous periods.  The company believes that the full-year bad debt expense result of 7.2% of revenue is the correct run rate for 2004**.  However, we are raising our 2004 estimate to 7.4% of revenue vs. 7.1% previously.  Our adjustment reflects this quarter's data point and what seems to be a general deterioration of bad debt throughout the industry.

49.     On March 1, 2004, before the market opened, the Company issued a news release

over the *PR Newswire* in which it stated that its earnings per share for the three-month period ending

March 31, 2004 could be off by as much as 25%.  The release stated:

Universal Health Services, Inc. (NYSE: UHS) announced today that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year.  On a same facility basis, the Company's acute care hospitals have

continued, in the first two months of 2004, to experience a decline in inpatient admissions.  Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay.  In addition, the rising level of uninsured and self-pay patients continues to unfavorably impact our bad debt expense. The Company is vigorously addressing each of these areas.

50.    The announcement that bad debt numbers had unexpectedly increased is belied by the systematic reporting requirements of information related to bad debt which UHS imposed on its member hospitals.  Former employees from numerous hospitals explained the ability of the corporate office to access financial information in electronic format for all of its hospitals.  For example, at LCH all revenue was recognized upon delivery of service and posted in the hospital's computerized billing system.  That data was sent to UHS's corporate office in electronic format approximately three to four times per day.  Additionally, bi-weekly and monthly reports tracking accounts receivable and bad debt were provided to the appropriate executives at UHS's corporate headquarters.  Similarly, former UHS personnel from the office of the controller at Summerlin Hospital Medical Center ("SHMC") confirmed that each UHS Las Vegas area hospital submitted its financial information, including uncollectible receivable account amounts, to Valley Health Systems, a centralized business office responsible for billing patients, collecting receivables and writing off receivables that were not collected.  Valley Health Systems consolidated the financial information from the hospitals and forwarded it to UHS's corporate accounting department at least on a monthly basis.  A former director of the Midwest Center for Youths and Family Services ("Midwest Center") stated there are "no surprises or sudden changes" when it comes to bad debt levels as it is known at the point of service whether a patient is uninsured, and because any indicators for potential bad debt problems would appear in reports submitted to UHS corporate offices for monthly management meetings.   Accordingly, UHS executives were well aware of the status of bad debt accounts in ample time to appropriately record such information in UHS financials.

51.     During a conference call with analysts held on March 1, 2004, defendants further disclosed that they would increase UHS's bad debt allowance to ***more than 10%*** of acute care revenues, that the increase was in part to "catch up" from previous quarters and that defendants had known of certain of the problems "for some time."  In this regard, defendant Filton stated, in relevant part, as follows:

> The decline in expected earnings results from a number of factors.  As we have discussed before, we are generally finding that a (indiscernible) remain solid.  According today to the same facility basis there's still several percentage points behind the same period last year.  We continue to attribute the majority of the admission's weakness to the general malaise in the economy particularly the jobs market but we've also identified trends indicating that the erosion of some business surgeries for example in certain markets are results of increased hospital and position competition.  In some cases the business that has been lost represent some of our better paying ... patients.  Bad debt expense remains a pressure point in our hospital as the level of uninsured patients being treated continues to rise. Finally a number of our hospitals have experienced an increase in length of stay, primarily Medicare patients early in 2004, and this proves problematic as we receive a fixed level of reimbursement for the stations. ***So what are we doing about these adverse filings – certain of the problems have been well known for sometime now*** and we have already been responding to (indiscernible) others are more recent and we are still analyzing and creating additional solutions at the same time.  Among these steps we have already taken are, we realize some of our hospitals that (indiscernible) for an expected seasonal surge in business that in many cases did not materialize.  Consequently several hundred MGEs (ph) had been reduced throughout our hospitals and we will look for additional salary expense savings that do not impair patient care – specifically we have frozen hiring for many general and administrative positions and are taking steps to reduce overhead expenses throughout the organization....
>
>       *... I think that for the most part the general admission softness and pressure on bad debt are dynamics that have been present now for several quarters and for the most part, again, we see across all of our facilities*.

