# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------X

LLOYD FREED, Individually and on Behalf
of Others Similarly Situated,                  :

                                   :     Civil Action No.  2:04-CV-01233-JP

          Plaintiff,          :

                                   :     <u>CLASS ACTION</u>

          v.               :

                                   :

UNIVERSAL HEALTH SERVICES,
INC., ALAN B. MILLER and                       :
STEVE G. FILTON,                               :

                                   :

          Defendants.      :

-------------------------------------------------------------X

LISELOTTE KLEIN, Individually and On
Behalf of All Others Similarly Situated,       :     Civil Action No. 2:04-CV-01340-JP

                                 :

          Plaintiff,          :

                                 :

          vs.             :

                                 :

UNIVERSAL HEALTH SERVICES,
INC., ALAN B. MILLER and                       :
STEVE G. FILTON,                               :

                                 :

          Defendants.      :

-------------------------------------------------------------X

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS
## <u>THE AMENDED CONSOLIDATED CLASS ACTION COMPLAINT</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................III

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND INFORMATION ........................................................................................1

THE ALLEGATIONS IN THE COMPLAINT ......................................................................2

SUMMARY OF ARGUMENT .............................................................................................4

ARGUMENT ........................................................................................................................6

POINT I.  THE PLEADING REQUIREMENTS APPLICABLE TO PLAINTIFFS'
10b-5 CLAIM ...........................................................................................................6

POINT II.  PLAINTIFFS' ALLEGATIONS CONCERNING BAD DEBT
RESERVES DO NOT ALLEGE A 10b-5 CLAIM ......................................................9

 A. The Alleged Misstatements in the Class Period...................................................10

 B. Plaintiffs Have Failed to Plead Facts to Support Their Contention that
Defendants Made Misstatements ........................................................................12

 C. The Alleged Misstatements Concerning  Bad Debt Reserves Are Not
Material ..............................................................................................................24

 D. Plaintiffs' Allegations Concerning Bad Debt Reserves Do Not State a 10b-
5 Claim ..............................................................................................................26

  1. No Allegation that UHS Engaged in Unreasonable Accounting
Practices ................................................................................................27

  2. No Particulars Concerning the Magnitude of the Alleged
Understatement of UHS's Bad Debt Reserves.........................................30

  3. An Alleged Failure to Reserve Unidentified Purportedly
Uncollectible Receivables Does Not Support a 10b-5 Claim ..................31

  4. Plaintiffs Have Not Stated a 10b-5 Claim Based on UHS's
Predictive Statements Concerning Bad Debt Reserves............................34

  5. Plaintiffs Have Not Alleged Any Characterization by UHS of Its
Bad Debt Reserves .................................................................................37

POINT III.  PLAINTIFFS' 10b-5 CLAIM SHOULD BE DISMISSED FOR
FAILURE TO ALLEGE FACTS GIVING RISE TO A STRONG
INFERENCE OF SCIENTER.....................................................................................39

 A. Plaintiffs Fail to Allege Motive and Opportunity ...............................................40

 B. Plaintiffs Have Not Alleged Circumstantial Evidence of Conscious
Misbehavior or Recklessness .............................................................................46

POINT IV.  PLAINTIFFS' 10b-5 CLAIM SHOULD BE  DISMISSED FOR LACK
OF LOSS CAUSATION.............................................................................................47

**TABLE OF CONTENTS**
(Continued)

**Page**

POINT V.  PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED ....................52

POINT VI.  THE COMPLAINT SHOULD BE DISMISSED WITH
    PREJUDICE AND WITHOUT LEAVE TO AMEND ...................................52

CONCLUSION .................................................................................................................54

# TABLE OF AUTHORITIES

Page

**CASES**

Acito v. IMCERA Group, Inc.,
  47 F.3d 47 (2d Cir. 1995)................................................................................... 39

Alfaro v. E.F. Hutton & Co., Inc.,
  606 F. Supp. 1100 (E.D. Pa. 1985) ................................................................... 35

Christidis v. Pennsylvania Mortgage Trust,
  717 F.2d 96, 100 (3d Cir. 1983).......................................................27, 28, 29, 34

DeBartolo v. Coopers & Lybrand,
  928 F. Supp. 557 (W.D. Pa. 1996) .................................................................... 48

Eisenberg v. Gagnon,
  766 F.2d 770 (3d Cir. 1983),
  cert. denied, 474 U.S. 946 (1984) ..................................................................... 36

EP Medsystems v. Ecocath, Inc.,
  235 F.3d 865 (3d Cir. 2000)......................................................................... 39, 47

Ernst & Ernst v. Hochfelder,
  425 U.S. 185 (1976) .......................................................................................... 39

GSC Partners CDO Fund v. Washington,
  368 F.3d 228, 236 (3d Cir. 2004)................................................................ passim

Hinerfeld v. United Auto Group,
  1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) .................................. 39

Ieradi v. Mylan Lab, Inc.,
  230 F.3d 594 (3d Cir. 2000) ............................................................................... 8

In re Adams Golf Inc. Sec. Lit.,
  381 F.3d 267 (3d Cir. 2004).............................................................................. 20

In re Advanta Corp. Sec. Litig.,
  180 F.3d 525 (3d Cir. 1999)........................................................................ passim

In re Aetna Inc. Sec. Litig.,
  34 F. Supp. 2d 935 (E.D. Pa. 1999) ............................................................ passim

In re Alpharma Sec. Litig.,
  372 F.3d 137 (3d Cir. 2004)........................................................................ passim

In re ATI Technologies, Inc. Sec. Litig.
  216 F. Supp. 2d 418 (E.D. Pa. 2002) ................................................................. 9

In re Burlington Coat Factory Sec. Litig.,
  114 F.3d 1410 (3d Cir. 1997)...................................................................... passim

In re Cybershop.com Sec. Litig.,
  189 F. Supp. 2d 214 (D.N.J. 2002) ................................................................... 48

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*In re Digital Islands Sec. Litig.*,
   357 F.3d 322 (3d Cir. 2004) ................................................................ 7, 52, 53

*In re First Union Corp. Sec. Litig.*,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................ 42

*In re Healthcare Group Inc. Sec. Litig.*,
   1993 U.S. Dist. LEXIS 2847 (E.D. Pa. Mar. 1, 1993) ................................ 38, 39

*In re Ikon Office Solutions, Inc. Sec. Liti*g.,
   131 F. Supp. 2d 680 (E.D. Pa. 2001),
   *aff'd*, 277 F.3d 658 (3d Cir. 2002) ................................................................ 47, 48

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   277 F.3d 658 (3d Cir. 2002) ................................................................ 5, 47

*In re Loewen Group Inc. Sec. Litig*,
   2003 U.S. Dist. LEXIS 15680 (E.D. Pa. July 15, 2003) ................................ passim

*In re Loewen Group Inc. Sec. Litig*,
   2004 U.S. Dist. LEXIS 16601 (E.D. Pa. Aug. 18, 2004) ................................ 30, 31

*In re Milestone Scientific Sec. Litig.*,
   103 F. Supp. 2d 425 (D.N.J. 2000) ................................................ 12, 31, 37, 44

*In re NAHC, Inc. Sec. Litig.*,
   2001 U.S. Dist. LEXIS 16754 (E.D. Pa. Oct. 17, 2001),
   *aff'd*, 306 F.3d 1314 (3d Cir. 2002) ................................................................ 26, 46

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002) ................................................................ passim

*In re Nice Sys. Ltd. Secs. Litig.*,
   135 F. Supp. 2d 551 (D.N.J. 2001) ................................................................ 12, 46

*In re NUI Sec. Litig.*,
   314 F. Supp. 2d 388 (D.N.J. 2004) ................................................................ 48

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) ................................................................ 43

*In re Phillips Petroleum Sec. Litig.*,
   881 F.2d 1236 (3d Cir. 1989) ................................................................ 39, 47

*In re Rockefeller Center Properties, Inc. Sec. Litig.*,
   311 F.3d 198 (3d Cir. 2002) ................................................................ 6, 7, 12

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) ................................................................ 10

*Isquith v. Middle South Utilities, Inc.*,
   847 F.2d 186 (5th Cir. 1988) ................................................................ 35

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Kalnit v. Eicher*,
   264 F.3d 131 (2d Cir. 2001).................................................................................... 40

*Landgraff v. Columbia-HCA Healthcare Corp. of Am.*,
   2000 U.S. Dist. LEXIS 21831 (M.D. Tenn. May 24, 2000)..................................... 42

*Marbury Managements, Inc. v. Kohn*,
   69 F.2d 705 (2d Cir. )
   *cert. denied sub nom Wood Walker & Co. v. Marbury Management, Inc.*,
   449 U.S. 1011 (1980).............................................................................................. 48

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
   254 F.3d 154 (3d Cir. 2001).................................................................................... 47

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)............................................................................passim

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003).......................................................................... 32

*Semerenko v. Cendant Corp.*,
   22 F.3d 165 (3d Cir. 2000),
   *cert. denied*, 531 U.S. 1149 (2001)................................................................... 47, 48

*Shapiro v. UJB Bank*,
   964 F.2d 272 (3d Cir.),
   *cert. denied*, 506 U.S. 934 (1992)......................................................................passim

*Sunquest Information Systems v. Dean Witter Reynolds, Inc.*,
   40 F. Supp. 2d 644 (W.D. Pa. 1999)....................................................................... 46

*The Winer Family Trust v. Queen*,
   2004 U.S. Dist. LEXIS 19244  (E.D. Pa. Sep. 27, 2004)...................................passim

*Weiner v. Quaker Oats*, 129 F.3d 310 (3d Cir. 1997).................................................. 47

*Wiley v. Hughes Capital Corp.*,
   746 F. Supp 1264 (D.N.J. 1990) ............................................................................. 48

*Wilson v. Bernstock*,
   195 F. Supp. 2d 619 (D.N.J. 2002) ................................................................... 41, 42

*Zucker v. Quasha*,
   891 F. Supp. 1010 (D.N.J.),
   *aff'd*, 82 F.3d 408 (3d Cir. 1995)........................................................................... 12

## STATUTES

15 U.S.C. § 78(b) (Exchange Act § 10(b))............................................................. 1, 5, 35

15 U.S.C. § 78t(a) (Exchange Act § 20(a))............................................................ 1, 5, 52

15 U.S.C. § 78u-4 ........................................................................................................... 10

### TABLE OF AUTHORITIES
(Continued)

**Page**

15 U.S.C. § 78u-4(b) (Private Securities Litigation Reform Act)..........................passim

15 U.S.C. § 78u-4(b)(1) ................................................................................. 7, 12

15 U.S.C. § 78u-4(b)(2) ............................................................................ 7, 39, 40

15 U.S.C. § 78u-4(b)(3)(A) ..................................................................................8

15 U.S.C. § 78u-4(b)(4) ....................................................................................47

15 U.S.C. § 78u-5(c)(1)(A)-(B) .........................................................................37

15 U.S.C. § 78u-5(i)(1)(A) ................................................................................37

17 C.F.R. § 240.10b-5 ..............................................................................passim

### OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)...........................................................................1, 7, 26

Fed. R. Civ. P. 9(b)...............................................................................passim

Fed. R. Evid. 201 .............................................................................................8

### RULES

141 Cong. Rec. H 2849 (Mar. 8, 1995)................................................................14

H.R. Conf. Rep. No. 104-369 (1995) (1995 U.S.C.C.A.N. 679) .....................................8

### TREATISES

3B O'Malley, Grenig & Lee, Federal Jury Practice and Instructions:  Civil § 16, 237 (2001).....36

## PRELIMINARY STATEMENT

Defendants Universal Health Services, Inc. ("UHS"), Alan B. Miller ("Miller"), its President, Chief Executive Officer and Chairman of the Board, and Steve G. Filton ("Filton"), UHS's Chief Financial Officer, submit this Memorandum of Law in support of their motion to dismiss Plaintiffs' Amended Consolidated Class Action Complaint (the "Complaint" or "Compl.").

Plaintiffs have brought this action on behalf of a purported class of purchasers of UHS stock between July 21, 2003 and February 27, 2004 (the "Class Period"). The Complaint alleges that Defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5) and that the individual defendants should be held liable under § 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) for the alleged violations of UHS.

Defendants move pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) as well as the Private Securities Litigation Reform Act (the "PSLRA") (15 U.S.C. § 78u-4(b)) to dismiss the Complaint with prejudice.

## BACKGROUND INFORMATION

UHS is engaged in the business of owning and operating health care facilities. As reported in its 2003 Form 10-K,[1] UHS reported that as of March 1, 2004, it owned and operated 48 acute care hospitals, 44 behavioral health centers and 16 surgery and radiation oncology centers which, in 2003, generated net revenues of $3.643 billion from the treatment of 436,259 admitted patients at these facilities.

---

[1]       A copy of this Form 10-K is at TAB 2 of the Appendix.

UHS was formed in 1978.  Since its inception, Miller has been its Chairman of the Board, CEO, and President.  He is one of UHS's largest stockholders.  He has guided the company from the outset assisted by a team of professionals, including Filton who started with the Company as the Director of Corporate Accounting and Control in 1985, became Vice-President and Controller in 1991, and was elected Chief Financial Officer in February 2003.

UHS's stock trades on the New York Stock Exchange.

## THE ALLEGATIONS IN THE COMPLAINT

Prior to the opening of trading on March 1, 2004, UHS issued a press release in which it announced that its earnings for the quarter ended March 31, 2004 could be as much as 25% less than what had been reported in the same period in the prior year.  (Compl. ¶ 7).  The market reacted quickly to this news and repriced UHS's stock.  When trading opened on March 1, the price was $45 per share, down from the previous closing price of $53.93.  The stock later closed above $45 both during that week and on March 31.

