IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LLOYD FREED, Individually      :
and On Behalf of All Others    :
Similarly Situated             :        CIVIL ACTION
                               :
        v.                     :        NO. 04-1233
                               :        (Consolidated)
UNIVERSAL HEALTH SERVICES,     :
INC., et al.                   :


**MEMORANDUM**

**Padova, J.**                                    **May 3, 2005**

_____Presently before the Court in this putative class action is

Defendants' Motion to Dismiss the Amended Consolidated Class Action

Complaint.  For the reasons that follow, said Motion is granted.

I.    BACKGROUND

This action is brought on behalf of a class of public

investors who purchased the securities of Universal Health

Services, Inc. ("UHS") during the period from July 21, 2003 through

February 27, 2004 (the "relevant period").  In Count One of the

Amended Consolidated Class Action Complaint (the "Amended

Complaint"), Lloyd Freed (hereafter "Lead Plaintiff") alleges

violations of Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), as amended by the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule

10b-5 promulgated thereunder, see 17 C.F.R. § 240.10b-5, against

UHS; Alan B. Miller, Chief Executive Officer of UHS and Chairman of

UHS's Board of Directors; and Steve G. Filton, Chief Financial

Officer of UHS.  In Count Two of the Amended Complaint, Lead

Plaintiff alleges violations of Section 20(a) of the Exchange Act against Defendants Miller and Filton (the "individual Defendants"). The essence of Lead Plaintiff's federal securities claims is that Defendants artificially inflated the price of UHS stock by issuing public statements and filing earnings reports that omitted or misstated material facts concerning UHS's rising level of bad debts, and by using accounting manipulations to materially overstate UHS's financial results.  (Am. Cons. Comp. ¶¶ 3, 5, 7.)

UHS is a Delaware corporation which owns and operates acute care hospitals, behavioral health centers, ambulatory surgery centers and radiation oncology centers throughout North America and France, and maintains its principal corporate offices in Pennsylvania.  (Id. ¶¶ 13, 31, 37.)  UHS hospitals and staff provide services which include general surgery, internal medicine, obstetrics, emergency room care, operating room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services, and physiotherapy and laboratory procedures. (Id. ¶ 23.)  UHS receives payments for the services it renders from private-sector insurers, the federal government under the Medicare program, state governments under their Medicaid programs, and directly from uninsured patients.  (Id.)

In 2001 and 2002, the overall hospital market sector began to experience a change in the mix of patients, which led to an increasing level of uninsured patients.  (Id. ¶ 24.)  At the same

time, insured individuals became responsible for an increasing percentage of healthcare expenditures because the burden of health care expenses was shifting from employers, private-sector insurers, and state and federal governments to individuals, while health insurance premiums, co-pay charges and deductibles were steadily rising.  (Id.)  Many hospitals responded to these industry-wide trends by increasing their levels of bad debt reserves in 2003. (Id. ¶ 26.)  UHS, however, reported that it was not affected by the changes other hospitals were experiencing, and decreased its level of bad debt reserves from 11.9% of revenue to 8.5% of revenue. (Id.)  The Amended Complaint alleges that Defendants acted recklessly in reducing UHS's levels of bad debt reserves, and that Defendants kept UHS's bad debt reserves artificially low by materially understating the amount of bad debt UHS was experiencing, thereby overstating UHS's financial results.  (Id. ¶¶ 27, 30.)

    A.   False and Misleading Statements During the Class Period

    According to the Amended Complaint, Defendants' fraudulent scheme began with a July 21, 2003 press release over the PR Newswire, in which UHS announced that its net earnings per share increased by 19% for the three-month and six-month periods ended June 30, 2003, over the comparable periods in 2002.  (Id. ¶ 31.) The press release further stated that UHS's operating margin "increased to 16.7% in the three-month period ended June 30, 2003

as compared to 16.0% in the same period of the prior year." (Id.)
The next day, in response to a question regarding UHS's bad debt
expenses during a conference call with investors, Defendant Filton
stated that "[w]e actually think that our self-pay utilization as
a percentage of overall utilization is pretty much pancake flat
between 2003 and 2002 and have not seen significant changes." (Id.
¶ 32.)   One month later, on August 13, 2003, UHS filed its
quarterly Form 10-Q report for the three month period ended June
30, 2003.  (Id. ¶ 33.)   In this report, UHS represented that
operating income and operating margins were important measures of
UHS's performance.   (Id.)   The report further stated that
"[o]verall operating margins . . . were 16.7% and 16.0% during the
three month periods ended June 30, 2003 and 2002, respectively.
Operating income increased 15% to $300 million for the six month
period ended June 30, 2003 from $261 million in the comparable
prior year period." (Id.)