52.     The reasons provided above for the unexpected decline in earnings, however, do not hold up to the scrutiny of former employees of various UHS hospitals.  These employees report that issues such as length of stay and increases in the numbers of self-pay patients were either non-existent, or had been recognized and discussed well before the Class Period.  For example, a former ERMC director confirmed that UHS management had been focusing on the length of stay issued at the ERMC facility from the beginning of 2003, if not earlier.  As ERMC was a for-profit hospital,

one of the main focuses for increasing profits was keeping expenses down, in part, through lower

lengths of stay.  The former director further explained that the length of stay issue wasn't related to

patients staying past a number of days for which Medicare would reimburse the hospital, but rather,

was related to the indigent patient population who had no coverage, and likely no ability to pay, from

the point of initial service, regardless of the length of stay.  Similarly, a former business development

employee from the Midwest Center explained that it is known whether a patient is uninsured or a

Medicare patient at the time of service, and that due to the nearly daily reporting of such information

from the hospitals to the corporate office, unexpected spikes in those numbers are virtually

impossible.

53.      During the March 1st call, Adam Feinstein, a Lehman Brothers analyst, asked Filton

the following question with respect to the magnitude of the earnings decrease:

> [T]he magnitude of the decline in earnings really stands out – I mean you guys are saying earnings down almost 25 percent and it sounds like pricing is holding up pretty strong.
>
> *      *      *
>
> Just I guess in terms of the bad debt, is there any sort of catch-up charge, though, that you are anticipating here?  I guess, just trying to really think through just the issue with the bad debt – I mean is there some sort of boost in the reserve levels?

Filton answered as follows:

> There is no conscious change, Adam, in our reserving policy or anything like that.  Again, as we talked about in the fourth quarter, ***I think the fourth quarter probably contained some intra or ... quarter catch-up in 2004.  Look, I'm sure if we went through the detail we would find some element of catch-up in the first quarter of '04.  I don't think it is material***.  I think the greater issue is just the increase in the level of uninsureds, which, again, as I listen to what my peers have to say seem to be what everybody or most of our peers are experiencing.

54.      On this news, UHS's stock dropped to $44.88 per share on volume of 6.7 million

shares, some 21% below the Class Period high of $56.95 per share.

55.     On March 1, 2004, *TheStreet.com* published an article about the UHS announcement in which it reported on UHS's admission that its problems were not all industry-wide.  In this regard, the article stated as follows:

> Some of Universal's problems may not prove contagious, however. The company acknowledged that it had overstaffed its hospitals for business that did not materialize in the first half of the quarter.  It blamed its soft admissions, in large part, on competition from nearby physician-owned facilities.  It also said it has been treating more Medicare patients – for longer periods – who bring in a limited amount of revenue.

56.     Similarly, a news article on March 19, 2004, reported that "[s]ome of Universal's problems appear to be company-specific.  Competition in some markets hit admissions, making it the only publicly traded company with same-facility admissions declines in its acute-care hospitals in the fourth quarter, when many logged notable increases."

**Defendants Miller and Filton Benefit from Inflation
of UHS Stock Price Caused by UHS's False Statements**

57.     The Individual Defendants engaged in a scheme to inflate the price of UHS securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of UHS securities; and (iii) sell their personally-held UHS shares at artificially inflated prices for proceeds in excess $6.6 million.