Shortly after the March 1 press release, securities fraud class action complaints were filed in this Court alleging the Defendants had violated Rule 10b-5 and defrauded investors.  Over six months later, Lead Counsel for the purported class filed the Amended Consolidated Class Action Complaint.

This Complaint makes no claim that UHS's 2004 earnings projections were false or misleading.  It alleges no restatement of results that previously had been publicly disseminated. There is no claim that on March 1 UHS corrected any prior statement or revealed any fact other than that its earnings for the First Quarter of 2004 would be below those reported for the First Quarter of 2003.

Nonetheless, Plaintiffs improperly seek to use a securities fraud claim as an insurance policy to reimburse losses from the decline in UHS's stock price caused by the Company's March 1 earnings warning.  In their Complaint, Plaintiffs contend:

- On February 18, 2004, UHS announced its financial results for the Fourth Quarter of 2003 and that the company had increased the percentage of its net revenues it allocated to the provision for doubtful accounts (the bad debt reserve) (Compl. ¶¶ 47-48);

- Somehow, that increase meant that UHS's bad debt reserve had been understated in the Second and Third Quarter of 2003 (Compl. ¶ 2);

- If UHS had set its bad debt reserves in the Second and Third Quarter using the same percentage of net revenues it used in the Fourth Quarter, the company would have reported lower earnings in both the Second and Third Quarter (Compl. ¶ 78).

- Therefore, UHS committed securities fraud by overstating its earnings in the Class Period.

Plaintiffs simply have alleged no facts to support their contention that UHS reported fraudulent results for the Second and Third Quarter of 2003 by not taking as a bad debt reserve the same percentage of its net revenues as it took in the Fourth Quarter.  In addition, there is no basis for Plaintiffs to claim that the action of UHS to increase its bad debt reserve for the Fourth Quarter caused the decline in UHS's stock price on March 1.

Plaintiffs' efforts to use a securities fraud claim to reimburse losses resulting from a downturn in UHS's business must fail.  Rule 10b-5 redresses fraud; it does not provide insurance against losses that arise from the inherent risks of investment.  Plaintiff have not pled, and cannot plead, a viable securities fraud claim because:

- The Complaint contains no facts from which it may be inferred that UHS's bad debt reserves were not proper estimates at the time they were made;

- No facts are alleged that indicate how, in setting those reserves, UHS departed from reasonable accounting practices or acted inconsistent with its past practices;

- There are no allegations that would give rise to the requisite strong inference that any Defendant acted with scienter to misstate UHS's bad debt reserves; and

- There are no facts alleged from which it may be inferred that the decline in UHS's stock price on March 1 was caused by a revelation of a misstatement of UHS's bad debt reserves.

## SUMMARY OF ARGUMENT

Plaintiffs take predictive statements by UHS, what it estimated in the Second and Third Quarter of 2003 would be that portion of its receivables that would not be collected, and claim UHS that committed fraud because it should have predicted a larger amount.

In each of the Second and Third Quarter of 2003, UHS made a projection of the amount of the percentage of its net revenues reported that quarter that would not be collected in the future.  For the Fourth Quarter, it increased that percentage.  On March 1, 2004, almost two weeks after its February 18, 2004 announcement of this increase, UHS announced that its earnings for the first quarter could be as much as 25% less than in the First Quarter of 2003.  UHS's stock dropped in response to the March 1 announcement.

Plaintiffs claim that the March 1 drop is due to fraud.  They contend that UHS inflated its earnings in the Second and Third Quarter by failing to take the same percentage of revenues as a bad debt reserve as it subsequently took the Fourth Quarter.[2]

Plaintiffs attempt to construct a fraud by hindsight claim.  They contend that because UHS increased the level of its reserve in the Fourth Quarter, it must have been understated in the Second and Third Quarter.  In short, Plaintiffs contend that fraud is sufficiently alleged whenever a company makes a projection about its future and the facts turn out differently than projected.

---

[2]  Plaintiffs make no allegation that UHS inflated its results for the First Quarter of 2003.  Nor do they contend that the downturn in earnings in the First Quarter of 2004 compared to the First Quarter of 2003 was due to the fact that earnings for the First Quarter of 2003 were inflated.

Such a claim is a back door attempt to undermine the requirements of the PSLRA which mandate that a plaintiff plead specific facts that a statement made by a defendant was false or misleading at the time it was made and that a plaintiff plead facts giving rise to a strong inference that defendants made those misstatements with an intent to deceive.

Plaintiffs also cannot satisfy another requirement of the PSLRA, that revelation of the alleged true facts caused a drop in UHS's stock price.  Their claim that the March 1 decline in UHS's stock price was caused by a revelation of the "true facts" concerning UHS's bad debt reserves is an illogical claim that has no basis in fact or law.

In order to state a claim under Rule 10b-5,[3] a plaintiff must allege that defendants "'(1) made a misstatement or an omission of material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which [plaintiffs] reasonably relied and (5) that [plaintiffs'] reliance was the proximate cause of [their] injury.'"[4]

Plaintiffs' 10b-5 claim must be dismissed because the Complaint fails to adequately allege:

- A misstatement or omission of a material fact (Point II);

- Scienter (Point III); and

- Loss Causation (Point IV).

Dismissal of the 10b-5 claim requires dismissal of the § 20(a) control person claim against the individual defendants.  (Point V).

---

[3]     Section 10(b) of the Exchange Act "is enforced through Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements."  In re Alpharma Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004).

[4]     Alpharma, 372 F.3d at 147 (quoting In re Ikon Office Solutions, Inc. Sec. Litig., 277 F.3d 658, 666 (3d Cir. 2002)); see also The Winer Family Trust v. Queen, 2004 U.S. Dist. LEXIS 19244, at **8-9 (E.D. Pa. Sep. 27, 2004).

The Complaint should be dismissed with prejudice because the deficiencies in the Complaint are uncurable and Plaintiffs have had adequate time (over 6 months) to prepare their complaint.  (Point VI).

## ARGUMENT

### Point I.

### THE PLEADING REQUIREMENTS APPLICABLE TO PLAINTIFFS' 10b-5 CLAIM

As the Court is aware, Plaintiffs' securities fraud claim must satisfy Federal Rule of Civil Procedure 9(b) which requires that the "circumstances constituting fraud" be pled with particularity.  Rule 9(b) requires plaintiffs to plead "'(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that plaintiff acted upon it to his damage.'"[5]  The particularity requirement of Rule 9(b) is to be "'rigorously applied in securities fraud cases.'"[6]  Rule 9(b) "provides an increased measure of protection for [defendants'] reputations, and reduces the number of frivolous suits brought solely to extract settlement."[7]

In addition to the requirements of Rule 9(b), the PSLRA "imposes another layer of factual particularity to allegations of securities fraud."[8]  It requires the complaint to specify "each statement alleged to have been misleading, the reason or reasons why the statement was

---

[5]    Alpharma, 372 F.3d at 148 (quoting In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002)); see also GSC Partners CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).

[6]    GSC Partners, 368 F.3d at 236 (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)).

[7]    Burlington Coat Factory, 114 F.3d at 1418.

[8]    Rockefeller Center Properties, 311 F.3d at 217.

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[9]  The party asserting a securities fraud claim must, at a minimum, support his "allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story – that is, the 'who, what, when, where and how' of the events at issue."[10]

With regard to the "scienter" element[11] of a 10b-5 claim, the PSLRA further requires the plaintiffs, "with respect to each act or omission," to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[12]  This particularity requirement of the PSLRA supersedes Rule 9(b)'s provision allowing state of mind to be averred generally.[13]  The plaintiffs may plead a "strong inference" that the defendants acted with "scienter" by alleging facts that either (a) show that defendants had both motive and opportunity to commit fraud or (b) constitute strong circumstantial evidence of defendants' conscious misbehavior or recklessness.[14]

The Third Circuit has held that under the PSLRA, if Plaintiffs do not allege facts with the requisite particularity, they may not benefit from inferences flowing from their allegations -- inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis.[15]

---

[9]     15 U.S.C. § 78u-4(b)(1).

[10]    Rockefeller Center Properties, 311 F.3d at 217; accord The Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, at *15.

[11]    The Third Circuit has defined "scienter" as "a mental state embracing an intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Alpharma, 372 F.3d at 148.

[12]    15 U.S.C. § 78u-4(b)(2) .

[13]    See In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1328 (3d Cir. 2002).

[14]    Burlington Coat Factory, 114 F.3d at 1418; accord GSC Partners, 368 F.3d at 237.

[15]    In re Digital Islands Sec. Litig., 357 F.3d 322, 328 (3d Cir. 2004); Rockefeller Center Properties, 311 F.3d at 224.

As the Third Circuit has noted, Congress enacted the heightened pleading requirement of the PSLRA to restrict abuses in securities fraud class action litigation including "(1) the practice of filing lawsuits against the issuers of securities in response to any significant change in the stock price, regardless of defendants' culpability; (2) targeting of 'deep pocket' defendants [and] (3) the abuse of the discovery process to coerce settlement."[16]

If a complaint fails to comply with the PSLRA's pleading requirements, dismissal is mandatory.[17]

Under Rule 201 of the Federal Rules of Evidence, this Court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  As the Third Circuit held in NAHC,[18] on a motion to dismiss a securities fraud claim, a court may take judicial notice of (i) documents filed with the SEC;[19] (ii) documents explicitly relied upon in the complaint;[20] and (iii) records concerning stock prices.[21]

In connection with this motion, Defendants are submitting an Appendix (the "Appendix") which contains copies of: (i) documents filed by UHS and the individual defendants with the SEC; (ii) transcripts of conference calls with analysts that are referred to in the Complaint; (iii) a February 18, 2004 Morgan Stanley research report expressly relied upon in the Complaint; and

---

[16]    In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999) (citing H.R. Conf. Rep. No. 104-369, at 28 (1995), reprinted 1995 U.S.C.C.A.N. 679, 748); accord Alpharma, 372 F.3d at 148 n. 7.

[17]    15 U.S.C. § 78u-4(b)(3)(A) .

[18]    306 F.3d at 1331.

[19]    See also Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

[20]    See also Burlington Coat Factory, 114 F.3d at 1426 (court may consider a document "integral to or explicitly relied upon in the complaint").

[21]    See also Ieradi v. Mylan Lab, Inc., 230 F.3d 594, 600 n.3 (3d Cir. 2000) (taking judicial notice of stock prices reported by Quotron Chart Services).

(iv) information concerning stock prices.  As the court noted in <u>In re ATI Technologies, Inc. Sec.</u>
<u>Litig.</u>:

> Under governing circuit law, our reference to [such] documents is permissible, and even desirable, in order to analyze whether the statements the plaintiffs feature in the complaint are actionable under Section 10(b) and satisfy Fed. R. Civ. P. 9(b) and the PSLRA's pleading and substantive standards.    Reference to these documents is necessary to assess defendants' statements in context, and to consider whether statements that are misleading in isolation are accurate or immaterial in their entirety.[22]

### Point II.

### PLAINTIFFS' ALLEGATIONS CONCERNING BAD DEBT RESERVES DO NOT ALLEGE A 10b-5 CLAIM

"The first step for a Rule 10b-5 plaintiff is to establish that the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."[23]   The crux of Plaintiffs' claim is set forth in paragraph 2 of their Complaint which alleges that throughout the Class Period, "UHS materially understated its bad debt reserves thereby overstating it reported financial results."  (Compl. ¶ 2).  Plaintiffs repeat this allegation in various iterations throughout the Complaint in an apparent effort to have repetition substitute for the absence of foundation and the specific factual allegations required by the PSLRA.

In determining whether Plaintiffs have satisfied their pleading burden with respect to alleging a false or misleading statement, this Court must look at four issues:

> A.    Have Plaintiffs specifically identified the purported misstatements made by Defendants in the Class Period;

---

[22]    216 F. Supp.2d 418, 430 (E.D. Pa. 2002).

[23]    <u>Burlington Coat Factory</u>, 114 F.3d at 1417; <u>accord</u> <u>In re Aetna Inc. Sec. Litig.</u>, 34 F. Supp. 2d 935, 955 (E.D. Pa. 1999).

B.      Have Plaintiffs alleged facts to support their contention that each statement was false or misleading when made;

C.      Are the alleged misstatements material; and

D.      If Plaintiffs' allegations satisfy Rule 9(b) and the PSLRA, and they are accepted as true with all reasonable inference drawn in Plaintiffs' favor, do they state a 10b-5 claim.

## A.      The Alleged Misstatements in the Class Period

Under the PSLRA, a party asserting a 10b-5 claim must specify "each statement alleged to have been misleading."[24]   In determining whether Plaintiffs have adequately pled a claim relating to UHS's bad debt reserves, this Court "must analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity."[25]

Despite its length, Plaintiffs' Complaint identifies only a few statements which they contend were false or misleading.  Most of these statements pertain to UHS's report of its operating results for the periods ended June 30, and September 30, 2003.

The Complaint alleges that in its Press Releases announcing its results in the quarters ended June 30 (the Second Quarter) and September 30 (the Third Quarter), 2003, and in its Form 10-Qs for those quarters, UHS understated the percentage of its revenues it allocated for bad debts and, as a result of this understatement, UHS overstated its earnings and operating margin. (Compl. ¶¶ 31, 33, 35 and 40).[26]

The Complaint also alleges two written statements made by, or attributed to, UHS concerning its performance for the Fourth Quarter of 2003.  On February 18, 2004, UHS issued a

---

[24]      15 U.S.C. § 78u-4; Alpharma, 372 F.3d at 147.