On October 20, 2003, UHS issued another press release over the
PR Newswire, which stated that "earnings per share . . . for the
three-month period ended September 30, 2003 were $.72, an 11%
increase from the earnings recorded in the third quarter of 2002."
(Id. ¶ 37.)  The next day, during a conference call with investors,
Defendant Filton represented that "[w]e're not seeing as some of
the other companies have mentioned, a real increase in uninsured or
at least uninsured after insurance patients or a difficulty in

collecting from those patients." (Id. ¶ 38.)  On November 10, 2003, UHS filed its quarterly Form 10-Q report, which stated that

> Operating income increased 11% to $138 million for the three month period ended September 30, 2003 from $125 million in the comparable prior year quarter.  Overall operating margins were 15.4% and 15.3% during the three month periods ended September 30, 2003 and 2002, respectively.  The slight increase in the overall operating margin during the three month period ended September 30, 2003, as compared to the comparable prior year period, resulted from a decrease in the provision for doubtful accounts to 6.9% of net revenues during the third quarter of 2003 as compared to 7.7% in the comparable prior year quarter, partially offset by an increase in salaries, wages and benefits to 40.4% of net revenues during the 2003 third quarter as compared to 39.8% in the comparable prior year quarter. Contributing to the increase in salaries, wages and benefits during the third quarter of 2003 as compared to the comparable prior year quarter was an increase of .4% of net revenues in employee benefit expenses.

(Id. ¶ 40.)  Thereafter, during the 22nd Annual J.P. Morgan Healthcare Conference held in mid-January 2004, Defendant Miller stated that UHS's bad debt ratio had not been increasing at the same rate as its peers because UHS had not experienced a material adverse change in self-pay revenues in its markets or in the collection rates.  (Id. ¶ 45.)  Defendant Miller further stated that he expected UHS's bad debt ratios to remain stable in the near term.  (Id.)

The Amended Complaint alleges that these statements proved to have been false because, on February 18, 2004, UHS issued a press

5

release over the PR Newswire which stated that

> [t]he Company's provision for doubtful
> accounts was 7.8% of net revenues during the
> fourth quarter of 2003 as compared to 6.9%
> during the prior year's fourth quarter. The
> increase resulted primarily from an increase
> in uninsured and self-pay patients which
> unfavorably impacts the collectibility of our
> patient accounts. We expect this trend to
> continue until there is a notable
> strengthening of the labor market.

(Id. ¶ 47.)  On March 1, 2004, UHS issued another press release

over the PR Newswire in which it announced that

> earnings per diluted share for the three-month
> period ending March 31, 2004, could be as much
> as 25% lower than the $.84 per diluted share
> recorded in the same period in the prior year.
> On a same facility basis, the Company's acute
> care hospitals have continued, in the first
> two months of 2004, to experience a decline in
> inpatient admissions. Moreover, during this
> period, certain of the Company's acute care
> facilities have been impacted by a negative
> shift in payor mix, a decline in intensity and
> an increase in length of stay. In addition,
> the rising level of uninsured and self-pay
> patients continue to unfavorably impact our
> bad debt expense. The Company is vigorously
> addressing each of these areas.

(Id. ¶ 49.)  In response to this announcement, UHS's stock dropped

21% to $44.88 per share on volume of 6.7 million shares.  (Id. ¶

54).

　　　B.　 "True Facts" and Fraudulent Accounting Practices

　　　The Amended Complaint alleges that, as early as July 23, 2003,

Defendants were aware that UHS's bad debt exposure was increasing

due to higher levels of uninsured patients and Medicare patients

who remained hospitalized at UHS facilities beyond the period reimbursable by Medicaid and Medicare. (Id. ¶ 42(e)-(f).) In addition, the Amended Complaint avers that UHS's operating income was inflated as a result of Defendants failure to (1) make sufficient allowance for the bad debt it was incurring; (2) properly write off uncollectible receivables; (3) properly deduct the appropriate allowance for doubtful accounts from operating income; and (4) comply with generally accepted accounting principles ("GAAP"). (Id. ¶ 42(a)-(d).)