58.     During the Class Period, as set forth on the chart below, defendants sold or otherwise disposed of 131,753 shares of UHS stock at artificially inflated prices for proceeds of $6,666,653.

| STEVE G. FILTON CHIEF FINANCIAL OFFICER | | | |
|---|---|---|---|
| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
| 7/25/03 | 4,077 | $47.83 | $195,002 |
| **TOTAL** | **4,077** | **$47.83** | **$195,002** |

| ALAN B. MILLER CEO AND CHAIRMAN | | | |
|---|---|---|---|
| DATE | NUMBER OF SHARES | PRICE | PROCEEDS |
| 11/13/03 | 26,010 | $49.98 | $1,299,979 |
| 9/16/03 | 25,351 | $51.28 | $1,299,999 |
| 7/29/03 | 24,940 | $51.75 | $1,290,625 |
| 7/28/03 | 26,286 | $49.10 | $1,290,642 |
| **TOTAL** | **102,587** | **$49.10-$51.75** | **$5,181,245** |

59.     Defendants were additionally motivated to falsely inflate UHS's financial results due to the financial incentives they were granted under the restricted stock award program and under the loan forgiveness program of UHS.  In 2002 Miller had been granted 319,490 shares of restricted stock worth $16.3 million.  The shares issued to Miller were scheduled to vest on the third, fourth and fifth anniversary dates of the award and would be vested only if the Company achieved a 14% cumulative increase in earnings during the two-year period ending December 31, 2004 compared to the year ended December 31, 2002.  Filton was also granted 17,528 shares of restricted stock in 2002 pursuant to this program.  At the time the shares were granted to Filton, they were worth $896,000.  During the Class Period, Miller was forgiven $7.4 million for a loan made by the Company to pay his tax liabilities incurred upon the exercise of stock options.

60.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, defendants,

by virtue of their receipt of information reflecting the true facts regarding UHS and its business practices, their control over and/or receipt of UHS's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UHS, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants played an active role in monitoring the financial status of each of its hospitals and medical facilities.  Individuals who were formerly employed as directors of various divisions in the Midwest Center, the ERMC and in the business office at the LCH, describe a daily monitoring by the corporate office of length of stay, accounts receivable, and other categories of information which comprise UHS financial reports.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of personnel at the highest level of the Company, including the Individual Defendants.

**UHS's False Financial Statements**

61.     In order to artificially inflate the price of UHS's stock, defendants used improper accounting practices in violation of Generally Accepted Accounting Principles ("GAAP") and SEC reporting requirements to falsely inflate UHS's earnings, assets and stockholders' equity earnings during the Class Period, including the defendants' failure to establish and maintain adequate allowances for uncollectible receivables, particularly for its acute care business.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).  Management is responsible for preparing financial statements that conform with GAAP.  As noted by the American Institute of Certified Public Accountants ("AICPA") professional standards:

[F]inancial statements are management's responsibility.... [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

62.    UHS's reported financial results during the Class Period were materially false and misleading because the Company failed to timely expense uncollectible receivables, despite the fact that the Company was experiencing a significant deterioration in the quality of its receivables.

63.    UHS's 10-K for the year ended December 31, 2003, represented that defendants "estimate[d] provisions for doubtful accounts based on general factors such as payor mix, the agings of the receivables and historical collection experience [and] routinely review[ed] accounts receivable balances in conjunction with these factors and other economic conditions which might ultimately affect the collectibility of the patient accounts and [made] adjustments to ... accounts as warranted."

64.    GAAP provides that an estimated loss from a loss contingency, such as the collectibility of receivables, "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.  Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies, ¶8 (March 1975).  SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.  SFAS No. 5, ¶22 also states:

[T]he conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which case a contingency exists as defined in paragraph 1.  Losses from uncollectible receivables shall be accrued when both conditions in paragraph 8 are met.  Those conditions may be considered in relation to

individual receivables or in relation to groups of similar types of receivables.  If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

65.     In addition, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated."  FASB Concepts Statement No. 5, ¶87.

66.     In order to falsely and materially inflate earnings during the Class Period, UHS violated GAAP and SEC rules by failing to record additional provisions for uncollectible receivables in its financial statements related to its accounts receivables.  As alleged herein, UHS's business was changing such that patients were personally responsible for a greater portion of charges for services.  Patients were more likely to default on payments owed to UHS.  Despite this increased risk, defendants failed to increase UHS's provision for doubtful accounts receivable during the Class Period and, in fact, *reduced* the provision for uncollectible receivables as a percentage of revenues from previous years.  The following chart sets forth UHS's provisions for accounts receivable from 1Q03-1Q04.