[25]      The Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, at *15 (citing In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996)).

[26]      The Press Releases, which were filed with the SEC as exhibits to Form 8-Ks, and the Form 10-Qs for these quarters are at TABs 7-10 of the Appendix.

Press Release[27] in which it announced its earnings for the quarter and year ended December 31, 2003. (Compl. ¶ 47). The release stated that UHS had increased its reserve for doubtful accounts from 6.9% of net revenues in the fourth quarter of 2002 to 7.8% of net revenues in the fourth quarter of 2002. A research report dated February 18, 2004 from Morgan Stanley[28] claimed that UHS attributed part of this increase to a "true up" of bad debt from previous quarters.

In addition to these written statements, Plaintiffs premise their claim concerning bad debt reserves on four alleged oral statements:

- On July 22, 2003, in a conference call[29] with analysts and investors to discuss second quarter earnings results, Filton said in response to a question regarding UHS's bad debt expenses: "We actually think that our self-pay utilization as a percentage of overall utilization is pretty much pancake flat between 2003 and 2002 and have not seen significant changes" (Compl. ¶ 32);

- During a conference call with analysts held on October 21, 2003,[30] (i) Defendants "suggested" they had continued to maintain a lower bad debt percentage because they were not experiencing the same increase in providing service to uninsured patients as others in the industry and (ii) Filton stated: "We're not seeing as some of the other companies have mentioned, a real increase in uninsured or at least uninsured after insurance patients or a difficulty in collecting from those patients" (Compl. ¶ 38);

- In mid-January 2004, at a forum hosted by an investment bank, Miller stated that UHS's bad debt ratio had not been increasing at the same rate as its peers because UHS had not experienced a material adverse change in

---

[27]    UHS filed this Press Release with the SEC as an Exhibit to a Form 8-K. A copy of that filing is submitted herewith at TAB 6 of the Appendix.

[28]    A copy of this research report is submitted herewith at TAB 21 of the Appendix.

[29]    A copy of the transcript of this call is submitted herewith at TAB 18 of the Appendix. The referenced language is at p. 6.

[30]    A copy of the transcript of this call is submitted herewith at TAB 19 of the Appendix. The referenced language is at p. 3. Filton also remarks that UHS was "seeing a slight uptick in truly uninsured patients," see id., but, as is discussed infra, an increase in "charity care" patients would have no impact upon UHS's net revenues or its provision for doubtful accounts. See infra Point II.B.

> self-pay revenues in its markets or in the collection rates and expected the ratio to remain stable in the near term (Compl. ¶ 45); and

- During the Class Period, Defendants repeatedly represented that UHS was not subject to the changing mix of payors and was not experiencing rising bad debt. (Compl. ¶ 26).

This last statement, which does not identify the person who made the representation, when it was made or where it was made, clearly is not adequate to state a securities fraud claim under the PSLRA.[31]  For reasons set forth in Point II.B., the first three oral statements concerning patient mix also do not provide a basis for a securities fraud claim.

### B.  Plaintiffs Have Failed to Plead Facts to Support Their Contention that Defendants Made Misstatements

The PSLRA requires Plaintiffs to plead specific facts as to why each of the statements set forth in Point II.A. was false or misleading at the time it was made.[32]  As one district court has noted, a plaintiff's pleading burden under the PSLRA is to allege not only what statements were false, but also to allege the "true facts" that existed at the time of the statement that "plead with particularity how and why those statements are false."[33]  Even if the allegedly false statements are specifically identified, a failure to allege specific facts as to how and why those statements were false requires dismissal of the Complaint.[34]

---

[31]   Rockefeller Center Properties, 311 F.3d at 217; The Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, at *15.

[32]   15 U.S.C. § 78u-4(b)(1); see NAHC, 306 F.3d at 1330 ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.") (quoting Zucker v. Quasha, 891 F. Supp. 1010, 1014 (D.N.J.), aff'd, 82 F.3d 408 (3d Cir. 1995), cert. denied, 519 U.S. 825 (1996)); In re Nice Sys. Ltd. Secs. Litig., 135 F. Supp. 2d 551, 574 (D.N.J. 2001) (plaintiff had not pleaded facts sufficient to support an allegation that defendant's press release "was false or misleading when issued"; In re Milestone Scientific Secs. Litig., 103 F. Supp. 2d 425, 466 (D.N.J. 2000) (plaintiff may not "infer the existence" of inventory problems at the time of referenced conference call "from later occurrences").

[33]   California Public Employees Retirement Sys. v. The Chubb Corp., 2002 U.S. Dist. LEXIS 27189, at **46-52 (D.N.J. June 25, 2002).

[34]   Id.

The allegedly false or misleading statements by Defendants set forth in the Complaint speak to two issues: the bad debt reserves reported by UHS during the Class Period and the patient mix (percentage of patients falling into various categories (e.g. Medicare, Medicaid, insured, self pay)) UHS was experiencing during the Class Period.

There are no facts in the Complaint that set forth the reasons why Defendants' statements concerning patient mix were false or misleading when made. No facts are alleged concerning the patient mix UHS experienced during the Class Period or how that patient mix differed from prior years. Accordingly, Plaintiffs cannot premise a 10b-5 claim on statements concerning patient mix.

With respect to the bad debt reserve issue, Plaintiffs alleged (Compl. ¶¶ 34, 42):

- Defendants failed to properly write off uncollectible receivables throughout the Class Period and materially overstated UHS's financial results by maintaining known uncollectible accounts as assets on UHS's balance sheet;

- UHS reported receivables from uninsured patients as assets even though these were essentially uncollectible on the day the patient left the hospital;

- The Company's allowance for doubtful accounts was insufficient given its bad debt exposure and, as a result, the Company's reported operating income was artificially inflated; and

- The Company's reported operating income was not a true measure of the Company's operating performance because Defendants failed to properly deduct from operating income the appropriate allowance for doubtful accounts.

Such conclusory allegations do not satisfy Plaintiffs' pleading burden to state why each statement at issue was misleading. In Burlington Coat, the Third Circuit stated "conclusory allegations will not suffice. ... Plaintiffs must accompany their legal theory with factual

allegations that make their theoretically viable claim plausible."[35]  As support for their sweeping

conclusory allegations, Plaintiffs have alleged only five purported facts.

First, Plaintiffs contend that UHS had a "unique corporate policy during and before the

Class Period of directing all its affiliated hospitals to never designate an account as bad debt if it

was less than 180 days old."  (Compl. ¶ 28).  The source for this statement was an unnamed

person[36] who previously worked in the business office of Lancaster Community Hospital, one of

the smaller of UHS's 48 acute care hospitals, which had only 117 of UHS's 7,237 licensed

beds.[37]  This unnamed source allegedly said that company procedure "dictated that no accounts

less than 180 days old were to be considered bad debt even if an account was known or

anticipated to be uncollectible from the date service was provided."  (Compl. ¶ 28).

The second "fact" alleged by Plaintiffs is from an unnamed former employee at the same

facility (possibly the same source) who allegedly provided support for the statement that "UHS's

practice was to bill Medicare and Medicaid for all services rendered and recognize all revenue at

the time of service even if it was known or anticipated that a large portion of those claims would

be denied."  (Compl. ¶ 29).

Plaintiffs cannot satisfy the pleading requirements of the PSLRA by alleging statements

made by a person who worked at one small hospital which provided a de minimis portion of

UHS's $3.6 billion in revenue in 2003.  There is nothing in these statements that would support

---

[35]    Burlington Coat, 114 F.3d at 1418.

[36]    In Aetna, this Court noted that under the PSLRA plaintiffs must include the names of their informants in their complaint.  34 F. Supp. 2d at 942 (quoting Representative Dingell noting that "you must literally, in your pleadings, include the names of confidential informants [and] employees … who have provided information" 141 Cong. Rec. H 2848 (Mar. 8, 1995)).

[37]    See Appendix TAB 2, pp. 4, 16.

Memo of Law for Dismissal.doc

the conclusion that UHS's corporate accounting was improper or its financial statements were inaccurate or that its reports of its Second and Third Quarter results were false or misleading.

As a matter of law, such remarks of a low level source far away from corporate headquarters do not provide a basis for a securities fraud claim.  This point is illustrated by Alpharma.[38]  In that case, plaintiffs alleged that accounting irregularities had caused defendant to report inflated revenue figures.  Plaintiffs alleged that "whistle blowers" in Alpharma's Brazil division alerted its New Jersey headquarters "to the violation of the company's revenue recognition policy" by employees of that division.[39]  The Third Circuit noted "the Complaint simply alleges that a sales manager in AHD's Brazil division notified employees in New Jersey of the accounting irregularities in Brazil."[40]

In Alpharma, in contrast to the facts in this case, accounting irregularities had led to a restatement of financial statements.  Also in stark contrast to this case, the Alpharma plaintiffs had specifically alleged that accounting irregularities had been brought to the attention of corporate headquarters during the class period.  Despite these facts, the Third Circuit held that these whistle blower allegations were of no consequence and affirmed the dismissal of plaintiffs' 10b-5 claim.  The court stated that "the Complaint is devoid of any allegations which would establish that [the] Brazil division was so central to Alpharma's business that its increased revenue figures should have received particular attention from company executives."[41]  It was not material that the claim of irregularities was sent to corporate headquarters because no facts were alleged that the information "ever passed up the chain of command" or was further

---

[38]      372 F.3d 137.

[39]      Id. at 150-51.

[40]      Id. at 151.

[41]      Id.

investigated.  Under <u>Alpharma</u>, statements of low level whistle blowers at outlying corporate facilities, like Plaintiffs' "source" at Lancaster Community Hospital, cannot form the basis of a claim that a company engaged in an accounting fraud let alone that the alleged billing procedure in that one hospital constituted "corporate policy" concerning setting bad debt reserves. Plaintiffs allegations simply provide no basis to infer that UHS's financial statements were false or misleading in any way.

Plaintiffs cannot use the statements from this unnamed source to contend that UHS acted improperly in preparing financial information that it publicly disseminated.  There is simply no way that these statements can provide a basis for any inference concerning the financial results UHS reported during the Class Period.  Like the Brazil division in <u>Alpharma</u>, Lancaster Community Hospital was so peripheral to UHS's business that it would be impossible to infer that UHS's financial statements were inaccurate because of anything occurring at that facility. Moreover, the alleged statements are contradicted by the accounting policies UHS had disclosed in its filings with the SEC.

Plaintiffs use the alleged statements of this unnamed source to insinuate that UHS inflated revenues by reporting revenue from bills to patients when it knew it had no chance of collection.  Such an alleged practice would be contrary to the company policy UHS previously stated in its SEC filing.  In its 2002 Form 10-K, concerning its corporate policy towards patients treated at its facilities who were incapable of making payment:  "The Company provides care to patients who meet certain financial or economic criteria without charge or at amounts substantially less than its established rates.  Because the Company does not pursue collection of amounts determined to qualify as charity care, they are not reported in net revenues or in

provision for doubtful accounts."[42]   Accordingly, charity care patients are simply irrelevant to

UHS's revenues, receivables and its bad debt reserves.

Plaintiffs also insinuate that UHS falsely included in its revenues monies billed to

Medicare and Medicaid that would never be collected.   Once again, Plaintiff's insinuation is

flatly contradicted by the statement of UHS's accounting policy employed set forth in its 2002

Form 10-K which stated:

> **Revenue Recognition**:  Revenue and the related receivables for health
> care services are recorded in the accounting records, at the time the
> services are rendered, on an accrual basis at the Company's established
> charges.  **The provision for contractual adjustments, which represents
> the difference between established charges and estimated third-party
> payor payments, is also recognized on an accrual basis and deducted
> from gross revenue to determine net revenues**.  Payment arrangements
> with third-party payors may include prospectively determined rates per
> discharge, a discount from established charges, per-diem payments and
> reimbursed costs.  **Estimates of contractual adjustments are reported
> in the period during which the services are provided and adjusted in
> future periods, as the actual amounts become known.   Revenues
> recorded under cost-based reimbursement programs may be adjusted
> in future periods as a result of audits, reviews or investigations**.  Laws
> and regulations governing the Medicare and Medicaid programs are
> extremely complex and subject to interpretation.  **As a result, there is at
> least a reasonable possibility that recorded estimates will change by
> material amounts in the near term.**   Medicare and Medicaid net
> revenues represented 42%, 42% and 44% of net patient revenues for the
> years 2002, 2001 and 2000, respectively.  In addition, approximately 39%
> in 2002, 37% in 2001 and 35% in 2000, of the Company's net patient
> revenues were generated from managed care companies, which includes
> health maintenance organizations and preferred provider organizations.[43]
> [emphasis added]

Contrary to Plaintiffs' insinuation (Compl. ¶ 29), the portion of patient charges that

would likely not be reimbursed by Medicare and Medicaid was not reported as part of net

revenues and, therefore, is irrelevant to UHS's bad debt reserve.  Furthermore, UHS had clearly

---

[42]      A copy of this Form 10-K is at TAB 1 of the Appendix.  The referenced language is at p. 52.

[43]      Appendix TAB 1, p. 52.

disclosed that the contractual adjustment it had taken for the amount of billed charges that would not be reimbursed was subject to material change in the future because of audits, reviews and investigations.