In support of these allegations, the Amended Complaint pleads the following "true facts." First, Defendants were aware that UHS's levels of bad debt were steadily increasing from July 21, 2003 through February 27, 2004. (Id. ¶¶ 18, 60.) Second, Defendants admitted that the increase in UHS's bad debt reserves for the fourth quarter of 2003 was a "catch up" or "true-up" for insufficient bad debt reserves during the fiscal year 2003. (Id. ¶¶ 47-56.) Third, the low levels of bad debt UHS had reported were attributable to fraudulent accounting practices, which concealed the true amounts of bad debt UHS was encountering. (Id. ¶¶ 5, 34, 42, 51, 61, 66.)

The Amended Complaint further charges Defendants with deliberately falsifying UHS's true levels of bad debt and income by violating GAAP and Security and Exchange Commission ("SEC") rules governing the calculation of uncollectible receivables in its

financial statements for purposes of inflating UHS's earnings and boosting UHS's stock.  (Id. ¶ 66.)  Specifically, the Amended Complaint avers that Defendants improperly delayed the write-off of uncollectible accounts, intentionally understated UHS's provision for doubtful accounts, decreased UHS's level of bad debt reserves, and failed to disclose UHS's policy of accounting for doubtful accounts.  (Id. ¶¶ 68, 73, 76.)  These practices allegedly allowed UHS to materially inflate reported earnings and mislead investors during the relevant period.  (Id. ¶ 73, 80.)

Defendants have moved to dismiss both counts of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b), as well as under § 78u-4(b) of the PSLRA.

II.  LEGAL STANDARD

When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  The court must accept as true all well pleaded allegations in the complaint and view them in the light most favorable to the Plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).  A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief.  Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir. 1988).  Documents "integral to or explicitly relied

upon in the complaint" and related matters of public record  may be considered on a motion to dismiss.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

III. DISCUSSION

    A.  Count One: Rule 10b-5

Defendants seek the dismissal of Count One of the Amended Complaint, which asserts a securities fraud claim against UHS and the individual Defendants pursuant to Section 10(b) and Rule 10b-5. Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . of any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5 makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).  To state a Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that plaintiff's reliance was the proximate cause of his or her injury. In re IKON Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002).

1.   <u>Pleading fraud with particularity</u>

Because a claim under Section 10(b) and Rule 10b-5 is a claim for fraud, a plaintiff must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and the PSLRA. <u>Cal. Pub. Employees' Retirement Sys. v. CHUBB Corp.</u>, 394 F.3d 126, 143 (3d Cir. 2004).  Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' - that is, the 'who, what, when, where and how' of the events at issue."  <u>In re Rockefeller Center Properties, Inc. Sec. Litig.</u>, 311 F.3d 198, 217 (3d Cir. 2002) (quoting <u>In re Burlington Coat Factory</u>, 114 F.3d at 1422)).  "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  <u>CHUBB</u>, 394 F.3d at 144 (quoting <u>In re Rockefeller</u>, 311 F.3d at 216)).  The court must analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity.  <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d 696, 712 (3d Cir. 1996).

In addition, under the PSLRA, a Rule 10b-5 complaint must

"specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,[1] the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  "[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations - inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis."  In re Rockefeller, 311 F.3d at 224.  "In other words, pursuant to this 'modified' Rule 12(b)(6) analysis, 'catch-all' or 'blanket' assertions that do not comply with the particularity requirements are disregarded."  CHUBB, 394 F.3d at 145.

    As mentioned above, Plaintiffs' 10b-5 claims are based on allegedly false or misleading statements contained in press releases issued by UHS, conference calls between financial analysts and the individual Defendants, and UHS's quarterly and annual earnings reports that were filed with the SEC.  The subject matter of the alleged misstatements and misleading information falls into two general categories:  (1) statements that UHS was not

---

[1]  Lead Plaintiff agrees that the Amended Complaint's "true facts," which are based on the investigation of counsel, are pled on information and belief.  (03/09/2004 Tr. at 30.)

experiencing an increase in the levels of bad debt during the relevant period; and (2) Defendants' use of improper accounting methods to conceal the rising levels of bad debt and artificially inflate UHS's earnings.