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| | **3/31/03** | **6/30/03** | **9/30/03** | **12/30/03** | **3/31/04** |
| Provision for Doubtful Accounts Receivable as a % of Revenues | 7.31% | 6.83% | 6.95% | 7.83% | 8.42% |

67.     The provision for doubtful accounts for Acute Care had a similar trend:

| | **3/31/03** | **6/30/03** | **9/30/03** | **12/30/03** | **3/31/04** |
|---|---|---|---|---|---|
| Provision for Doubtful Acute Care Accounts Receivable as a % of Acute Care Revenues | 8.8% | 8.6% | 8.5% | 10.4% | 10.5% |

68.     As defendants knew or recklessly ignored, prior to and during the Class Period, UHS improperly delayed the write-off of uncollectible accounts.  Despite a pronounced increase in

uncollectible receivables from self-insured patients during the Class Period, UHS, inexplicably decreased its provision for uncollectible accounts.

69.     UHS's reduction in its provision for uncollectible accounts was in marked contrast to that of its competitors.

70.     Indeed, former UHS employees stated that during the Class Period, the Company mandated that no accounts less than 180 day delinquent be written off.  UHS's policy of failing to timely write off accounts that were delinquent understated the Company's historical loss experience. In this way, UHS deceptively began to reduce its provision for doubtful accounts during the Class Period.  Moreover, when analysts questioned management about why UHS's provision for doubtful accounts was less than that of its peers, defendants falsely stated that the reduced provision was attributable to its "business mix."

71.     Prior to the Class Period, the AICPA, in 2001, issued an alert which stated, in pertinent part, that:

> While changes in [accounting] estimates may be acceptable when supported by real economic facts, changing estimates when the underlying economics of the business do not support the change, and without any disclosure, is inappropriate. You may need to review changes in estimates to determine that they are appropriate, timely, and adequately supported with sufficient competent evidential matter.  In addition, the company's disclosures need to comply with the requirements of APB Opinion No. 20, Accounting Changes, regarding the need to disclose material changes in accounting estimates. Paragraph 33 of APB Opinion No. 20 specifically requires companies to disclose the effect on income and per share amounts for a change that affects several future periods.

72.     In addition, the SEC issued numerous statements to its registrants, their auditors, and to accounting and auditing standards-setters warning them to be ever vigilant about the fairness of financial reporting practices in general and accounting reserve practices in particular after having witnessed alarming financial reporting abuses prior to and during the Class Period.

73.     Nonetheless, defendants, in violation of GAAP, intentionally understated UHS's provision for doubtful accounts during the Class Period.  As a result, UHS's reported earnings

during the Class Period were materially inflated; UHS failed to file financial statements with the SEC that conformed to the requirements of GAAP; and defendants disseminated financial statements of UHS that were presumptively misleading and inaccurate.

74.    Concerning the Company's financial statement disclosures, GAAP, in Accounting Principles Board ("APB") Opinion No. 22, ¶7, provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company.  In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users.  (APB Opinion No. 22, ¶8.)