Plaintiffs have not met their obligations under the PSLRA to plead specific facts to support their claim that UHS understated its bad debt reserves in the Class Period. Plaintiffs' pleading burden is not met by allegations from an unnamed source at one of the smaller of one of UHS's acute care hospitals who had no involvement in setting the bad debt reserves included in UHS's financial statements. This is especially true when allegations made by the source are directly contradicted by UHS's disclosure of its accounting policies in its SEC filings. The statements attributed to this source simply cannot be the predicate for the conclusion that UHS fraudulently understated its bad debt reserve when it reported over three quarters of a billion dollars in revenue in each of the Second and Third Quarter of 2003.

The other three "facts" advanced by Plaintiffs as to why UHS's statements concerning its bad debt reserves were inaccurate when they were made simply are immaterial and do not support that assertion. Plaintiffs alleged:

- One UHS hospital in Edinburg, Texas (described by Plaintiffs as "a small rural market") "internally recorded that bad debt was a concern in April 2003," four months before the beginning of the class period. (Compl. ¶ 39);

- Some UHS hospitals "were located in less economically stable markets which therefore exposed the Company to increased risk of non-payment."[44] (Compl. ¶ 30); and

- During the class period other hospital companies were (i) experiencing a change in patient mix such that they had more self pay patients and (ii) increasing their bad debt reserves. (Compl. ¶¶ 24-25).

---

[44]    The location of UHS's hospitals was disclosed in its Form 10K. See Appendix TAB 2, pp. 16-19. The investing public could draw its own conclusions concerning the economic climate in the areas where these hospitals were located.

The alleged inadequacy during the Class Period of the reserves on UHS's financial statements cannot be inferred from allegations that four months prior to the beginning of Class Period, one of UHS's smaller facilities expressed a concern about bad debts.  Similarly, an allegation that UHS was "exposed" to increased risk of non-payment at its facilities that were located in economically depressed areas does not specify how or why UHS's bad debt reserve reported in its filings with the SEC was inadequate.  The fact that UHS had some facilities in economically depressed areas does not mean UHS intentionally understated its bad debt reserve.  Plaintiffs' Complaint does not pass muster under the PSLRA because there are no allegations concerning the number or magnitude of the accounts from UHS facilities in depressed areas which allegedly should have been reserved or the relation of such amounts to the total of the revenues and reserves reported from all of UHS's facilities.

Plaintiffs also cannot satisfy their pleading burden by contending that because UHS's competitors were admitting more self pay patients and increasing their bad debt reserves to take account of this change in payor mix, UHS's disclosure was misleading.  As previously noted, no facts are alleged in the Complaint that during the Class Period UHS experienced a similar change in patient mix.  As UHS stated in its conference calls on July 22 and October 21, 2003[45] after the release of its quarterly earnings, UHS was not experiencing such a change.  (Compl. ¶¶ 32, 38).  Plaintiffs have alleged no facts that would support an inference that it was.

Plaintiffs also ignore that UHS reserved as bad debt a lower portion of its revenue than its competitors did because, as previously noted, UHS classified charges for patients who had no means of making payment as charity care that was not included in revenues.  Accordingly, charges to such patients were not included in UHS's bad debt reserve.

---

[45]      Copies of the transcripts of these calls are at Appendix TABs 18 and 19.

In addition, what UHS's competitors were experiencing or doing during the class period is irrelevant to the issue of whether UHS's statements concerning its bad debt reserves were false or misleading at the time they were made.  The Third Circuit recently rejected a contention that a securities fraud claim arises from a company's alleged failure to disclose the impact upon it of alleged industry wide problems that competitors were reporting.[46]  The <u>Adams Golf</u> case involved a claim against a manufacturer of golf clubs alleging, *inter alia*, that it failed to disclose an industry-wide glut of golf equipment carried by retailers.  The manufacturer had stated that stores had fewer of its golf clubs in inventory than they had of its competitors.  Plaintiffs contended this statement was misleading because it failed to disclose that retailers had excess inventory of Adams clubs.

In affirming the District Court's dismissal of this retail oversupply claim as a matter of law, the Third Circuit noted that allegations that Adams Golf's competitors "were suffering from retail oversupply" and were taking corrective action to address the problem did not render misleading Adams Golf's statement that inventories of its product on the retail level were less than that of its competitors.[47]  The court held that what competitors were experiencing was of "no moment" because a company's disclosure obligation related to what was going on in its business, not to what competitors were experiencing.[48]  Under <u>Adams Golf</u>, the fact that UHS's competitors reported that they were admitting more self pay patients and increasing bad debt reserves does not permit the inference that UHS also was admitting more self pay patients or that UHS should have increased its reserves.

---

[46]   <u>In re Adams Golf Inc. Sec. Litig.</u>, 381 F.3d 267, 272 (3d Cir. 2004).

[47]   381 F.3d at 278.

[48]   <u>Id</u>.

On the basis of two allegations by an unnamed former employee (that do not relate to the reserves recorded on UHS's financial statements reported to the investing public and are contrary to company policy stated in UHS's SEC filing) and three irrelevant assertions, Plaintiffs contend that they have specified why UHS's bad debt reserves were understated during the Class Period even though:

- UHS's Form 10-Q for the quarter ended June 30, 2003 reported that for the six month period then ended it had reserved $127,122,000 of its net revenues reported in that period as its estimate of that portion of its reported net revenues that would not be collected;[49]

- UHS's Form 10-Q for the quarter ended September 30, 2003 reported such a provision for doubtful accounts of $189,410,000 had been taken for the nine month period then ended;[50] and

- UHS's Form 10-K for the year ended December 31, 2003 reported such a provision for doubtful accounts of $263,724,000 had been taken for the year then ended.[51]

Plaintiffs have simply failed to allege any facts which would indicate that these massive bad debt reserves were, at the time they were taken, inadequate to satisfy anticipated write-offs of uncollectible receivables.  The alleged "supporting" facts advanced by Plaintiffs do not allow the inference that Defendants' statements concerning UHS's bad debt reserves identified in Point II.A. were false or misleading at the time they were made.

Plaintiffs' theory that UHS was reporting understated bad debt reserves is not only without basis, it makes no sense.  Even if UHS had the alleged policies to include all charges in revenues and not to write off receivables until they were over 180 days old and to record Medicare/Medicaid revenue that would not be reimbursed, and it did not, those policies would

---

[49]     Appendix TAB 9, p. 3.

[50]     Appendix TAB 7, p. 3.

[51]     Appendix TAB 2, p. 26.  The disclosure speaks to the amount of the receivables and the reserve on UHS's balance sheet at December 31, 2003 and 2002.

not allow the inference that UHS understated its provision for doubtful accounts.  Plaintiffs simply fail to recognize that there is nothing improper about billing for services rendered.  The issue is whether adequate reserves are maintained against which uncollectible receivables would eventually be written off.  There are absolutely no facts in the Complaint that indicate that UHS did not maintain such adequate reserves.

When it records the revenue from patients, UHS knows that some of its billed charges will not be paid.  To take into account that there will be unpaid invoices in the future, UHS reports to its shareholders both a net revenue figure (what it billed for patient care net of charity care and third party payor contractual accruals)[52] and a provision for doubtful accounts (the portion of those net revenues UHS believes will not be collected in the future).  As UHS stated in its 2002 Form 10-K:

> The Company establishes an allowance for doubtful accounts to reduce its receivables to their net realizable value.  The allowances are estimated by management based on general factors such as payor mix, the agings of the receivables and historical collection experience.  At December 31, 2002 and 2001, accounts receivable are recorded net of allowance for doubtful accounts of $59.1 million and $61.1 million, respectively.[53]

The provision for doubtful accounts, or as it is referred to in this case, the bad debt reserve, is a predictive statement by UHS that sets forth its estimate of the portion of the net revenues it is reporting that will not be collected in the future.  UHS records as net revenue charges for services rendered.  It recognizes that some of the more than three quarters of a billion dollars in revenues it records each quarter will not be collected.  UHS reports as its bad debt reserve its estimate of the portion of its revenues that will not be collected.  With respect to

---

[52]    The net revenue figure on UHS's Financial Statements did not include (i) charges for charity care patients and (ii) UHS's estimate of the charges that would not be reimbursed by Medicare/Medical.

[53]    Appendix TAB 1, p. 52.

Plaintiffs' claim of securities fraud, the relevant issue is whether Plaintiffs have alleged any facts that would permit the inference that UHS's intentionally or recklessly understated its estimate of bad debts at the time it made that estimate.  There are no facts in the Complaint that speak to this issue.

According to its Form 10-K for 2003, in that year UHS treated some 436,259 admitted patients at its 108 facilities and booked revenues of $3.643 billion.  The revenue figure is derived from hundreds of thousands of bills for the patients treated at UHS facilities.[54]   At best, Plaintiffs' theory of the case is that UHS committed securities fraud because, in preparing its quarterly reports in 2003, it did not (i) independently evaluate each of the receivables that made up the $902,954,000 in net revenues it reported for the quarter ended June 30, 2003[55] and the $896,332,000 in net revenues it reported for the quarter ended September 30, 2003;[56] (ii) form a judgment as to whether or not each such receivable was collectible; and (iii) aggregate the receivables deemed non-collectible to arrive at a provision for doubtful accounts.  Plaintiffs advance no reason how UHS committed Fraud by continuing its practice of setting its reserves based on past history and its evaluation of the overall collectibility of its receivables.

The issue in this case is whether UHS maintained adequate reserves that took into account that a portion of its net revenues would not be collected.  The fatal defect with Plaintiffs' Complaint is that it alleges absolutely no facts that would permit the inference that UHS did not.  There is nothing in the Complaint that would permit the inference that UHS's bad debt reserves reported for the Second Quarter and the Third Quarter of 2003 were not UHS's reasonable estimates of the portion of the net revenues reported that quarter that would not be collected in

---

[54]     See Appendix TAB 2, p. 4.

[55]     Appendix TAB 9, p. 3.

[56]     Appendix TAB 7, p. 3.

the future.   Because Plaintiffs have failed to meet their burden under the PSLRA to allege specific facts which set forth reasons why UHS's disclosure during the Class Period concerning its bad debt reserves was false or misleading at the time it was made, the 10b-5 claim should be dismissed.

> ### C.      The Alleged Misstatements Concerning
> ### Bad Debt Reserves Are Not Material

Plaintiffs allege that "the market for UHS stock was an efficient market," (Compl. ¶ 87), which "promptly digested current information with respect to UHS from all publicly-available sources and reflected such information in UHS's stock price." (Compl. ¶ 88).

In the portion of the Complaint captioned, inaccurately, "UHS Admits It Understated Bad Debt During the Class Period," Plaintiffs alleged that on February 18, 2004, UHS announced that it had increased its bad debt reserves to 7.8% of net revenues and purportedly confirmed a statement reported by a stock analyst at Morgan Stanley that "the higher bad debt expense was used to effectively 'true-up' bad debt expense from previous periods."  (Compl. ¶¶ 47-48).  It cannot be presumed that the term "true up" was actually used by UHS as opposed to being a characterization by the analyst.  Nonetheless, the Morgan Stanley report clearly establishes that the facts concerning UHS's bad debt reserves that form the basis for Plaintiffs' Complaint were disclosed on February 18 and the market deemed them immaterial.

On February 17, 2004, the day before this alleged "admission," UHS's stock closed at $56.13.[57]  On February 19, 2004, the day after this alleged "admission," UHS's stock closed at $55.18.[58]  This decline reflected a general decline in the market.  On February 17, 2004, the New

---

[57]      Appendix TAB 22.

[58]      Id.

York Stock Exchange Healthcare Index (^NYP) closed at 6180.35 and thereafter declined to close at 6119.20 on February 19, 2004.[59]  UHS's stock continued trading in the lower to mid $50s for the remainder of February.[60]

UHS's stock trades on the New York Stock Exchange.  As Judge O'Neil noted in In re Loewen Group Inc. Sec. Litig.,[61] a "special rule regarding materiality applie[s]" when a company's stock trades in an efficient market like the New York Stock Exchange.  The Loewen court stated:

> [T]he materiality of disclosed information may be measured by looking at movement in the price of the corporation's stock in the days following the announcement.  ...  Because in an efficient market "the concept of materiality translates into information that alters the price of the firm's stock," if a company's disclosure of information has a negligible effect on stock prices, "it follows that the information disclosed … was immaterial as a matter of law."[62]

As the Third Circuit stated in Oran v. Stafford:

> In Burlington, however, this Court fashioned a special rule for measuring materiality in the context of an efficient securities market.  This rule was shaped by the basic economic insight that in an open and developed securities market like the New York Stock Exchange, the price of a company's stock is determined by all available material information regarding the company and its business.  In such an efficient market, "information important to reasonable investors … is immediately incorporated into the stock price."  Burlington, 114 F.3d at 1425.  As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking at the movement, in the period immediately following disclosure, of the price of the firm's stock.  Because in an efficient market "the concept of materiality translates into information that alters the price of the firm's stock," **if a company's disclosure of information has no effect on stock**

---

[59]   Appendix TAB 23.

[60]   Appendix TAB 22.

[61]   2003 U.S. Dist. LEXIS 15680, *37 (E.D. Pa. July 15, 2003).

[62]   2003 U.S. Dist. LEXIS 15680 at *37-38 [citations omitted] (citing and quoting Burlington Coat Factory, 114 F.3d at 1425.)

**prices, "it follows that the information disclosed … was immaterial as a matter of law."** Burlington, 114 F.3d at 1425.[63]

The market's lack of response to UHS's February 18 statements concerning the increase in its bad debt reserves shows that the alleged misstatements concerning bad debt reserves were not material.[64]

### D.   Plaintiffs' Allegations Concerning Bad Debt Reserves Do Not State a 10b-5 Claim

Even if this Court were to rule that Plaintiffs' allegations have satisfied the pleading requirements of the PSLRA and Rule 9(b), dismissal under Rule 12(b)(6) would still be required because, accepting all the allegations of the Complaint as true and drawing any reasonable inferences in Plaintiffs' favor, the Complaint fails, as a matter of law, to state a 10b-5 claim.