Defendants do not dispute that Lead Plaintiff has identified Defendants' allegedly false and misleading statements with particularity.  Defendants instead maintain that Lead Plaintiff has failed to plead sufficient "true facts" specifying why those statements were false.  Under the heightened pleading standard imposed by Rule 9(b) and the PSLRA, "it is the 'true facts' recited in the [Amended Complaint] that are of paramount importance . . . because they provide the exclusive basis for [Lead Plaintiff's] claims that the various statements made throughout the [relevant period] were materially false and misleading . . . and that Defendants knew of the falsity of the statements and financial results."  CHUBB, 394 F.3d at 145.

A complaint can meet these heightened pleading requirements by providing sufficient documentary evidence and/or a sufficient description of the personal sources which lead the plaintiff to believe that certain statements were false or misleading.  Id. at 147.  Here, Lead Plaintiff has not provided any documentary evidence to support the Amended Complaint's allegations of securities fraud, and instead is proceeding solely on the basis of information received from confidential sources.  (See 03/09/2005

Tr. at 35.)  Lead Plaintiff's reliance on confidential sources to supply the requisite particularity for their fraud claims, therefore, "assumes a heightened importance."  CHUBB, 394 F.3d at 149.

In assessing the particularity of allegations made on information and belief which are based on statements by confidential sources, courts examine "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  Id. at 147. Under this standard, "so long as plaintiffs supply sufficient facts to support their allegations, there is no reason to inflict the obligation of naming confidential sources."  Id.  However, a complaint must contain sufficient information about each source "to support the probability that the source possesses the information alleged."  Id. at 155.  Accordingly, complaints that rely heavily on confidential sources to establish the "true facts" must contain information describing the time period during which the confidential sources were employed by the defendant corporation, the dates on which they acquired the information they purportedly possess, and the manner in which they had access to such information.  Id. at 148.

Lead Plaintiff contends that Defendants were reckless in

13

reducing UHS's bad debt reserves during the relevant period, and that Defendants' statements regarding UHS's consistently low levels of bad debt were false and misleading, because Defendants at the time were aware that UHS's was in fact experiencing an increase in its levels of bad debt.  In support of this contention, the Amended Complaint cites to "a former UHS employee from the business office of LCH [Lancaster County Hospital]" who stated that when the area's county hospital closed in the fall of 2002, LCH "immediately began experiencing an influx of indigent patients seeking treatment through the emergency room."  (Am. Cons. Compl. ¶ 30.)  The Amended Consolidate Complaint further alleges that the Edinburg Regional Medical Center ("ERMC") served as the county hospital before being purchased by UHS, and that "[a] former ERMC director explained that ERMC inherited the large indigent patient population from the date of purchase."  (Id.)

In addition, the Amended Complaint avers that UHS hospitals had begun to experience increased numbers of self-pay patients as early as April 2003, because ERMC at that time "internally recorded that bad debt was a concern."  (Id. at 39.)  The Amended Complaint does not mention the source from which Lead Plaintiff's counsel received this information.  The Amended Complaint does allege, however, that "a former ERMC director confirmed that UHS management had been focusing on the length of stay issued [sic] at the ERMC facility from the beginning of 2003, if not earlier."  (Id. ¶ 52.)

That former director further explained that "the length of stay issue . . . was related to the indigent patient population who had no coverage, and likely no ability to pay, from the point of initial service." (Id.)

Both the EMRC and LCH sources were employed in two local UHS hospitals, and none of them claim to have information regarding a nationwide increase in the treatment of indigent patients or rising levels of bad debt at UHS facilities in general. Moreover, the Amended Complaint does not allege when the confidential sources were employed by UHS, the dates on which they acquired the information they purportedly possess, or how these former employees had access to such information. See CHUBB, 394 F.3d 148. The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess the information that UHS was experiencing an increase in levels of bad debt during the relevant period.

Lead Plaintiff also contends that Defendants acted recklessly when, in face of UHS's alleged rising exposure to bad debt, Defendants failed to increase UHS's bad debt reserves. In support of the contention that Defendants were aware of UHS's rising exposure to bad debt, the Amended Complaint cites to "former UHS personnel employed in the business office of [LCH]," who state that UHS "corporate procedure, unbeknownst to investors, dictated that

no accounts less than 180 days old were to be considered bad debt even if an account was known or anticipated to be uncollectible from the date service was provided." (Am. Cons. Compl. ¶ 28.) Similarly, a "former business office employee at LCH" stated that "UHS's practice was to bill Medicare and Medicaid for all services rendered and recognize all revenue at the time of service even if it was known or anticipated that a large portion of those claims would be denied." (Id. ¶ 29) (emphasis deleted).