75.    Accordingly, GAAP, in ¶12 of APB Opinion No. 22 provides:

In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:

(a)    A selection from existing acceptable alternatives;

(b)    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in industry;

(c)    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

76.    In violation of GAAP, UHS failed to disclose its policy of accounting for doubtful accounts.  After the end of the Class Period, UHS's financial statements for the year ended December 31, 2003 filed with the SEC on Form 10-K disclosed:

Provision for Doubtful Accounts:  Collection of receivables from third-party payors and patients is our primary source of cash and is critical to our operating performance. Our primary collection risks relate to uninsured patients and the portion of the bill which is the patient's responsibility, primarily co-payments and deductibles. We estimate our provisions for doubtful accounts based on general factors such as payor mix, the agings of the receivables and historical collection experience. We routinely review accounts receivable balances in conjunction with

these factors and other economic conditions which might ultimately affect the collectibility of the patient accounts and make adjustments to our allowances as warranted. Significant changes in business office operations, payor mix, economic conditions or trends in federal and state governmental health coverage could affect our collection of accounts receivable, cash flow and results of operations. At December 31, 2003 and 2002, accounts receivable are recorded net of allowance for doubtful accounts of $56.4 million and $59.1 million, respectively.

77.     Indeed this was the first time UHS disclosed its policy of accounting for doubtful accounts.  In fact, UHS's 2003 Form 10-K disclosed for the first time that it deemed such policy to be a "critical" accounting policy.

78.     Ultimately, in the third quarter of 2003, UHS had to begin to increase the provision and in the fourth quarter of 2003 and the first quarter of 2004, increased the provision substantially. Had UHS used the same ratio it used in the fourth quarter of 2003 (7.83%) to calculate its provision in prior quarters, its allowance would have been materially higher and reported earnings would have been materially lower.

|  | 2nd Q03 | 3rd Q03 |
|---|---|---|
| Provision using 12/31/03 rate (7.83%) | $     70,701 | $     70,183 |
| Reported Provision | $     61,702 | $     62,288 |
| Difference | $     8,999 | $     7,895 |
| Difference reduced for tax effect | $     3,363 | $     2,944 |
| Effect of difference on Net Income | $     5,636 | $     4,951 |
| Reported Net Income | $     50,950 | $     47,362 |
| Actual Net Income using 12/31/03 rate for provision | $     45,314 | $     45,999 |

79.     The rate used in the first quarter of 2004 (8.42%) was even higher.  Using this ratio would have resulted in even lower net income.

80.    The Company's failure to properly account for and disclose UHS's deteriorating accounts receivables was materially misleading to investors.

81.    Although UHS has now admitted, albeit backhandedly, that its financial statements issued during the Class Period were materially false and misleading, defendants have continued their financial deception by failing to restate UHS's previously misstated financial statements in accordance with GAAP.

82.    GAAP provides that previously issued financial statements which are materially misstated as a result of an oversight or a misuse of facts that existed at the time are to be retroactively restated.  *See, e.g*., APB Opinion No. 20.

83.    In violation of GAAP, UHS's understated provision for doubtful accounts during the Class Period was improperly corrected by prospective increases to the provision after the Class Period when GAAP requires that UHS's materially false and misleading Class Period financial statements be restated.

84.    As a result of the foregoing accounting improprieties, defendants caused UHS's reported financial results to violate, among other things, the following provisions of GAAP for which each defendant is necessarily responsible:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities.  (Concepts Statement No. 1, ¶34);

(b)    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying

upon the report would have been changed or influenced by the inclusion or correction of the item. (Concepts Statement No. 2, ¶132);

        (c)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (Concepts Statement No. 1, ¶50);

        (d)     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (Concepts Statement No. 1, ¶42);

        (e)     The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (Concepts Statement No. 2, ¶¶58-59);

        (f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (Concepts Statement No. 2, ¶80);

        (g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (Concepts Statement No. 2, ¶¶95, 97); and

(h)     The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies. (FAS No. 5.)