Plaintiffs' 10b-5 claim rests on the allegation that, during the Class Period, UHS understated its bad debt reserves thereby resulting in an overstatement of income.  Plaintiffs' claim fails as a matter of law because:

- Plaintiffs have not adequately alleged that in setting its reserves UHS engaged in any unreasonable accounting practice;

- Plaintiffs have made no allegation concerning when or to what level UHS should have written down its accounts receivable or why its reserves were unreasonable during the Class Period;

---

[63]    226 F.3d 275, 282 (3d Cir. 2000) [emphasis added]; see also In re NAHC, Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 16754, *44 (E.D. Pa. Oct. 17, 2001), aff'd, 306 F.3d 1314 (3d Cir. 2002) (information is not material if its release "has a negligible effect on the stock price").

[64]    Defendants note that on October 22, 2004, prior to the opening of trading, UHS issued a Press Release concerning its financial results for the quarter ended September 30, 2004.  That Press Release stated the company's provision for doubtful accounts increased to $82.0 million, or 8.1 percent of revenue, during the third quarter.  This was an increase from $60.6 million, or 7.1 percent of revenue during the Third Quarter of 2003.  In that press release UHS announced a bigger change in its bad debt reserve than it had announced in February 2004 when UHS announced it was taking a reserve of 7.8% of its net reserves in the Fourth Quarter of 2003 compared to a 6.9% reserve figure in the Fourth Quarter of 2002.  UHS filed this Press Release with the SEC as an Exhibit to a Form 8-K.  A copy of that filing is submitted herewith at TAB 11 of the Appendix.

On October 22, UHS stock closed up $1.31 per share from its previous close.  Appendix TAB 22.  This fact further confirms that the alleged misstatements concerning UHS's bad debt reserves are not material.

- Plaintiffs' allegations, concerning alleged failures to reserve uncollectible receivables are not actionable;

- Plaintiffs have failed to allege any facts that would make UHS's predictive statements concerning bad debts actionable; and

- Plaintiffs have not alleged that UHS mischaracterized its reserves.

Each of these five separate and independent points is fatal to Plaintiff's 10b-5 claim.  A determination that any one of these failures exists would require dismissal of Plaintiffs' 10b-5 claim for failure to state a claim.

1.    No Allegation that UHS Engaged in Unreasonable Accounting Practices.

Plaintiffs claim that Defendants committed fraud because, during the Class Period, UHS understated its bad debt reserve resulting in an overstatement of its revenues and earnings.  The pleading requirements for a 10b-5 claim premised upon such an alleged financial statement fraud were stated in Burlington Coat Factory as follows:

> [W]here plaintiffs allege that defendants distorted certain data disclosed to the public by **using unreasonable accounting practices**, we have required plaintiffs **to state what the unreasonable practices were** and how they distorted the disclosed data.[65]

The requirement that a plaintiff state the "unreasonable" accounting practice has long been the law in this Circuit.  In Christidis v. Pennsylvania Mortgage Trust, the Third Circuit held that a plaintiff alleging a securities fraud claim premised upon alleged inadequate reserves must plead how "defendants knowingly departed from reasonable accounting practices."[66]  As the Third Circuit noted, the "gravamen" of plaintiff's complaint in Christidis, like the Complaint herein, was that defendant's financial statements "understated the reserves which the [defendant] should have accrued for bad debts."[67]  The court held that a statement of the amount of reserves

---

[65]      114 F.3d at 1417-18 [emphasis added].

[66]      717 F.2d 96, 100 (3d Cir. 1983).

[67]      Id. at 97.

"could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices."[68]   The Christidis court affirmed the dismissal of plaintiff's securities fraud claim because plaintiffs did not allege what accounting practices defendant used to determine the amount of the reserves and how those practices departed from the norm.[69]

In Shapiro v. UJB Fin. Corp., the Third Circuit elaborated upon Christidis stating:

> In Christidis we dismissed allegations that defendants knew or should have known that loan loss reserves were understated, were improperly used, and led to distortions of other financial data.  Such allegations, we stated, could only succeed if, when the loan loss reserves were established, "the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices." 717 F.2d at 100.  We found the allegations deficient because they had not disclosed "the manner in which, in establishing reserves for bad debts in the financial statements relied upon, defendants knowingly departed from reasonable accounting practices."  Id.[70]

As the Burlington Coat Factory, Christidis and Shapiro courts stated, an essential element of a financial statement fraud claim, such as Plaintiffs' bad debt reserve claim, is an allegation of facts showing how, in establishing its reserves, defendants did not follow "reasonable accounting principles."  This Court, in In re Aetna Sec. Litig., also recognized that in pleading a securities fraud claim premised upon an alleged understatement in bad debt reserves, a plaintiff must state "what the alleged unreasonable accounting practices were."[71]

As the above discussion makes clear, a plaintiff alleging a 10b-5 claim premised on the theory that a company's accounting practice distorted its financial statements, must allege facts

---

[68]   Id. at 100.

[69]   Id. at 99-100 (the complaint "says nothing about the method whereby those estimates were made or the manner in which that method departed from reasonable accounting practices and procedures").

[70]   964 F.2d 272, 284 (3d Cir.), cert. denied, 506 U.S. 934 (1992).

[71]   34 F. Supp. 2d 935, 956 (E.D. Pa. 1999).

setting forth (i) the accounting practice of the company that resulted in the alleged distortion and (ii) why that practice was unreasonable.  Plaintiffs' Complaint addresses neither point.

Plaintiffs' Complaint is totally devoid of any allegation concerning what accounting practices UHS employed at a corporate level in determining the bad debt reserves reported in its SEC filings during the Class Period.[72]  Plaintiffs' 10b-5 claim fails to state a claim because Plaintiffs do not allege how UHS's policies and practices in setting its bad debt reserves that were set forth in the company's 2002 Form 10-K departed from reasonable accounting practices.[73]  Moreover, there is no allegation that anyone at UHS knew or should have known that the company's reserves were set in a manner inconsistent with reasonable accounting practices.  Accordingly, under Burlington Coat Factory, Christidis, Shapiro and Aetna, Plaintiffs' 10b-5 claim fails as a matter of law and must be dismissed.

In addition, UHS notes that after March 1, 2004, it filed its 2003 Form 10-K including its audited financial statements.[74]  UHS's accountants made no adjustments to previously reported results for 2003 and gave their consent to the filing of these results in the Form 10-K.

---

[72]  Plaintiffs ignore the fact that UHS reported revenue in 2003 of over $3.6 billion generated at over 108 facilities.  Appendix TAB 2, p. 21.  Its provision for bad debts of over $250,000,000 for the year 2003 reported in its Form 10-K was set at its corporate headquarters.  Plaintiffs' Complaint says absolutely nothing as to how the amount of that reserve was determined or the accounting methods that were employed to determine or why those accounting methods were unreasonable.  See also supra  Point II.B.  Plaintiffs' allegations concerning the remarks one former low level employee at one small hospital are simply irrelevant to the company's corporate accounting and preparation of financial statements.

[73]  Having failed to state UHS's corporate accounting policy with respect to setting bad debt reserves, Plaintiffs have no basis to allege that UHS departed from reasonable accounting principles when it followed that policy to set reserves for bad debts with respect to over $3.5 billion in revenue it reported in 2003.

[74]  Appendix TAB 2.

2.      No Particulars Concerning the Magnitude of the Alleged Understatement of UHS's Bad Debt Reserves.

Plaintiffs cannot premise a 10b-5 claim on a bald assertion that UHS overstated its revenue and income by understating its bad debt reserves.  They must allege the particulars of the alleged understatement.  This point is illustrated by Judge O'Neil's two opinions in In re Loewen Financial Group, Inc. Sec. Litig.[75]

In that case, Judge O'Neil recently dismissed with prejudice plaintiffs' amended 10b-5 claim premised on an alleged misstatement of bad debt reserves.  The court stated:

> In my 2003 decision I held that plaintiffs had not met the pleading requirement for this claim because the complaint did not include details about **when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the cancellations experienced, and how many accounts ultimately were uncollectible.**  Loewen Group, 2003 U.S. Dist. LEXIS 15680, at *30-31.  Plaintiffs attempt to rectify these problems in the new complaint.[76]

In dismissing plaintiffs' amended complaint, the court stated:

> Plaintiffs are able to estimate that Loewen Group's reserve for the first quarter of 1997 was $3.9 million less than it should have been.  New compl. P 92.  They arrived at that number by taking the difference between the 13% loss Loewen Group took on the sale of the cemetery receivable to an affiliate and the 8% reserve that Loewen Group maintained in the first quarter of 1997.  Id.  The new complaint also states that the income reported for the third quarter of 1997 was inflated by $3.6 million, and the annual income for 1997 inflated by $15 million, due to Loewen Group's understating its reserve for accounts receivable.  New compl. PP 104, 106, 111….

> Plaintiffs have not pleaded sufficient facts indicating that Loewen Group overvalued its accounts receivable and kept too small a reserve for uncollectible receivables.  ...  As I stated in my 2003 decision, "neither the increase in allowance toward the end of the class period nor the eventual financial ruin of Loewen Group are proof that defendants committed any

---

[75]      2003 U.S. Dist. LEXIS 15680; and 2004 U.S. Dist. LEXIS 16601 (E.D. Pa. Aug. 18, 2004).

[76]      Id. at *34 [footnote omitted; emphasis added].

acts worse than mismanagement." <u>Loewen Group</u>, 2003 U.S. Dist. LEXIS 15680, at *30-31, citing <u>In re Milestone Scientific Sec. Litig.</u>, 103 F. Supp. 2d 425, 465-66 (D.N.J. 2000).  I will dismiss this claim.[77]

Plaintiffs' Complaint suffers from the same deficiencies as the complaint in <u>Loewen</u>.  It alleges no particulars concerning the alleged understatement of UHS's bad debt reserves during the Class Period.  There are no allegations concerning why the reserve taken by UHS was unreasonable in light of the company's historic performance or the amount of the uncollectible accounts experienced by the company in the past or expected by the Company in the future.  There are no allegations concerning why or to what level UHS's reserve should have been restated.  There is only a bald conclusory assertion set forth in a table in ¶ 78 of the Complaint that if UHS had reserved in the Second and Third Quarter of 2003 the same percentage of net revenue as it did in the Fourth Quarter, UHS would have reported lower earnings.  This case is a clear instance of Plaintiffs' attempting to allege fraud by asserting what was done at a given time in response to a circumstances that existed at the time should have been done earlier.  If such an effort were countenanced, there would be a reversion to the conditions that prevailed prior to the passage of the PSLRA, and the intention of Congress in passing that statute would be frustrated.

The fatal defect in the Complaint is that no facts are alleged that set forth what the reserves should have been in the Second and Third Quarter and why.  Accordingly, this Court should reach the same result as the <u>Loewen</u> court and dismiss Plaintiffs' 10b-5 claim with prejudice.

      3.      An Alleged Failure to Reserve Unidentified Purportedly Uncollectible Receivables Does Not Support a 10b-5 Claim.

Plaintiffs premise their bad debt claim on the alleged fact that at some UHS hospitals "no accounts less than 180 days old were to be considered bad debt."  (Compl. ¶ 28).  As previously

---

[77]    <u>Id</u>. at *36-37.

discussed, this allegation does not permit the inference that UHS's bad debt reserves, which were reviewed and adjusted for adequacy at the corporate level, were inadequate.[78]  Moreover, such an allegation is insufficient as a matter of law to establish a securities fraud claim.

In Scritchfield v. Paolo, in granting a motion to dismiss, the court stated that a company's "alleged failure to write-off bad debts (and its inclusion of 'uncollectible' invoices as revenue) … are not actionable."[79]  The Scritchfield court noted that such allegations failed "to support an inference that Defendants fraudulently inflated their revenue."[80]  The court stated:

> Plaintiffs claim that "earnings also were materially inflated as a result of defendants' failure to write off uncollectible receivables and establish and maintain an adequate bad debt reserve," because "[the company] did not have an effective system in place to monitor and collect outstanding accounts receivables [sic]."  Complaint, ¶36.  The evidence supporting this contention is that "accounts receivable skyrocketed during the Class Period from $171,897 at June 30, 1999 to $1,880,178 at September 30, 2000," and that [the company] "added and billed customers without regard to their poor credit histories."  Id.[81]

The Scritchfield court held that these allegations "demonstrate[ ] nothing of consequence" and could not support a 10b-5 claim.[82]

Plaintiffs' allegations in this case echo those in Scritchfield.  As the Scritchfield court held, an inference that bad debt reserves were understated may not be drawn from the fact that a company did not immediately write off allegedly uncollectible receivables or from allegations that a defendant included such receivables in revenue.  The issue is whether there is any allegation that at the time it reported its operating results for the Second and Third Quarter, UHS

---

[78]     See supra Points II.B. and II.D.1.

[79]     274 F. Supp. 2d 163, 186 (D.R.I. 2003).

[80]     Id.

[81]     Id.

[82]     Id.

knew facts that made its estimate of its bad debt reserve inadequate.  No such facts are alleged.
In this case, as in <u>Scritchfield</u>, the fact that UHS increased its reserves in the Fourth Quarter is of
no consequence.