The Amended Complaint further cites "[f]ormer employees from numerous hospitals" for the proposition that all LCH revenue "was sent to UHS's corporate office in electronic format approximately three to four times per day" and that "bi-weekly and monthly reports tracking accounts receivable and bad debt were provided to the appropriate executives at UHS's corporate headquarters." (Am. Cons. Compl. ¶ 50.) The Amended Complaint goes on to state that

> former UHS personnel from the office of the controller at Summerlin Hospital Medical Center [] confirmed that each UHS Las Vegas area hospital submitted its financial information, including uncollectible receivable account amounts, to Valley Health Systems, a centralized business office responsible for billing patients, collecting receivables and writing off receivables that were not collected. Valley Health Systems consolidated the financial information from the hospitals and forwarded it to UHS's corporate accounting department at least on a monthly basis.

(Id.) In addition, the Amended Complaint avers that

> [a] former director of the Midwest Center for

16

> Youths and Family Services ("SMCH") stated
> there are 'no surprises or sudden changes'
> when it comes to bad debt levels as it is
> known at the point of service whether a
> patient is uninsured, and because any
> indicators for potential bad debt problems
> would appear in reports submitted to UHS
> corporate offices for monthly management
> meetings.

(Id.)

Notably, though all of these sources were employed in local UHS hospitals, the Amended Complaint fails to allege how they would have had access to information regarding UHS's operations nationwide. Where a complaint relies heavily on former employees who worked in the defendant corporation's local branches for information concerning the defendant corporation's business on a national scale, a "lack of allegations regarding how or why such employees would have access to the information they purport to possess is problematic." CHUBB, 394 F.3d at 148. The Amended Complaint also fails to allege at what time the confidential sources were employed by UHS, or the dates on which they acquired the information they purportedly possess. See id. The Amended Complaint, therefore, pleads insufficient facts to support the probability that a person in the position occupied by the confidential sources would possess information regarding UHS's nationwide operating procedures. Accordingly, the Court finds that the Amended Complaint fails to plead the falsity of Defendants' statements during the relevant period with the particularity

demanded by the PSLRA.

Lead Plaintiff further contends that Defendants committed accounting fraud when, in violation of the GAAP and SEC reporting requirements, Defendants falsely inflated UHS's earnings and assets as well as stockholders' equity earnings by failing to establish and maintain adequate bad debt reserves during the relevant period.[2]  The Amended Complaint alleges that Defendants, in violation of the GAAP, delayed the recognition and write-off of uncollectible accounts, understated its provision for bad debt, and failed to restate UHS's previously misstated financial statements.[3] In support of these contentions, the only "true fact" the Amended Complaint alleges is that "former UHS employees stated that during the [relevant period], the Company mandated that no accounts less

---

[2] Financial results reported in violation of GAAP are presumptively misleading.  <u>See</u> 17 C.F.R. § 210.4-01(a)(1); <u>CHUBB</u>, 394 F.3d at 152 n.16.

[3] Specifically, the Amended Complaint alleges that Defendants violated the following GAAP principles: (1) financial reporting should provide information that is useful to present and potential investors in making rational investment decisions; (2) omissions or misstatements are material if the judgment of a reasonable person relying on it would have been changed or influenced by the inclusion or correction of the item; (3) financial reporting should provide information about management's discharge of its stewardship responsibility to stockholders; (4) financial reporting should provide information about an enterprise's financial performance during a period; (5) financial reporting should be reliable in that it represents what it purports to represent; (6) no information that may be necessary to ensure that the report validly represents underlying events and conditions should be omitted; (7) conservatism should be used as a prudent reaction to uncertainty; and (8) contingencies that might result in gains should not be reflected in accounts.

than 180 day [sic] delinquent be written off."  (Am. Cons. Compl.
¶ 70.)