85.     The undisclosed adverse financial information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## NO SAFE HARBOR

86.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Further, none of the statements pleaded herein were identified as "forward-looking statements" when made.  Nor was it stated that actual results "could differ materially from those projected."   Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for any forward- looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of UHS who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

87.     At all relevant times, the market for UHS stock was an efficient market for the following reasons, among others:

(a)     UHS stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient market;

(b)     As a regulated issuer, UHS filed periodic public reports with the SEC and the National Association of Securities Dealers;

(c)     UHS stock was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)     UHS regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

88.     As a result, the market for UHS securities promptly digested current information with respect to UHS from all publicly-available sources and reflected such information in UHS's stock price.  Under these circumstances, all purchasers of UHS securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and
### Rule l0b-5 Promulgated Thereunder Against All Defendants

89.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

90.      During the Class Period, UHS, Miller and Filton carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other class members, as alleged herein; (ii) artificially inflate and maintain the market price of UHS securities; and (iii) cause plaintiff and other members of the Class to purchase UHS stock at artificially inflated prices, and in furtherance of this unlawful

scheme, plan and course of conduct, defendants UHS, Miller and Filton took the actions set forth herein.

91.     These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UHS securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule l0b-5 (17 C.F.R. §240.10b-5)).  These defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  Defendants Miller and Filton are also sued herein as controlling persons of UHS, as alleged below.

92.     In addition to the duties of full disclosure imposed on these defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to disseminate truthful information promptly that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.04), Regulation S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly-traded securities would be based on truthful, complete and accurate information.

93.     UHS and these defendants, individually and in concert, directly and indirectly, by the use of the mails or other means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of UHS as specified herein.  These defendants employed devices, schemes and artifices to defraud, while in possession of material

adverse non-public information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of UHS's value and performance and substantial growth. This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about UHS and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of UHS securities during the Class Period.

94.     Defendants UHS's, Miller's and Filton's primary liability, and controlling person liability, arises from the following facts: (i) each of the defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) these defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

95.     Defendants UHS, Miller and Filton had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing UHS's operating conditions, business

practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

96.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UHS securities was artificially inflated during the Class Period.  Unaware of the fact that the market price of UHS shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by these defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these defendants but not disclosed in public statements during the Class Period, plaintiff and the other members of the Class acquired UHS securities during the Class Period at artificially high prices and were damaged thereby.

97.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were unaware of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of UHS, which were not disclosed by these defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their UHS securities during the Class Period, or, if they had acquired such securities during the Class Period, they should not have done so at the artificially inflated prices which they paid.

98.     By virtue of the foregoing, these defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Miller and Filton

100.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

101.    Defendants Miller and Filton were and acted as controlling persons of UHS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Each of these defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

102.    In addition, each of the defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

103.    Miller's control of UHS was dramatic.  Due to the structure of UHS and four types of common stock with different ratios for voting and for appointing directors, Miller held less than 1.5% of the outstanding shares of UHS and controlled nearly 84% of the voting power of the

Company.  He had the lion's share of the Class A securities and had the right to elect six of the eight board directors of the Company.

104.    As set forth above, UHS and these defendants each violated Section 10(b) and SEC Rule l0b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, defendants Miller and Filton are liable pursuant to Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)).  As a direct and proximate result of these defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of itself and all purchasers of UHS securities from July 21, 2003 through February 27, 2004.  Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

106.    The members of the Class are so numerous that joinder of all members is impracticable.  UHS had more than 56 million shares outstanding as of October 31, 2003.  The precise number of class members is unknown to plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the class members can be ascertained from the books and records of UHS or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

107.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

108.    Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff's and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

109.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

110.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether defendants' public statements during the Class Period omitted and/or misrepresented material facts about UHS and its business; and

(c)    The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     Awarding plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  September 29, 2004

LAW OFFICES BERNARD M.
  GROSS, P.C.
DEBORAH R. GROSS (DG639)

_____
               DEBORAH R. GROSS

1515 Locust Street, 2nd Floor
Philadelphia, PA  19102
Telephone:  215/561-3600
215/561-3000 (fax)

Liaison Counsel

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
LAURA M. ANDRACCHIO
SUSAN G. TAYLOR
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)
200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Lead Counsel for Plaintiff

S:\CasesSD\UniversalHealth\CPT00012805.doc