Similarly, the <u>Loewen</u> plaintiffs alleged that Loewen's high sales commissions coupled
with low down payments encouraged pre-need cemetery sales (the product defendant was
selling) that "would lead to a high level of customer defaults."[83]  They contended that
defendants' "reported revenue and income were inflated during the class period by the
corporation's failure to account properly for its pre-need cemetery accounts receivable."[84]
Plaintiffs alleged that Loewen did not "make allowances high enough to cover" expected
uncollectible receivables nor did it "write down or write off accounts receivables that it knows
are not collectible in full."[85]  In dismissing the complaint, Judge O'Neil faulted plaintiffs for not
providing "any dollar amounts or percentages by which Loewen Group's revenue and figures are
inflated.  Nor do they plead when adjustments to accounts receivable or increases in allowance
should have been made or why the adjustments and increases made by Loewen Group were
unreasonable."[86]

The issue of whether UHS waited 180 days to reserve doubtful accounts also is a red
herring.  As previously noted, services rendered to patients who were not capable of making
payment were classified as charity care and not included in revenues or receivables.
Accordingly, there was no reason to reserve the amounts attributable to charity care.  Similarly,
because UHS recorded its revenues and receivables net of reductions from adjustments by third

---

[83]     2003 U.S. Dist. LEXIS 15680, at *26-27.

[84]     <u>Id</u>. at *25.

[85]     <u>Id</u>. at *27.

[86]     <u>Id</u>. at *29.

party payors such as Medicare or Medicaid, there was no need for it to add an estimate of such adjustments to the bad debt reserve.  Thus, the allegations Plaintiffs made in ¶¶ 28 and 29 of the Complaint about UHS not considering as bad debt charges that it knew or anticipated would be uncollectable do not support the contention that UHS understated its bad debt reserve.

> 4.    Plaintiffs Have Not Stated a 10b-5 Claim Based on UHS's Predictive Statements Concerning Bad Debt Reserves.

Bad debt reserves are a company's estimate of the amount of its revenue that will not be collected and will have to be written off at a future date.  The <u>Christidis</u> court noted that these reserves were "estimates or predictions" concerning future collections.[87]  A bad debt reserve is, by its nature, a forward looking predictive statement.

In <u>Shapiro</u>, the Third Circuit addressed a bank's loan loss reserves and noted factors that are equally applicable to bad debt reserves: the reserves are set up in light of "expectations" of future loss; a variety of methods can be used to set the reserve; no matter what method is used, "economic judgments" are made to set the reserves; and those judgments can be validated only at some future date.[88]  The mere fact that at a future date the reserve may be increased does not mean the reserve was false or misleading at the time it was created and cannot give rise to a 10b-5 claim.[89]

The PSLRA requires that plaintiffs plead facts that show a statement was false when it was made.  There are no such facts alleged in the Complaint.  It is not enough to claim that a predictive statement was false because the future did not turn out as predicted.  As we have

---

[87]    717 F.2d at 100.

[88]    964 F.2d at 281.

[89]    <u>See</u> <u>Loewen Group</u>, 2003 U.S. Dist. LEXIS 15680, at *30-31 ("[n]either the increase in allowance toward the end of the class period nor the eventual financial ruin of Loewen Group are proof that defendants committed any acts worse than mismanagement").

noted, Plaintiffs' theory of the case is that because UHS increased its bad debt reserve in the Fourth Quarter of 2003, the reserves that UHS took in the Second Quarter and the Third Quarter must have been fraudulently understated.  By definition, a reserve is a predictive statement representing a judgment of what the future portends.  Securities fraud liability cannot be imposed merely because the future turns out to be other than what was predicted.  One hundred percent accuracy of predictions requires omniscience.  Rule 10b-5 does not impose liability for not being omniscient.  It does not permit "fraud by hindsight" which has been defined as the 'attempt to impose liability on management for unrealized economic predictions.'"[90]  The Third Circuit has noted that the PSLRA was intended to eliminate such "fraud by hindsight claims."[91]

A predictive statement, such as a statement of bad debt reserves, is actionable under Rule 10b-5 only where the statement was not a reasonable, good faith prediction or was made with knowledge that it was not based upon a sound method applied to factual or historical data.[92]  To state a 10b-5 claim, it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis.  Instead, plaintiffs bear the burden of pleading factual allegations, not hypotheticals, sufficient to reasonably allow the inference that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology.[93]  Plaintiffs simply have not met this burden.

---

[90]  In re Milestone Scientific Sec. Litig., 103 F.Supp. 2d at 458 (quoting Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1040 (6th Cir. 1991)).

[91]  Rockefeller Center, 311 F.3d at 225; see also Ikon Office Solutions, 277 F.3d at 673 (securities fraud claim cannot be premised on fraud by hindsight because the law does not expect clairvoyance).

[92]  Alfaro v. E.F. Hutton & Co., Inc., 606 F. Supp. 1100, 1104 (E.D. Pa. 1985) ("predictions not made in good faith or made with the knowledge that they are not based upon a sound, factual or historical basis are actionable under § 10(b) and Rule 10b-5"); see also Isquith v. Middle South Utilities, Inc., 847 F.2d 186, 203-04 (5th Cir.), cert. denied, 488 U.S. 926 (1988).

[93]  Advanta, 180 F.3d at 536; see also Burlington Coat Factory, 114 F.3d at 1429.

Plaintiffs make no allegation concerning what method UHS used in setting its bad debt reserve during the Class Period let alone that that method was not sound.[94]  Nor do they allege that in setting its reserves in 2003 UHS departed from past practice or acted inappropriately in light of either the results it had experienced in its prior 25 years of operation or the information that was then available to it.  There is nothing alleged in the Complaint that would allow the inference that in making its predictive statement concerning bad debts or in setting its reserve, UHS did not act reasonably and in good faith.

The Federal Practice and Jury Instructions dealing with securities regulation note that a predictive statement made on a reasonable basis can give rise to a securities fraud claim only if the party making the prediction (i) did not believe it was reliable; (ii) had reason to believe it was not reliable; or (iii) was aware of undisclosed facts tending to seriously undermine the accuracy of the prediction.[95]  Plaintiffs do not allege that any of these factors is present in this case.  They do not allege facts from which it may be inferred that UHS believed its estimate of bad debt reserves was not reliable.  Nor do they allege facts that indicate that UHS had reason to believe that its estimate was not reliable.  Plaintiffs have made no allegation that UHS was aware of facts that seriously undermined the accuracy of its estimate.  In the absence of such allegations, a 10b-5 claim cannot be premised on UHS's predictive statement concerning its bad debt reserves that it made on a reasonable basis based on its past experience and data currently available to it.

The securities laws provide specific protection to a defendant who makes a forward looking predictive statement.  Under the PSLRA, a statement is forward looking if it relates to

---

[94]     As previously noted, Plaintiffs do not even allege what UHS's policy and practice was during the class period to set the bad debt reserve that was included in its financial statement.

[95]     3B O'Malley, Grenig & Lee, <u>Federal Jury Practice and Instructions:  Civil</u> § 16, at 237 (2001); <u>see also</u> <u>Eisenberg v. Gagnon</u> 766 F.2d 770, 775 (3d Cir.), <u>cert. denied</u>, 474 U.S. 946 (1985).

"revenues" or sets forth a "projection" of a "financial item."[96]  A bad debt reserve falls squarely within that definition.  It is a projection by a company of the anticipated uncollectible portion of the revenues reported on its income statement and of the accounts receivable reported on its balance sheet.

Under the PSLRA, a defendant could have 10b-5 liability arising from such a projection only if the forward looking statement was made with "actual knowledge" that it was false or misleading.[97]  Plaintiffs have failed to state a 10b-5 claim because they have alleged no facts from which it reasonably may be inferred that when UHS announced its quarterly results for 2003, any defendant had "actual knowledge" that the statements concerning the company's bad debt reserve were false or misleading.[98]

> 5.    Plaintiffs Have Not Alleged Any Characterization by UHS of Its Bad Debt Reserves.

Under the Third Circuit's decision in <u>Shapiro</u>, a company's failure to make adequate provision for doubtful accounts does not, standing alone, give rise to a 10b-5 claim.[99]  In <u>Shapiro</u>, shareholders in a bank holding company alleged that the company violated 10b-5 by misstating its loan loss reserves.  In affirming dismissal of that portion of the plaintiff's claim, the Third Circuit held that defendants could not be held liable for "failing to predict the future."[100]  The <u>Shapiro</u> court held that plaintiffs did not state a 10b-5 claim by alleging

---

96    15 U.S.C. § 78u-5(i)(1)(A); <u>Advanta</u>, 180 F.3d at 536.

97    15 U.S.C. § 78u-5(c)(1)(A)-(B).

98    <u>See</u>, <u>infra</u>, Point III.B.

99    964 F.2d 272; <u>accord</u> <u>In re Milestone Scientific Sec. Litig.</u>, 103 F. Supp. 2d at 469 n.32.

100   <u>Shapiro</u>, 964 F.2d at 283.

defendants failed to disclose the alleged inadequacy of loan loss reserves "in light of the 'high risk of non-collectibility.'"[101]  The court stated:

> [M]ere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable.  Similarly, if a defendant has not commented on the nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves, earnings, assets, or net worth, it is not a violation of the securities laws to fail to characterize these practices as inadequate, meaningless, out of control, or ineffective.  Craftmatic, 890 F.2d at 633 n.5 & 640 (dismissing allegations that defendants failed to disclose general subjective assessments of controls, organization, and management information systems).
>
> However, where a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play."  For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.  Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud.  By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.[102]

Under Shapiro, where, as here, no facts are alleged that a defendant engaged in unreasonable accounting practices which distorted its financial operations, the fact that a company maintained inadequate reserves could give rise to a 10b-5 claim only if the company mischaracterized its reserves.  Plaintiffs have made no allegation that UHS in any way characterized its bad debt reserves or commented upon the adequacy or strength of those reserves.  All Plaintiffs allege is that during the Class Period UHS's bad debt reserve must have

---

[101]   Id.; see also In re Healthcare Group Inc. Sec. Litig., 1993 U.S. Dist. LEXIS 2847, at *9 (E.D. Pa. Mar. 1, 1993).

[102]   Shapiro, 964 F.2d at 281-82.

been understated and inadequate because UHS subsequently increased it.   Under <u>Shapiro</u>,

Plaintiffs' 10b-5 claim concerning the alleged inadequacy of UHS's bad debt reserve must be

dismissed for failure to state a claim.[103]

**Point III.**

**PLAINTIFFS' 10b-5 CLAIM SHOULD BE DISMISSED
FOR FAILURE TO ALLEGE FACTS GIVING
<u>RISE TO A STRONG INFERENCE OF SCIENTER</u>**

Under the PSLRA, a plaintiff alleging a 10b-5 claim must "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."[104]   In a

10b-5 claim, this required state of mind, scienter, is defined as "a mental state embracing intent

to deceive, manipulate or defraud."[105]   A plaintiff may plead a "strong inference" that the

defendants acted with scienter "either (a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."[106]   Plaintiffs' Complaint

meets neither standard.

---

[103]   <u>See</u> <u>Hinerfeld v. United Auto Group</u>, 1998 U.S. Dist. LEXIS 10601, *21-22 (S.D.N.Y. July 15, 1998) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under the federal securities laws"); <u>see</u> <u>also</u> <u>Healthcare Services Group</u>, 1993 U.S. Dist. LEXIS 2847, at *9 (under the securities law, "a company is under no duty to provide adequate reserves for potential losses on defaulted loans or accounts receivable").

[104]   15 U.S.C. § 78u-4(b)(2) .

[105]   <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976); <u>see</u> <u>also</u> <u>In re Phillips Petroleum Sec. Litig.</u>, 881 F.2d 1236, 1244 (3d Cir. 1989).

[106]   <u>See</u> <u>also</u> <u>GSC Partners</u>, 368 F.3d at 237; <u>Oran</u>, 226 F.3d at 288-89; <u>Advanta</u>, 180 F.3d at 534-35; <u>Burlington Coat Factory</u>, 114 F.3d at 1418 (quoting <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 53 (2d Cir. 1995)).   Recklessness is defined as an extreme departure from the standards of ordinary care, which presents a danger of being misleading that is either known to defendant or so obvious that he must be aware of it.  <u>EP Medsystems v. EchoCath, Inc.</u>, 235 F.3d 865, 880 (3d Cir. 2000).

A.      **Plaintiffs Fail to Allege Motive and Opportunity**

In GSC Partners, the Third Circuit in discussing what constitutes "motive" under the

PSLRA's pleading standard, stated:

> Motive must be supported by facts stated "with particularity," and must
> give rise to a "strong inference" of scienter.  In re Advanta, 180 F.3d at
> 535; 15 U.S.C. § 78u-4(b)(2).  "Blanket assertions of motive and
> opportunity" will not suffice, and "catch-all allegations that defendants
> stood to benefit from wrongdoing and had the opportunity to implement a
> fraudulent scheme are no longer sufficient, because they do not state facts
> with particularity or give rise to a strong inference of scienter."  In re
> Advanta, 180 F.3d at 535.  Moreover, "[m]otives that are generally
> possessed by most corporate directors and officers do not suffice; instead,
> plaintiffs must assert a concrete and personal benefit to the individual
> defendants resulting from this fraud."  Kalnit v. Eichler, 264 F.3d 131, 139
> (2d Cir. 2001) (citation omitted).[107]

As this Court noted in Aetna, a plaintiff pleading motive must show concrete benefits that

could be realized by defendants as a result of the alleged wrongful disclosures.[108]  Plaintiffs

attempt to plead motive by alleging that Miller and Filton "sold" $6.6 million of UHS stock

during the Class Period.  Plaintiffs try to present a picture whereby Miller and Filton fraudulently

pumped up the price of UHS stock and then dumped their holdings on an unsuspecting public.