   As above, the Amended Complaint does not allege sufficient
facts to support the probability that the confidential sources
would possess the information they purport to possess.  Indeed, the
relevant confidential sources are identified only as "former UHS
employees."  In addition, the Amended Complaint does not rely on
any sources, confidential or otherwise, to substantiate its
allegations that UHS understated its provision for bad debt and
would have been required to restate its earlier financial
statements.  The Court further notes that, where a complaint
alleges that defendants distorted certain data disclosed to the
public by using unreasonable accounting practices, the complaint
must state what the unreasonable accounting practices were and how
those practices distorted the disclosed data.  In re Burlington,
114 F.3d at 1417-18.  Statements of reserve amounts are "fraudulent
only if . . . the responsible parties knew or should have known
that [the amounts of reserve] were derived in a manner inconsistent
with reasonable accounting practices."  Christidis v. Pa. Mortgage
Trust, 717 F.2d 96, 100 (3d Cir. 1983).  Accordingly, a complaint
must plead with particularity "the manner in which, in establishing
reserves for bad debts in the financial statements relied upon, the
defendants knowingly departed from reasonable accounting
practices."  Id.  To do so, the complaint must "include details

19

about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the [bad debt] experienced, and how many accounts ultimately were uncollectible." In re Loewen Group, Inc. Sec. Litig., Civ. A. No. 98-640, 2004 WL 1853137, at *11 (E.D. Pa. Aug. 18, 2004).  In the absence of such allegations, "neither the increase of allowance toward the end of the class period nor the eventual financial ruin of [the defendant corporation] are proof that defendants committed any acts worse than mismanagement." Id. at *12.

Here, the Amended Complaint does identify with sufficient particularity which GAAP procedures were allegedly violated. However, the Amended Complaint does not state when and to what level bad debt should have been recognized, when and to what level bad debt reserves should have been changed, or how many accounts ultimately were uncollectible. See id. Similarly, the Amended Complaint does not identify the data, or source of data, that was used to arrive at its conclusions, the amount by which reserves were distorted, or how much revenue was improperly recognized. See CHUBB, 394 F.3d at 153.  Accordingly, the Court finds that the Amended Complaint fails to plead facts which would support the inference that Defendants were engaging in accounting fraud with the particularity demanded by the PSLRA.

2.   <u>Failure to State a Claim: Falsity of Statements</u>

The Amended Complaint's failure to plead the "true facts" with the particularity required by Rule 9(b) and the PSLRA supports dismissal apart from Rule 12(b)(6).   <u>CHUBB</u>, 394 F.3d at 156. Dismissal, however is also warranted pursuant to Rule 12(b)(6) for failure to adequately plead the falsity of Defendants statements. As the Amended Complaint does not comply with the PSLRA's threshold pleading requirements, Lead Plaintiff may not benefit from inferences stemming from the unparticularized allegations mentioned above to establish the falsity of Defendants' statements during the Class Period.   However, even if those allegations were accepted, they would not give rise to an inference that UHS was experiencing an increase in bad debt during the relevant period.   Thus, the information provided by the LCH source does not establish that LCH was experiencing a rising exposure to bad debt beginning in July 2003, but merely that the closing of the county hospital one year earlier, in the fall of 2002, "immediately" caused LCH to see an influx of indigent patients.   Similarly, the information provided by the EMRC source does not establish that EMRC experienced an increase in levels of indigent patients during the relevant period, or that UHS acquired EMRC, and therefore inherited its unusually high existing levels of bad debt, during that time.   Moreover, the mere fact that EMRC "internally" recorded that bad debt was "a concern" at its facility, and that UHS "focused" on the length of

21

patient stays at EMRC in early 2003, does not establish that either EMRC, or UHS as a whole, were in fact experiencing an increase in exposure to bad debt during the relevant period.   Indeed, the Amended Complaint itself broadly asserts that "former employees of various UHS hospitals . . . . report that issues such as length of stay and increase in the numbers of self-pay patients were either non-existent, or had been recognized and discussed well before the [relevant period]."   (Am. Cons. Compl. ¶ 52.)   The confidential sources, therefore, fail to establish that UHS was in fact experiencing an increase in levels of bad debt during the relevant period, much less that Defendants were aware of any such increase.

The only other source the Amended Complaint relies on for the falsity of Defendant's representations are statements made by Defendants' themselves and which, according to Lead Plaintiff, amount to admissions that Defendant's earlier statements were false.[4]   In support of this argument, the Amended Complaint points to the following statements.   First, in a press release issued by UHS over the PR Newswire on February 18, 2004, UHS reported that

---

[4] The Court notes that the Amended Complaint also alleges that general industry trends showed an increase in levels of bad debt throughout the hospital sector during the relevant period. However, Lead Plaintiff has stated that those industry trends are not relied on to establish the falsity of Defendants' statements, but rather were included merely as "a background for . . . the entire situation."  (03/09/05 Tr. at 29.)   The Court agrees that the fact that UHS's competitors were experiencing an increase in bad debt is not relevant to a determination whether Defendants' statements that UHS's levels of bad debt during the relevant period remained comparatively stable were false.