This simply is not true and is contradicted by publicly available records on file with the SEC.

Plaintiffs allege that on March 1, 2004, the alleged fraudulent scheme ended, the true

facts were revealed and UHS stock dropped because it was no longer inflated by the alleged

fraudulent disclosure.  The documents on file with the SEC show that on March 15, 2004, Miller

exercised options and "sold" 23,023 shares of UHS stock and Filton exercised options and "sold"

4,605 shares.[109]  If Defendants actually were engaging in a fraudulent scheme to inflate UHS's

stock price during the Class Period, one would think Miller and Filton would have "sold" their

---

[107]      368 F.3d at 237.

[108]      34 F. Supp. 2d at 955.

[109]      Appendix TAB 17.

shares at the inflated prices and not two weeks later after the purported truth had been revealed and the market price had dropped.

When a corporate officer or director engages in a transaction in the corporation's stock, he must file a Form 4 with the SEC. The Form 4 filings with the SEC made in connection with the alleged "sales" by Miller and Filton clearly show that there was no public sale of UHS stock by either of them.[110] They received no money from the sale of UHS stock. The Form 4s show that what the Complaint characterizes as "sales" were not market transactions but were the cashless exercise of options. Miller and Filton basically gave up their right to purchase a portion of the option shares (the amount reflected as a sale) and UHS credited the value of those shares to satisfy the purchase price of the remainder of the option shares (the amount reflected as a purchase).[111]

The individual Defendants' transactions, "cashless exercises" of options that were part of their compensation packages, did not result in a decrease in their holdings. After the cashless exercise, each of Miller and Filton owned more shares of UHS than they held prior to the exercise. The net increase in Miller and Filton's holdings unquestionably undermines Plaintiffs' claim of fraud. As the court noted in <u>Wilson v. Bernstock</u>:

> While an individual corporate defendant's retention or sale of his or her stock holdings does not conclusively negate any inference of scienter, in the absence of other facts supporting Plaintiffs' theory of motive, these facts do tend to significantly undermine Plaintiffs' suggestion that Defendants were motivated by serious concerns about the company's

---

[110]    Appendix TABs 12-16.

[111]    For example, the July 30, 2003 Form 4 for Miller (Appendix TAB 14) shows that he acquired 50,000 UHS shares at an option exercise price of $25.8125 such that his purchase price was $1,290,625. Miller also "sold" 24,940 shares of UHS at $51.75 per share or, in the aggregate, $1,290,645. The slight difference in numbers resulted from the fact that the transaction did not involve fractional shares.

survival and a desire to "save" or preserve that portion of their personal wealth which was tied up in Vlasic securities and stock options.[112]

The lack of sales in the public marketplace of stock for cash by Miller and Filton totally undermines Plaintiffs' attempt to satisfy the scienter pleading requirement by alleging motive and opportunity.  As the Third Circuit stated in <u>Oran v. Stafford</u>:

> The gravamen of plaintiffs' case against the individual officer-defendants is that they intentionally concealed material information in order to artificially inflate the price of AHP's stock, and then profited by selling their own stock at this inflated price shortly before the public disclosure of the Mayo data.
>
> Plaintiffs do not dispute that Stafford and Jones traded no stock during the relevant period.  This reason alone requires that we affirm the District Court's dismissal of the claims against these two defendants.[113]

Even if this Court were to consider the cashless exercise of options by Miller and Filton as trading in UHS stock, Plaintiffs would still fail to plead motive and opportunity because they have alleged no facts showing the transactions were unusual in scope or timing.  The <u>Alpharma</u> court addressed the exercise stock options by corporate insiders stating:

> '[a] large number of today's corporate executives are compensated in terms of stock and stock options.'  <u>In re Advanta</u>, 180 F.3d at 541 (quoting <u>In re Burlington Coat Factory</u>, 114 F.3d at 1424).  Thus, "'[i]t follows . . . that these individuals will trade those securities in the normal course of events.'"  <u>Id</u>.  Although we have recognized that an inference of scienter may be created when plaintiffs demonstrate that sales are "unusual in scope or timing," <u>id</u>. at 540, we concluded that the plaintiffs in both <u>In re Burlington Coat Factory</u> and <u>In re Advanta</u> failed to establish such an inference based in part on the fact that some key insiders sold no stock

---

[112]     195 F. Supp. 2d 619, 638 (D.N.J. 2002); <u>see</u> <u>also</u> <u>In re First Union Corp. Sec. Litig.</u>, 128 F. Supp. 2d 871, 899-900 & n.30 (W.D.N.C. 2001) ("The public record also establishes that Mr. Georgius' net holdings of First Union stock <u>actually increased</u> by 3.9% during the "Class Period" -- a fact Plaintiffs omit because it is wholly inconsistent with their contention that he knew undisclosed negative information about the Company."); <u>Landgraff v. Columbia/HCA Healthcare Corp. of Am.</u>, 2000 U.S. Dist. LEXIS 21831, at *56-59 (M.D. Tenn. May 24, 2000), <u>aff'd</u>, 2002 U.S. App. LEXIS 2334 (2002) (transaction by various individual defendants, including one cashless exercise of stock options, "do not indicate that the members of the retirement committee and other executives were substantially reducing their investments in company stock.").

[113]     226 F.3d at 289.

during the class period.  See In re Burlington Coat Factory, 114 F.3d at
1423; In re Advanta, 180 F.3d at 540-41.

… we note that the Complaint fails to allege that the sales of the remaining
three individual defendants were unusual in scope (e.g., compared to their
total level of compensation or the size of previous sales) or timing (e.g.,
compared to the timing of past trades).  The allegations therefore fail to
give rise to a strong inference of scienter.[114]

The Third Circuit has recognized that "stock options are commonly an important part of

compensation packages, and refused to impute scienter based on sales of such shares."[115]  As the

Third Circuit stated in Burlington Coat Factory:

A large number of today's corporate executives are compensated in terms
of stock and stock options.  It follows that these individuals will trade
those securities in the normal course of events.  We will not infer
fraudulent intent from the mere fact that some officers sold stock.  Instead,
plaintiffs must allege that the trades were made at times and in quantities
that were suspicious enough to support the necessary strong inference of
scienter.[116]

As the Form 4s show, Miller and Filton exercised options that would have expired during

the Class Period.  Such action is neither suspicious or unusual.

Plaintiffs' attempt to allege a strong inference of scienter also falls short because the

Complaint contains no allegations concerning the total stock holdings of Miller or Filton.[117]

Miller, for example, according to UHS's proxy statement for its 2004 annual meeting filed with

the SEC,[118] holds 5,395,668 shares of UHS Class B Common Stock,[119] the Class that is publicly

---

[114]   372 F.3d at 152.

[115]   In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D.N.J. 2001).

[116]   Burlington Coat,, 114 F.3d at 1424; see also In re Advanta, 180 F.3d at 541 ("Although the profits realized
by the defendants were significant relative to their base salaries, these proceeds were the result of
accumulated stock options and were an intended part of their overall compensation package.")

[117]   Burlington Coat Factory, 114 F.3d at 1422-24.

[118]   Appendix TAB 4.

[119]   This figure includes 1,230,000 shares issuable pursuant to stock options exercisable within 60 days of
March 31, 2004.  See id., p. 4.

traded, and holds 3,618,144 shares of other classes of stock.[120]  It is simply absurd for Plaintiffs to contend that Miller, the founder of UHS who has guided the Company for over 25 years, fraudulently inflated the price of UHS stock for six months[121] so that he could "sell" a small fraction (1.1%) of his UHS holdings, 102,587 shares (Comp. ¶ 58), at an inflated price.[122]

It also does not make sense for Plaintiffs to contend that Miller and Filton, who has been an officer in UHS's accounting department for nearly 20 years,[123] caused UHS to disseminate false financial statements to inflate the price of the company's stock over a short period.  As the Third Circuit noted in <u>Burlington Coat Factory</u>:

> [a]s a general matter, though, causing temporary inflations of price through the dissemination of false information hurts the long term stock price of the company and thereby presumably hurts managerial compensation that may be tied to the long term performance of the company.[124]

Plaintiffs also fail to make any allegation that the transactions by Miller or Filton are in contrast to their prior transactions in UHS stock.[125]

Even if the Court were to assume that Miller and Filton profited from their cashless exercises of options, the Complaint fails because there is no allegation that the profits realized

---

[120]    These shares are convertible into Class B Common Stock on a one for one basis.

[121]    If Plaintiffs' theory of the case were accepted, there could be only a six or seven month period when UHS stock was inflated.  Plaintiffs contend that UHS bad debt reserves were understated because the Company did not reserve receivables until they had aged for 180 days even though the Company should have recognized from with that 180 day period that the receivable was not collectible and therefore should have been reserved.  (Compl. ¶ 28).  Under Plaintiffs' theory, UHS could only benefit from its policy for, at most, two quarters because after 180 days the uncollected receivable would be added to the reserve.

[122]    The absurdity of Plaintiffs' theory of the case is further compounded by the fact that neither Miller nor Filton put a penny in their pocket from the public sale of UHS stock during the Class Period.

[123]    <u>See</u> Appendix TAB 2, p.14.

[124]    114 F.3d at 1423 n.12; <u>see</u> <u>also</u> <u>Advanta</u> 180 F.3d at 540-41 (the fact that defendants "sold only a small percentages of their holdings . . . suggests they had every incentive to keep <u>Advanta</u> profitable").

[125]    <u>See</u> <u>Alpharma</u>, 372 F.3d at 140-41; <u>In re Milestone Scientific Sec. Litig</u>, 103 F. Supp. 2d at 471 ("Because the Amended Complaint fails to indicate the previous trading volume and, or, practices of [the selling insider], it is difficult, if not suspect, to assign this number any significance").

from the alleged insider trading were significant in relation to the base salaries and overall compensation packages, including stock options, held by Miller and Filton.[126]  Plaintiffs allege Filton sold 4,077 shares of UHS stock.  (Compl. ¶ 58).  Plaintiffs cannot seriously contend that Filton risked his career at UHS, his professional reputation and criminal sanction so that he could garner extra profits on the "sale" of 4,077 shares of stock.

Plaintiffs also allege that Miller had a motive to commit fraud because he stood to benefit from a "restricted stock award program" if UHS "achieved a 14% cumulative increase in earnings during the two year period ending December 31, 2004."  (Compl. ¶ 59).  There is no way UHS could have achieved that goal by understating its bad debt reserves for two quarters. Indeed, Plaintiffs' theory of the case is that UHS understated its reserves in the Second and Third Quarter of 2003 and increased them in the Fourth Quarter as part of a "true-up."   Taking Plaintiffs' theory of the case as true, an inflation in UHS's earnings in the Second and Third Quarter of 2003 resulting from an understated bad debt reserve would be offset later by a decrease in UHS's earnings when uncollectible receivables were written off and the allegedly understated reserve was increased.  Because the alleged understatement of the bad debt reserve could not have contributed to a 14% cumulative increase in earnings for the two years ended December 31, 2004, Plaintiffs' allegations concerning the "restricted stock award program" cannot give rise to a strong inference of scienter.

---

[126]   Oran v. Stafford, 226 F.3d at 289; Advanta, 180 F.3d at 541; Burlington Coat Factory, 114 F.3d at 423 ("Nor do we have information as to whether the profits made were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have an incentive to commit fraud").

**B.      Plaintiffs Have Not Alleged Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Plaintiffs' Complaint also fails to set forth any facts that could constitute circumstantial evidence of conscious misbehavior or recklessness.

Plaintiffs make a conclusory allegation that UHS's "executives were well aware of the status of bad debt accounts to appropriately record the information in UHS financials." (Compl. ¶ 50). This pleading is simply insufficient to give rise to a strong inference of scienter. Where, as here, plaintiffs contend that defendants had access to facts which contradicted information disseminated to the public, they must specifically identify the reports or statements containing this information.[127]

"In the absence of any allegations regarding the factual content of any single report received by the Individual Defendants that would have provided a basis for advance knowledge of the falsity of their statements," a securities fraud claim does not adequately allege circumstantial evidence of conscious misbehavior.[128]   In this case, since Plaintiffs do not allege the factual content of any such report, their Complaint fails.

The Complaint also fails to allege recklessness that would give rise to the strong inference of scienter required by the PSLRA.   As previously discussed in Point II.D, supra, Plaintiffs have not even alleged what UHS's corporate policy or practice was in setting its bad debt reserve.   Therefore, it is impossible for Plaintiffs to claim that that policy or practice was "highly unreasonable" or an "extreme departure from the standards of ordinary care.[129]

---

[127]   In re Nice Systems Sec. Litig., 135 F. Supp. 551, 585 (D.N.J. 2001); NAHC, 2001 U.S. Dist. LEXIS 16754, at *64; Sunquest Information Systems v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 661 (W.D. Pa. 1999)

[128]   NAHC, 2001 U.S. Dist. LEXIS 16754, at *64; see also Advanta 180 F.3d at 539 ("Generalized inputations of knowledge do not suffice, regardless of the defendants' positions within the company").

[129]   Advanta, 180 F.3d at 535.