its provision for doubtful accounts for the fourth quarter of 2003 was 7.8% of net revenues, as compared to 6.9% during the prior year's fourth quarter. (Am. Cons. Compl. ¶ 47.) The press release went on to state that UHS "expect[s] this trend to continue until there is a notable strengthening of the labor market." (Id.) Second, in a press release issued by UHS over the PR Newswire on March 1, 2004, UHS reported that its earnings per diluted share for the three-month period ending March 31, 2004, could be as much as 25% lower than the earnings per diluted share recorded in the same period in the prior year. (Id. ¶ 49.) UHS explained this development as follows:

> On a same facility basis, the Company's acute care hospitals have continued, in the first two months of 2004, to experience a decline in inpatient admissions. Moreover, during this period, certain of the Company's acute care facilities have been impacted by a negative shift in payor mix, a decline in intensity and an increase in length of stay. In addition, the rising level of uninsured and self-pay patients continues to unfavorably impact our bad debt expense.

(Id.)

Third, the Amended Complaint cites to the transcript of a conference call between the individual Defendants and analysts held on March 1, 2004. During that conference call, Filton stated that "[b]ad debt expense remains a pressure point in our hospital" and that "for the most part the general admission softness and pressure on bad debt are dynamics that have been present now for several

23

quarters and for the most part, again, we see across all of our facilities."  (<u>Id.</u> ¶ 51.)  In response to one analyst's question concerning whether there was any catch-up charge in UHS's bad debt numbers, Filton further stated that "the fourth quarter probably contained some intra or catch-up in 2004 . . . .  Look, I am sure if we went through the detail we would find some element of catch-up in the first quarter of '04.  I do not think it is material."  (<u>Id.</u> ¶ 53; 03/01/04 Conf. Tr., Defs.' Ex. 20.)

While Lead Plaintiff contends that these statements are admissions which demonstrate the falsity of Defendants' earlier representations, the statements in fact are entirely consistent with Defendants' prior disclosures.  Indeed, the fact that pressure on bad debt had been present for several quarters in March 2004 is mirrored by UHS's steady increase in bad debt reserves during the relevant period from 6.83% of net revenues on June 30, 2003, to 8.42% of net revenues on March 31, 2004.  (<u>See</u> Am. Cons. Compl. ¶ 66.)  Moreover, Filton's statements that the level of bad debt reserves in the fourth quarter of 2004 probably contained an immaterial element of catch-up does not amount to an admission that the statements made by Defendants during the relevant period were false.  Courts have long recognized that "fraud cannot be inferred merely because at one time the firm bathes itself in a favorable light but later the firm discloses that things are less than rosy."  <u>CHUBB</u>, 394 F.3d at 158 (internal quotations omitted).  The Court,

therefore, concludes that even if the information provided by the confidential sources is taken into account, the Amended Complaint fails to establish the falsity of Defendants' statements during the relevant period.  Accordingly, Defendants' Motion to Dismiss Count One of the Amended Complaint is granted.[5]

      C.   <u>Section 20(a) of the Exchange Act</u>

Defendants also move to dismiss Count Two of the Amended Complaint, which alleges that the individual Defendants violated Section 20(a) of the Exchange Act.  Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person liable" under any provision of the Exchange Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. §78t(a).  Plaintiffs alleging a Section 20(a) violation must plead facts showing (1) an underlying violation by the company; and (2) circumstances establishing the defendant's control over the company's actions.[6]

---

[5] Because the Court concludes that the Amended Complaint does not plead the "true facts" with sufficient particularity under the PSLRA and does not establish that Defendants' representations during the relevant period were false, the Court does not reach the question whether the Amended Complaint properly attributes the allegedly misleading statements to the Defendants, or adequately pleads the elements of scienter, materiality, and loss causation.