**Point IV.**

**PLAINTIFFS' 10b-5 CLAIM SHOULD BE
DISMISSED FOR LACK OF LOSS CAUSATION**

As the Third Circuit noted in <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>,[130] causation under Rule 10b-5 has two prongs:  (1) transaction causation which establishes that but for the fraudulent misrepresentation the investor would not have purchased or sold the security,[131] and (2) loss causation which demonstrates that the fraudulent misrepresentation actually caused the loss for which plaintiff seeks redress.[132]

Initially, courts viewed the loss causation requirement as an outgrowth of the standard tort rule that plaintiff must allege and prove that defendant's wrongdoing proximately caused plaintiff's injury.[133]   The PSLRA made loss causation an essential element of a 10b-5 claim requiring a plaintiff to plead facts that the alleged violation "caused the loss for which plaintiff seeks to recover."[134]

To satisfy the loss causation element, a 10b-5 plaintiff must plead facts "that the alleged misrepresentations proximately caused the decline in the security's value."[135]   This pleading burden can be met by a showing that the stock price dropped in response to the disclosure of facts that allegedly had been misrepresented or concealed.[136]

---

[130]     259 F.3d 154, 172 (3d Cir. 2001).

[131]     <u>Id</u>. at 172-73  (citing <u>Weiner v. Quaker Oats</u>, 129 F.3d 310, 315 (3d Cir. 1997)).

[132]     259 F.3d at 173  (citing <u>EP MedSystems, Inc. v. EchoCath, Inc.</u>, 235 F.3d at 883-84).

[133]     <u>Newton</u>, 259 F.3d at 178; <u>see also</u> <u>In re Phillips Petroleum Sec. Litig.</u>, 881 F.2d 1236, 1244 (3d Cir. 1989).

[134]     15 U.S.C. §78u-4(b)(4); <u>see also</u> <u>Newton</u>, 259 F.3d at 177.

[135]     <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 185 (3d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1149 (2001).

[136]     <u>Semerenko</u>, 223 F.3d at 186; <u>In re Ikon Office Solutions, Inc. Sec. Litig.</u>, 131 F. Supp. 2d 680, 687 (E.D. Pa. 2001), <u>aff'd</u>, 277 F.3d 658 (3d Cir. 2002).

"Loss Causation" is required so as not to "'transform the defendant into an insurer of the stock, a result which is contrary to the purpose of the federal securities laws.'"[137]   If a 10b-5 plaintiff were not required to show loss causation -- that the harm suffered flowed from the alleged misstatement -- the defendant "would become 'an insurer of the investment, responsible for an indefinite period of time for any and all manner of unforeseen difficulties which may eventually beset the stock.'"[138]

If a plaintiff alleging a 10b-5 claim does not plead loss causation, his complaint should be dismissed.   "Absent the requisite causal nexus between [Defendant's] allegedly misleading conduct and a *measurable decrease* in share price, Plaintiff's 10b-5 claim must be dismissed on Defendant's motion."[139]

In this case, Plaintiffs complain about a drop in the price of UHS stock that occurred on March 1, 2004.  Plaintiffs allege that UHS's stock closed at $53.93 on Friday February 27, 2004 (Compl. ¶ 6) and on Monday March 1, 2004, it "fell $9.05, or 17%, to $44.88." (Compl. ¶ 8). The facts in the public record conclusively show that this loss had nothing to do with UHS's bad debt reserves.

---

[137]   In re Cybershop.com Sec. Litig., 189 F. Supp. 2d 214, 233 (D.N.J. 2002) (quoting Wiley v. Hughes Capital Corp., 746 F. Supp 1264, 1294 (D.N.J. 1990)).

[138]   Edward J. DeBartolo Corp. v. Coopers & Lybrand, 928 F. Supp. 557, 562 (W.D. Pa. 1996) (quoting Marbury Managements, Inc. v. Kohn, 629 F.2d 705, 718 (2d Cir.) (Meskill, J., dissenting), cert. denied sub nom Wood Walker & Co. v. Marbury Management, Inc., 449 U.S. 1011 (1980)).

[139]   In re Cybershop.com, 189 F. Supp. 2d at 233 [emphasis added] (citing Semerenko, 223 F.3d at 185) ("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation"); see also In re NUI Sec. Litig., 314 F. Supp. 2d 388, 401 (D.N.J. 2004) (dismissing securities fraud claim for failure to allege loss causation or a causal nexus between the alleged violation and a drop in the price defendant's stock); In re Ikon Office Solutions Sec. Litig., 131 F. Supp. 2d at 689 (dismissing securities fraud complaint on loss causation grounds where "[n]either analyst reports nor plaintiffs' expert analysis indicate that the stock decline was caused by anything other than business conditions and operational and management problems").

It is undisputed that on February 18, 2004, UHS issued a Press Release which stated it was increasing its bad debt reserves.  (Compl. ¶ 47). That Press Release stated:

> The Company's provision for doubtful accounts was 7.8% of net revenues during the fourth quarter of 2003 as compared to 6.9% during the prior year's fourth quarter.  The increase resulted primarily from an increase in uninsured and self-pay patients which unfavorably impacts the collectibility of our patient accounts.  We expect this trend to continue until there is a notable strengthening of the labor market.[140]

Plaintiff's Complaint quotes a February 18, 2004, Morgan Stanley research report that stated that UHS had "noted that the higher bad debt expense was used to effectively 'true up' bad debt expense from prior periods."  (Compl. ¶ 48).[141]

Between February 18 and 27, 2004, UHS stock traded between $52.70 and $56.30.  The efficient market absorbed the information disclosed on February 18 concerning UHS's bad debt reserves and reflected it in the closing stock price on Friday, February 27, 2004.  On that day, the market clearly knew, and UHS's closing stock price of $53.93 reflected, that:

- In the Fourth Quarter of 2004, UHS had increased the percentage of its net revenues it set as its bad debt reserves;

- The Fourth Quarter reserve was 7.8% of net revenues, a greater percentage than had been reported for the Third Quarter;

- The increase resulted from an increase in uninsured and self-pay patients;

- UHS expected that trend to continue; and

- UHS purportedly stated that part of the increase in bad debt reserves in the Fourth Quarter was to "true-up" the prior periods.

On Monday, March 1, 2004, before the opening of trading, UHS issued a Press Release. UHS stock opened at $45 that day.[142]  The statements in the March 1 Press Release caused the decline in market price of UHS stock from $53.93 to $45.00.

---

[140]    See also Appendix TAB 6.

[141]    See also Appendix TAB 21, p. 4.

Because of the importance of the March 1 Press Release, Defendants repeat it herein.  It stated:

> Universal Health Services, Inc. announced today that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the $.84 per diluted share recorded in the same period in the prior year.  On the same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions.  Moreover, during this period, certain of the company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay.  In addition, the rising level of uninsured and self-pay patients **continues to** unfavorably impact our bad debt expense.  The Company is vigorously addressing each of these areas.
>
> We will hold a conference call for investors and analysts today at 10:30 a.m. Eastern Time.  The dial in number is 1-877-648-7971.  A digital recording of the conference call will be available two hours after the completion of the conference call and will continue through midnight on March 8, 2004.  To access the recording, call 1-800-642-1687 and enter the conference ID number 5898400.
>
> In addition, Alan B. Miller, Chairman and Chief Executive Officer, will give a presentation on the Company followed by a question and answer session on Tuesday, March 2, 2004 at 9:50a.m. ET at the Raymond James Institutional Investors Conference in Orlando, Florida and at 11:15a.m. ET ion Wednesday, March 3, 2004 at the Lehman Brothers Healthcare Conference in Miami, Florida.  A webcast of today's conference call and both investor conference presentations will be available on the Company's website, http://www.uhsinc.com/.  [emphasis added].[143]

On February 18, UHS had stated that the trend toward more uninsured and self-pay patients had impacted the reserve and that UHS expected the trend would continue.  The market absorbed that information.  The only thing the March 1 Press Release said about UHS's bad debt reserve was that the trend was continuing.  There was no new information in the March 1 Press Release concerning bad debt reserves.  Accordingly, the drop in UHS's stock price at the

---

[142]   Appendix TAB 22.  The stock rebounded to close at $46 on March 3 and above $47 on each of March 4 and 5.  On March 31, the stock closed at $46.07.  Id.

[143]   Appendix TAB 5.

opening of trading on March 1 had nothing to do with bad debt reserves and could not have been caused by any prior misstatement or omission concerning UHS's bad debt reserves.

UHS's stock price dropped on March 1, 2004 in response to the company's announcement that its earnings for the First Quarter of 2004 could be as much as 25% below the earnings it reported in the First Quarter of 2003.[144]   The securities laws do not provide an insurance policy to reimburse investors for a loss they suffer when a company encounters a downturn in its business.

Since the March 1 price drop had nothing to do with bad debt reserves, Plaintiffs cannot allege that misstatements about UHS's bad debt reserves in the Class Period caused them to suffer a loss.  The PSLRA requires that a plaintiff plead facts showing that the revelation of facts that had been misrepresented or concealed, and not a downturn in the issuer's business, caused a decline in the price of the issuer's stock.  The PSLRA's loss causation requirement was intended to weed out at the pleading stage attempts to use the securities laws to recover for trading losses caused by a downturn in a company's business.  Plaintiff's failure to allege loss causation is an uncurable defect in the Complaint and requires its dismissal.

---

[144]   Because the loss of which Plaintiffs complain happened at the opening of trading at 9:30 a.m. on March 1, 2004, nothing that was said in UHS's conference call an hour later could have caused the loss which Plaintiffs seek to recover.  Accordingly, Plaintiffs' allegations concerning that conference call are irrelevant to the issue of loss causation.  UHS also notes that during the conference call, Filton noted that the increase in the bad debt reserve in the Fourth Quarter was not material.  Appendix TAB 22.  Filton's statement is supported by the fact that the price of UHS's stock was not impacted by the February 18 announcement.  See also supra Point II.C.  In ¶ 53 of the Complaint, Plaintiffs characterize Filton's statement as constituting an "admission" that UHS understated its bad debt reserve in the Class Period.  An adjustment that Filton stated was not material does not constitute such an alleged admission.

## Point V.

## PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED

As the Third Circuit has noted, "Section 20(a) imposes joint and several liability on any person who 'controls a person liable under any provision of the [Exchange Act].'"[145]  There can be no liability under § 20(a) if there is no underlying violation of the Exchange Act by UHS.[146] Accordingly, dismissal of the Rule 10b-5 claim against UHS would require the dismissal of the §20(a)  claims against Miller and Filton.[147]

## Point VI.

## THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND

Dismissal with prejudice and without leave to amend is appropriate in this case since the PSLRA was designed "to filter out weak claims at the early stages of litigation"[148] and to "screen out lawsuits that have no factual basis."[149] These objectives would be frustrated if Plaintiffs were given leave to amend.

Plaintiffs had over six months to prepare the Complaint.  At the October 6, 2004 conference with the Court, defense counsel raised the subject of a motion to dismiss.  At the Court's suggestion, defense counsel advised Class Counsel of what Defendants believed were the most obvious defects in the Complaint so that Class Counsel could attempt to remedy them in

---

[145]   Alpharma, 372 F.3d at 153 (quoting Shapiro v. UJB Financial Corp., 964 F.2d at 279).

[146]   The Winer Family Trust, 2004 U.S. Dist. LEXIS 19244, at *74 ("Plaintiffs alleging a Section 20(a) violation must plead facts showing . . . an underlying violation by the company").

[147]   Alpharma, 372 F.3d at 153 ("because plaintiffs failed to state a Rule 10b-5 claim against the company, its Section 20(a) claim against the Individual Defendants fails as well"); In re Digital Island Sec. Litig., 357 F.3d 322, 337 (3d Cir. 2004) (because "[l]iability under Section 20(a) is derivative and must be predicated upon an independent violation of the '34 Act," dismissal of the 10b-5 claim requires dismissal of the Section 20(a) claim).

[148]   Alpharma, 372 F.3d at 153.

[149]   NAHC, 306 F.3d at 1332; accord GSC Partners, 368 F.3d at 246.

an amended complaint prior to the filing of this motion.  Plaintiffs chose not to do so.  Having chosen to stand on their Complaint and to force Defendants and this Court to be burdened with this motion to dismiss, Plaintiffs should not be given leave to replead.  When Plaintiffs have failed to remedy defects in their Complaint noted by Defendants, dismissal with prejudice is appropriate.[150]

Plaintiffs also are incapable of amending their Complaint to remedy its defects because it is impossible for them to plead facts that can set forth these essential elements of a 10b-5 claim. Leave to amend is properly denied where the amendment would be futile.[151]

---

[150]    Alpharma, 372 F.3d at 153-54 (dismissal with prejudice affirmed where plaintiffs had "already filed previous complaints," "were given an extension of time to assemble the amended consolidated complaint" and "failed to propose an amendment" to the deficiencies noted by defendant); GSC Partners, 368 F.3d at 246.

[151]    Alpharma, 372 F.3d at 154; Digital Island, 357 F.3d at 337; NAHC, 306 F.3d at 1332.

## CONCLUSION

The Complaint should be dismissed with prejudice.

Respectfully submitted,

**ECKERT SEAMANS CHERIN & MELLOTT, LLC.**


BY:   <u>NE 878</u>
            Neil G. Epstein
            Attorney I.D. No. 09776
            1515 Market Street, 9th Floor
            Philadelphia, PA 19102
            (215) 851-8408

**FULBRIGHT & JAWORSKI L.L.P.**
            James Nespole, Esquire
            Glen Banks, Esquire
            666 Fifth Avenue, 31st Floor
            New York, NY 10103-3198
            (212) 318-3000

Dated: Philadelphia, Pennsylvania
       November 30, 2004

Memo of Law for Dismissal.doc