[6] While Lead Plaintiff will also have to prove at trial that the individual Defendants were each "culpable participants" in the underlying fraud, <u>Rochez Bros., Inc. v. Rhoades</u>, 527 F.2d 880, 889-90 (3d Cir. 1975), "the 'overwhelming trend in this circuit' is that culpable participation does not have to be plead to survive a

La Fata v. Raytheon Co., 207 F.R.D. 35, 45 n.5 (E.D. Pa. 2002).
The heightened pleading requirements of Rule 9(b) do not apply to
Section 20(a) claims.  In re U.S. Interactive, Inc. Sec. Litig.,
Civ. A. No. 01-522, 2002 WL 1971252, at *20 (E.D. Pa. Aug. 23,
2002) (citing In re Tel-Save Sec. Litig., Civ. A. No. 98-3145, 1999
WL 999427, at *6 (E.D. Pa. Oct. 19, 1999)); see also In re Enron
Corp. Sec., Derivative & ERISA Litig., Nos. MDL-1446, Civ. A. No.
H-01-3624, 2003 WL 230688, at *11 (S.D. Tex. Jan. 28, 2003)
(concluding that Rule 8 notice pleading standard applies to Section
20(a) claims because "the legislative history behind the
controlling person provision of both the 1933 and 1934 Acts
indicates that Congress sought to reach persons who tried to evade
responsibility under the common law of agency by standing behind
the scenes and having 'dummies' under their control commit the
primary violations" and "without discovery, it would be extremely
difficult to know facts where the controlling person was hiding
behind the controlled person").  Here, the Amended Complaint fails
to establish an underlying violation by UHS.  La Fata, 207 F.R.D.
at 45 n.5.  Accordingly, Defendants' Motion to Dismiss Count Two of
the Amended Complaint is granted.

    D.   Leave to Amend

    Lead Plaintiff has requested that, should the Court grant any

---

motion to dismiss."  Jones v. Intelli-Check, Inc., 274 F. Supp. 2d
615, 645 (D.N.J. 2003) (quoting Derensis v. Coopers & Lybrand
Chartered Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996)).

part of Defendants' Motion, the Court also grant Lead Plaintiff
leave to amend the Amended Complaint.  By adopting the PSLRA,
Congress has evinced its intent to "provid[e] a filter at the
earliest stage (the pleading stage) to screen out lawsuits that
have no factual basis." GSC Partners CDO Fund v. Washington, 368
F.3d 228, 246 (3d Cir. 2004) (quotations omitted).  However,
"ordinarily, leave to amend is granted when a complaint is
dismissed on Rule 9(b) particularity grounds alone." CHUBB, 394
F.3d at 165.  Here, the Amended Complaint is dismissed not only for
failure to comply the particularity requirements imposed by Rule
9(b) and the PSLRA, but also for failure to state a claim pursuant
to Rule 12(b)(6).  Nonetheless, the Court notes that the Amended
Complaint could have been dismissed on particularity grounds alone,
the Court was not previously called upon to rule on a motion to
dismiss in this action, and Lead Plaintiff's investigation is
ongoing.  Accordingly, the Court will permit Lead Plaintiff to move
for leave to file a Second Amended Consolidated Complaint which, in
compliance with Rule 11(b)[7], corrects the Amended Complaint's Rule
9(b), PSLRA and Rule 12(b)(6) pleading deficiencies.

---

[7] Pursuant to Rule 11(b) an attorney who presents a pleading
to the court certifies that to the best of his or her knowledge,
information, and belief, formed after an inquiry reasonable under
the circumstances, "the allegations and other factual contentions
have evidentiary support or, if specifically so identified, are
likely to have evidentiary support after a reasonable opportunity
for further investigation or discovery." Fed. R. Civ. P. 11(b)(3).

III. CONCLUSION

        For the foregoing reasons, the Court grants Defendants' Motion
to Dismiss the Amended Complaint and permits Lead Plaintiff to move
for leave to file a Second Amended Consolidated Complaint.

        An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
LLOYD FREED, Individually      :
and On Behalf of All Others    :
Similarly Situated             :        CIVIL ACTION
                               :
          v.                   :        NO. 04-1233
                               :        (Consolidated)
UNIVERSAL HEALTH SERVICES,     :
INC., et al.                   :
```

### O R D E R

_____**AND NOW**, this 3rd day of May, 2005, upon consideration of Defendants' Motion to Dismiss the Amended Consolidated Class Action Complaint (Doc. No. 29), all submissions received in response thereto, and the argument held on March 9, 2005, **IT IS HEREBY ORDERED** that said Motion is **GRANTED** and the Amended Consolidated Complaint is **DISMISSED** in its entirety.  **IT IS FURTHER ORDERED** that Lead Plaintiff may move for leave to file a Second Amended Consolidated Complaint within thirty (30) days of the date of this Order.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.

_____